~~16 MAG 2541~~ **ORIGINAL**

Approved: _____
         RUSSELL CAPONE / KAN M. NAWADAY / MARTIN S. BELL
         Assistant United States Attorneys

Before:  HONORABLE HENRY B. PITMAN
         United States Magistrate Judge
         Southern District of New York

*U.S. DISTRICT COURT*
*FILED*
**APR 1 8 2016**
*S.D. OF N.Y.*

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :          **COMPLAINT**

            - v. -                :          Violations of
                                             18 U.S.C. §§ 666, 371 &
                                  :          2

ALEX LICHTENSTEIN,                :          County of Offense:
  a/k/a "Shaya,"                             New York
                                  :
       Defendant.
- - - - - - - - - - - - - - - -x          **DOC #_____**

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JOSEPH DOWNS, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI") and charges as follows:

                        **COUNT ONE**
                        **(Bribery)**

        1.    In or about April 2016, in the Southern District
of New York and elsewhere, ALEX LICHTENSTEIN, a/k/a "Shaya," the
defendant, willfully and knowingly did corruptly give, offer,
and agree to give a thing of value to a person, with intent to
influence an agent of an organization of a State government, and
an agency thereof, in connection with business, transactions,
and series of transactions of such organization, government, and
agency involving a thing of value of $5,000 and more, to wit,
LICHTENSTEIN offered bribes to members of the New York City
Police Department ("NYPD") in order to obtain gun licenses from
the NYPD's License Division for individuals who had paid
LICHTENSTEIN thousands of dollars for his assistance in
obtaining such gun licenses.

        (Title 18, United States Code, Sections 666 and 2.)

## COUNT TWO
### (Conspiracy)

2.     From in or about 2013, up to and including in or about February 2016, ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 666.

3.     It was a part and an object of the conspiracy that ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, and others known and unknown, willfully and knowingly would and did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more.

4.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, was committed in the Southern District of New York:

a.     From at least in or about June 2015 to in or about December 2015, ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, traveled to One Police Plaza in Manhattan, New York, approximately two times per week to meet with an officer of the NYPD's License Division.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5.     I have been a Special Agent with the FBI for approximately 11 years.  I am currently assigned to a public corruption squad in the FBI's New York Field Office.  As a Special Agent, I have participated in investigations involving the bribing of public officials and law enforcement officers.

6.     Since at least in or about 2013, I have been involved in an investigation being conducted jointly by the FBI and the Internal Affairs Bureau ("IAB") of the NYPD into, among other things, allegations of misconduct by law enforcement

personnel.   IAB is the unit within the NYPD that investigates
police misconduct.

7.   The information contained in this affidavit is
based upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources and agents.   Because this affidavit is prepared for
limited purposes, I have not set forth each and every fact I have
learned in connection with this investigation.   Where
conversations and events are referred to herein, they are related
in substance and in part.

### The NYPD License Division and Relevant Individuals

8.   Based on my discussions with relevant personnel of
the NYPD, including NYPD officers in the NYPD License Division, my
review of publicly available information, and my training and
experience, I have learned the following:

a.   The NYPD License Division, located at One
Police Plaza in Manhattan, is the entity within the NYPD
responsible for approving or disapproving all applications
("Applications") for handgun licenses in New York City.

b.   Among the types of handgun licenses issued by
the NYPD License Division are (i) a premises license, which
permits its holder to have a handgun in the holder's home (a
"Premises License"); (ii) a license for retired law enforcement
personnel (a "Retiree License"); (iii) a limited carry license,
which permits its holder to have a handgun in the home or business
and to carry the handgun for specified, limited purposes and at
limited times (a "Limited Carry License"); and (iv) a full carry
license, which permits its holder to carry a handgun anywhere in
New York State at all times, but only for justified business
purposes (a "Full Carry License").

c.   The NYPD License Division receives
approximately 5,000 Applications for gun licenses a year.   Limited
and Full Carry Licenses are a small fraction of the licenses
issued by the NYPD License Division annually.

d.   After an Application is received, the NYPD
License Division conducts an investigation of the applicant before
electing to approve or disapprove the Application.   The
investigation includes (i) a review of the applicant's criminal
history, including summonses, arrests, and convictions; (ii) a

review of the applicant's mental health history; (iii) a verification of the details of the application; (iv) an in-person interview of the applicant; and (v) an investigation into the business need for Limited and Full Carry Licenses.

       e.    Certain findings, such as a prior felony conviction, result in the automatic disapproval of an applicant.

       f.    Pursuant to New York State Law, the NYPD License Division has discretion to reject gun license Applications for additional reasons, such as moral character, mental health issues, or substance abuse issues. On its website, the NYPD License Division indicates that it may reject Applications if the investigation reveals a history of arrest, driving infractions, or domestic violence incidents, among other reasons.

       g.    Typically, the processing, investigation, and approval or disapproval of an Application takes several months. For Limited and Full Carry Licenses, it can take even longer, and in the case of Full Carry Licenses, in excess of one year.

       9.    Based on my discussions with NYPD personnel and my review of NYPD records, I learned the following:

       a.  Sergeant-1 is an NYPD Sergeant who has been assigned to the NYPD License Division for more than a decade. Sergeant-1 has the authority and capacity to approve Applications for gun licenses. In addition, Sergeant-1 is responsible for investigating existing gun license holders who are arrested, given summonses, or otherwise interact with law enforcement to determine whether their licenses should be revoked, and for suspending licenses pending further investigation.

       b.  Officer-1 is an NYPD Officer who is assigned to the License Division and is responsible for, among other things, investigating Applications.

       c.  Deputy Inspector-1 is the Commanding Officer of the License Division.

## The Defendant's Bribes in Order to Obtain Gun Licenses from the NYPD License Division

10.   Based on my review of publicly available information, I know that ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, is a member of the Shomrim, based in Borough Park, Brooklyn.  The Shomrim is a volunteer, ostensibly unarmed Orthodox Jewish patrol society whose mission includes combatting criminal activity and locating missing people.

11.   This investigation is based in part on information provided by an officer of the NYPD ("Officer-2") who knows ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant.  Based on my discussions with Officer-2, I learned the following:

a.   Officer-2 is familiar with LICHTENSTEIN as a member of the community and the Shomrim.  LICHTENSTEIN is acquainted with numerous members of the 66th precinct, which covers Borough Park, Brooklyn.

b.   In early April 2016, LICHTENSTEIN approached Officer-2 in an attempt to bribe Officer-2 into assisting LICHTENSTEIN in obtaining gun licenses for various individuals from the NYPD License Division.  LICHTENSTEIN told Officer-2, in sum and substance, that he (LICHTENSTEIN) previously had connections inside the License Division who recently had shut him out.  LICHTENSTEIN stated that he charged members of the community several thousand dollars per license to assist them in obtaining licenses through his connections in the License Division.

c.   Although Officer-2 does not work in or with the License Division, as a result of LICHTENSTEIN no longer being able to contact his direct connections, LICHTENSTEIN indicated that he was soliciting Officer-2, as an NYPD officer with whom LICHTENSTEIN was familiar, for assistance.

d.   Officer-2 did not agree to help LICHTENSTEIN. After LICHTENSTEIN's approach and bribe offer to Officer-2, he reported LICHTENSTEIN to IAB, which as noted above, is the unit of the NYPD that investigates police misconduct.

12.   On or about April 13, 2016, Officer-2, acting at the direction of the FBI and IAB, met with ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, in Borough Park, Brooklyn.  Officer-2 was equipped with video- and audio-recording devices for the duration of the meeting.  Based on my review of a recording of the meeting and my discussions with Officer-2, I learned the following:

a.  At the beginning of the meeting, LICHTENSTEIN patted down Officer-2 in an attempt to detect whether Officer-2 was wearing a wire.  Officer-2 said that "you don't have to pat me down."  LICHTENSTEIN stated that he would rather meet Officer-2 "in your underpants and your undershirt," which Officer-2 understood to mean that LICHTENSTEIN wanted to be sure that Officer-2 was not recording the meeting.

b.  Officer-2 told LICHTENSTEIN, in sum and in substance, that he was nervous about helping LICHTENSTEIN obtain gun licenses but could use the money.  Officer-2 told LICHTENSTEIN that he (Officer-2) could not secure gun licenses on his own since he was not in the NYPD License Division, but that he knew a union delegate who was in the License Division and would be willing to help him.

c.  Officer-2 asked LICHTENSTEIN how much money Officer-2 could make if Officer-2 obtained gun licenses for LICHTENSTEIN's customers, and LICHTENSTEIN responded: "I'll give you and [the union delegate] more than you'll make in the police department."  LICHTENSTEIN offered Officer-2 $6,000 per gun license that Officer-2 helped him obtain.

d.  LICHTENSTEIN further told Officer-2: "I got so many license[s] in last year," and estimated that he had obtained 150 gun licenses through his connections in the NYPD License Division.  LICHTENSTEIN then took out his calculator and multiplied 150 by $6,000, to demonstrate to Officer-2 how much money ($900,000) Officer-2 could make.

e.  LICHTENSTEIN also said, in sum and substance, that the reason his customers needed assistance obtaining licenses was because the License Division denies Applications "for the biggest stupidity," such as "somebody got a moving violation."

f.  LICHTENSTEIN maintained that his customers were deserving of gun licenses, and that all he was asking

Officer-2 and his connection to do was to "expedite" the process, which I believe to be a reference to foregoing the full investigation typically conducted before the NYPD License Division approves or disapproves an Application.

> g.  LICHTENSTEIN said that "for the past year or two or three, I was delivered" licenses by his connections in the NYPD License Division.  Officer-2 asked LICHTENSTEIN about the process for obtaining a license from the NYPD License Division. LICHTENSTEIN said that after the Application is submitted, "the person goes in and there's an interview," after which the investigating officer must decide whether to approve or disapprove the Application.  LICHTENSTEIN said that for people referred by LICHTENSTEIN, the investigating officer is made to "understand that the answer is yes."

> h.  LICHTENSTEIN said that his connections in the NYPD License Division "sign[] off because it's Lichtenstein."

> i.  Officer-2 asked LICHTENSTEIN if his connections in the NYPD License Division were "making money," to which LICHTENSTEIN responded: "now they cut down, nobody's making anything."  During a later part of the discussion, LICHTENSTEIN claimed that he did not give cash to his connections in the NYPD License Division, but helped them with things, such as hospital bills for their family.

> j.  LICHTENSTEIN also explained to Officer-2 why he needed a new inroad with the NYPD License Division. Specifically, he told Officer-2 that, recently, Deputy Inspector-1 (who, as noted above, is the Commanding Officer of the NYPD License Division) "got pissed off" because "people got information that "[Lichtenstein's] being paid so much money," and Deputy Inspector-1 got scared that people would think Deputy Inspector-1 "had his hand in the cookie pot."  LICHTENSTEIN said that Deputy Inspector-1 then prevented LICHTENSTEIN's connections in the NYPD License Division from doing favors for LICHTENSTEIN.  As a result, LICHTENSTEIN was coming to Officer-2 to re-establish a connection within the NYPD License Division that would enable LICHTENSTEIN to continue to get licenses for his customers within the community.

> k.  After LICHTENSTEIN explained to Officer-2 that LICHTENSTEIN would pay Officer-2 $6,000 for every license Officer-2 delivered to LICHTENSTEIN, LICHTENSTEIN stated: "I want to repeat myself, I'm not bribing you," to which Officer-2 responded "Shaya I'm not an a--hole, of course you're bribing me.  Let's be

frank and honest here." LICHTENSTEIN did not further respond to this point.

## LICHTENSTEIN's Affiliation with Sergeant-1 and Officer-2

13.  Based upon my debriefings of various personnel within the NYPD License Division and my discussions with other law enforcement officers from FBI and IAB who have conducted such debriefings, I have learned the following:

a.  Sergeant-1, who, as noted above, has worked at the NYPD License Division for more than a decade, was very friendly with a Commanding Officer for the NYPD (the "Commanding Officer") who did not work in the License Division.  Even though he did not work in the License Division, the Commanding Officer spent considerable time at the NYPD License Division with Sergeant-1.

b.  In 2014, the Commanding Officer brought ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, to the NYPD License Division, and LICHTENSTEIN began to get to know Sergeant-1.

c.  Beginning at some point in 2014, through early 2016, LICHTENSTEIN began spending time at the NYPD License Division with Sergeant-1 on a near daily basis.  Sergeant-1 frequently bragged about his relationship with the Commanding Officer and the Hasidic Jewish community.  Sergeant-1 frequently socialized with the Commanding Officer and LICHTENSTEIN.

d.  From at least in or about June 2015 to in or about December 2015, an officer who works in the NYPD Licensing Division estimated that the officer saw LICHTENSTEIN in the NYPD Licensing Division approximately two times per week and LICHTENSTEIN would typically sit near Sergeant-1's work area.

e.  In early 2016, Sergeant-1 told others at the NYPD License Division, in sum and in substance, that Deputy Inspector-1 had sat Sergeant-1 and LICHTENSTEIN down and banished LICHTENSTEIN because of the money that LICHTENSTEIN was making selling gun licenses.  Sergeant-1 said that LICHTENSTEIN charged his customers $18,000 per gun license.

14.  On April 17, 2016, another FBI Agent interviewed an NYPD officer ("Officer-1") who has investigated and processed a number of Applications for Sergeant-1.  Based on my discussions with that agent, I learned that Officer-1 acknowledged that he and

Sergeant-1 had a relationship with ALEX LICHTENSTEIN, a/k/a
"Shaya," the defendant, and that Officer-1 had processed license
applications for LICHTENSTEIN.  When asked if LICHTENSTEIN paid
cash bribes to Sergeant-1 or Officer-1, Officer-1 was silent for
several seconds and then said that LICHTENSTEIN would give
Sergeant-1 "lunch money" for Sergeant-1 and Officer-1.  Asked how
much "lunch money" he would receive, Officer-1 responded "a
hundred dollars."

## Arrest of LICHTENSTEIN and Additional Investigation

15.  On or about April 17, 2016, ALEX LICHTENSTEIN,
a/k/a "Shaya," was arrested at his residence in Pomona, New York.
LICHTENSTEIN's home office was full of photographs of LICHTENSTEIN
with various NYPD personnel, including the Commanding Officer.  In
LICHTENSTEIN's wallet was an NYPD Detective Shield with the word
"Liaison" imprinted on it, even though LICHTENSTEIN had no
official role as an NYPD Liaison.

16.  Also on or about April 17, 2016, agents from the
IAB seized applicant files from the NYPD License Division
associated with Sergeant-1 and/or ALEX LICHTENSTEIN, a/k/a
"Shaya," the defendant.  A review of those files has begun.  I
have spoken to an IAB officer who reviewed one such file for a
license holder ("License Holder-1").  As a result of that
discussion and my review of an NYPD database, I learned the
following:

a.  License Holder-1 was approved for and obtained
a Full Carry License in July 2013.  A credit card receipt in the
file indicates that LICHTENSTEIN paid the application fee for
License Holder-1.

b.  Prior to the time that he was approved for a
gun license, License Holder-1 had been involved in four car
accidents; been arrested for forgery; received three vehicle-
related summonses; received approximately ten moving violations;
and had been the subject of at least four domestic violence
complaints, including one in which he was accused of threatening
to kill someone.

c.  In October 2013, a complainant reported to the
NYPD that LICHTENSTEIN was able to use his connections to get a
gun license for License Holder-1 despite License Holder-1's
history of domestic violence.  The NYPD License Division was
responsible for investigating this report.  License Holder-1's

file includes two unsigned letters that appear to be drafts, one in which License Holder-1's license was revoked, and one, from approximately one week later, in which it was reinstated.  The second draft letter stated that License Holder-1 should contact Sergeant-1 with any questions.  License Holder-1's file reflects no further investigation conducted as a result of the complaint, and License Holder-1's Full Carry License remains active.

### NYPD's Receipt of Federal Funding

17.  Based on my training, experience, and review of publicly available information, I know that the NYPD receives in excess of $10,000 annually in federal funding.

WHEREFORE, the deponent prays that an arrest warrant be issued for ALEX LICHTENSTEIN, a/k/a "Shaya," the defendant, and that he be imprisoned or bailed as the case may be.

JOSEPH DOWNS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
18th day of April, 2016

THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK