UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

   UNITED STATES OF AMERICA         :

          - v. -              :    S2 16 Cr. 342 (SHS)

   ALEX LICHTENSTEIN,         :
    a/k/a "Shaya,"

                              :

                              :

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

 

**<u>GOVERNMENT'S MEMORANDUM OF LAW</u>**
**<u>IN OPPOSITION TO DEFENDANT ALEX LICHTENSTEIN'S</u>**
**<u>MOTION TO SUPPRESS AND FOR DISMISSAL</u>**

 

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

RUSSELL CAPONE
LAUREN SCHORR
KAN NAWADAY
Assistant United States Attorneys
    - Of Counsel -

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES……………………………………………………………..ii

PRELIMINARY STATEMENT…………………………………………………....……..1

PROCEDURAL BACKGROUND………………………………………………………..1

RELEVANT FACTS……………………………………………………………………...2

I.      The Agents' Entry into Lichtenstein's Home…………………………………….3

II.     The Interview of Lichtenstein……………………………………………………..6

ARGUMENT……………………………………………………………………………...9

I.      Standard for Necessity of Hearing………………………………………………...9

II.     The Agents Legally Entered Lichtenstein's Home with His Consent…………….10

        A. Applicable Law……………………………………………………………10

        B. Discussion………………………………………………………………….13

        The Surveillance Stills and Video Alone Confirm that Lichtenstein Consented to the
        Agents' Entry Into His Home Before Any Agents Had Entered the Curtilage………….13

        Even If the Agents Improperly Entered the Curtilage, Lichtenstein's Consent Was Not
        Tainted…………………………………………………………………………....18

        Lichtenstein's Consent Was Plainly Voluntary………………………………………19

III.    *Miranda* Warnings Were Not Required Because the Defendant Was Not in Custody
        When He Was Interviewed by the Agents…………………………………………22

        A. Applicable Law……………………………………………………………..22

        B. Discussion……………………………………………………………....……24

IV.     The Agents Properly Seized Lichtenstein's Guns, Police Shield, and Cellphone……….30

V.      The Indictment Should Not Be Dismissed…………………………………………32

CONCLUSION……………………………………………………………………………..33

## **TABLE OF AUTHORITIES**

**Case**                                                                                    **Page(s)**

*Bank of Nova Scotia* v. *United States*,
    487 U.S. 250 (1988)…………………………………………………..……..33

*Florida* v. *Jardines*,
    133 S.Ct. 1409 (2013)…………………………………………..……..17

*Florida* v. *Jimeno*,


*Illinois* v. *Rodriguez*,
    497 U.S. 177 (1990)………………………………………..........…..10, 14

*Kentucky* v. *King*,
    563 U.S. 462 (2011)………………………………………………....18, 31, 32

*Krause* v. *Penny*,
    837 F.2d 595 (2d Cir. 1988)…………………………………….... …..10, 11, 15

*Maisano* v. *Welcher*,
    940 F.2d 499 (9th Cir. 1991)………………………………...…………...…12, 15

*Miranda* v. *Arizona*,
    384 U.S. 436 (1966)……………….……………………………………….....1

*New York v. Quarles*,
    467 U.S. 649 (1984)……………………………………………………...30

*Oliver* v. *United States*,
    466 U.S. 170 (1984)…………………………………………………10, 11

*Payton* v. *New York*,
    445 U.S. 573 (1980)……………………….…………………………1, 10

*Riley* v. *California*,
    134 S.Ct. 2473 (2014)…………………………………………………32

*Rogers* v. *Vicuna*,
    264 F.3d 1 (1st Cir. 2001)……………………………………………...11, 15

*Schneckloth* v. *Bustamonte*,
    412 U.S. 218 (1973)…………………………………………………...............10, 20

*Stansbury* v. *California*,
   511 U.S. 318 (1994)………………………………………………………..………..23

*United States* v. *Ansaldi*,
   372 F.3d 118 (2d Cir. 2004)………………………………………………………20, 21

*United States v. Calix*,
   No. 13 Cr. 582 (RPP), 2014 WL 2084098 (S.D.N.Y. May 13, 2014)………………30, 31

*United States* v. *Casamento*,
   887 F.2d 1141 (2d Cir. 1989)…………………………………………………...32, 33

*United States* v. *Dunn*
   480 U.S. 294 (2d Cir. 1987)……………………………………………….…....11, 16

*United States* v. *Echevarria*,
   692 F.Supp.2d 322 (S.D.N.Y. 2010)…………………………………………………32

*United States v. Estrada*,
   430 F.3d 606 (2d Cir. 2005)……………………………………………………30, 31

*United States* v. *Evans*,
   27 F.3d 1219 (7th Cir. 1994)……………………………………………………...12, 15

*United States* v. *Faux*,
   828 F.3d 130 (2d Cir. 2016)..………………………………………………….passim

*United States v. Feliciano*,
   95 Cr. 468 (AGS), 1995 WL 710199 (S.D.N.Y. Dec. 4, 1995)…………………………21

*United States v. Ferguson*,
   702 F.3d 89 (2d Cir. 2012)……………………………………………………………31

*United States* v. *Fields*,
   592 F.2d 638 (2d Cir. 1978)……………………………………………..……32

*United States* v. *FNU LNU*,
   653 F.3d 144 (2d Cir. 2011)……………………………………....………...23

*United States* v. *Gamble*,
   388 F.3d 74 (2d Cir. 2004)……………………………………………..…………32

*United States* v. *Gandia*,
   424 F.3d 255 (2d Cir. 2005)…………………………………………..……….....12, 18

*United States* v. *Garcia*,
  53 F.3d 418 (2d Cir. 1985)……………………………………………………...20, 21

*United States* v. *Groezinger*,
  625 F.Supp.2d 145 (S.D.N.Y. 2009)……………………………………….........26

*United States* v. *Guerrero*,
  813 F.3d 462 (2d Cir. 2016)…………………………………………………...12

*United States* v. *Hayes*,
  551 F.3d 138 (2d Cir. 2008)…………………………...…………..…………11, 16

*United States* v. *Karagozian*,
  715 F.Supp. 1160 (D.Conn. 1989)…………………………………….........17

*United States* v. *Kon Yu-Leung*,
  910 F.2d 33 (2d Cir. 1990)…………………………………………………...20, 21

*United States* v. *Magana*,
  512 F.2d 1169 (9th Cir. 1975)……………………………………………12, 18

*United States* v. *Marquez*,
  367 F.Supp.2d 600 (S.D.N.Y. 2005)…………………………………...…9

*United States* v. *Mitchell*,
  966 F.2d 92 (2d Cir. 1992)………………………………………………… …..24, 25

*United States* v. *Newton*,
  369 F.3d 659 (2d Cir. 2004)…………………………………………….23, 25, 27, 28

*United States* v. *Nicholson*,
  15 Cr. 6143, 2016 WL 3360459 (W.D.N.Y. June 15, 2016)………………………...13, 19

*United States* v. *Oguns*,
  921 F.2d 442 (2d Cir. 1990)………………………………………….......13, 19

*United States* v. *Ortiz*,
  943 F.Supp.2d 447 (S.D.N.Y. 2013)……………………………...…………………...25

*United States* v. *Pena*,
  961 F.2d 333 (2d Cir. 1992)…………………………………………………...9

*United States* v. *Pena Ontiveros*,
  547 F.Supp.2d 323 (S.D.N.Y. 2008)……………………………………………11, 15, 16

*United States* v. *Peterson*,
  100 F.3d 7 (2d Cir. 1996)……………………………………………………23, 24, 28

*United States* v. *Reilly*,
  76 F.3d 1271 (2d Cir. 1996)……………………………………………………...10

*United States* v. *Reyes*,
  283 F.3d 446 (2d Cir. 2002).....……………………………………………11, 15, 16

*United States* v. *Roberts*,
  No.01 Cr. 410, 2001 WL 1602123 (S.D.N.Y. Dec. 14, 2001)……………….…....………9

*United States* v. *Roccio*,
  981 F.2d 587 (1st Cir. 1992)…………………………………………………....12, 15

*United States* v. *Ruggles*,
  71 F.3d 262 (2d Cir. 1995)……………………………………………………29

*United States* v. *Sanchez*,
  32 F.3d 1330 (8th Cir. 1994)……………………………………………………20

*United States* v. *Scopo*,
  19 F.3d 777 (2d Cir. 1994)……………………………………………………32

*United States* v. *Singer*,
  687 F.2d 1135 (1982), *rev'd on other grounds*, 710 F.2d 431 (8th Cir. 1983)
  (en banc)………………………………………………………………....12, 15

*United States* v. *Smith*,
  783 F.2d 648 (6th Cir. 1986)……………………………………………...12, 15

*United States* v. *Snype*,
  441 F.3d 119 (2d Cir. 2006)………………………………………..…………10

*United States* v. *Springer*,
  946 F.3d 1012 (2d Cir. 1991)…………………………………..…24, 28

*United States* v. *Titemore*,
  437 F.3d 251 (2d Cir. 2006)……………………………………………11, 15, 16

*United States* v. *Urena-Pere*,
No.91 Cr. 964, 1992 WL 17977 (S.D.N.Y. Jan. 24, 1992)………………………...……….9

*United States* v. *Vazquez*,
638 F.2d 507 (2d Cir. 1980)……………………………………………………...………22

*United States* v.*Ventling*,
678 F.2d 63 (8th Cir. 1982)……………………………………………...…......12, 15

*United States* v. *Viscioso*,
711 F.Supp.740 (S.D.N.Y. 1989)………………………………………………..……9


**Statute**                                                              **Page(s)**
18 U.S.C. §371………………………………………………………………………1

18 U.S.C. §666……………………………………………………………………....1

## PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in response to the motion of defendant Alex Lichtenstein to suppress statements made to law enforcement on April 17, 2016; to suppress evidence seized at Lichtenstein's house that day and pursuant to a search warrant the following day; and to dismiss the indictment against him.  Lichtenstein claims, among other things, that the officers entered his property without consent, in violation of *Payton* v. *New York*, 445 U.S. 573 (1980), and then interrogated him without reading him his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and that all of the evidence and statements obtained therefrom need be suppressed.

Lichtenstein's claims are without merit, and, in many cases, are flatly contradicted by surveillance footage from April 17, 2016 that Lichtenstein himself submits.  That footage makes clear that Lichtenstein invited the agents inside and agreed to be interviewed, and was not in custody for the interview.  While Lichtenstein has submitted a brief affidavit in connection with his motion, his affidavit does not (i) call into question the voluntariness of his invitation for the agents to come inside; or (ii) provide any further detail with respect to the interview that is not apart from the video recording of that interview he himself has provided.  For these reasons, as articulated in more detail below, Lichtenstein's motion should be denied without a hearing.

## PROCEDURAL BACKGROUND

Lichtenstein was arrested on a probable cause basis on April 17, 2016.  He was presented before a United States Magistrate Judge the following day, pursuant to a complaint sworn out that day.  On May 16, 2016, Lichtenstein was indicted by a grand jury in this district.  On June 20, 2016, a superseding indictment was filed charging both Lichtenstein and co-defendant David Villanueva.  Lichtenstein is charged in three counts; one count charges him with conspiring to

commit bribery, pursuant to Title 18, United States Code, Section 371; and the remaining two

counts charge him with substantive acts of bribery or offering a bribe, all pursuant to Title 18,

United States Code, Section 666.

## RELEVANT FACTS

In or around late March 2016, agents from the FBI began investigating bribery of officers

at the New York City Police Department's ("NYPD") Gun Licensing Division by the defendant,

Alex Lichtenstein, a/k/a "Shaya."  By April 2016, the investigation revealed that Lichtenstein

was an "expediter" who charged clients thousands of dollars to shepherd their gun license

applications through the NYPD, and in turn bribed personnel within the Licensing Division –

most prominently Sergeant David Villanueva, Lichtenstein's co-defendant – to approve and

expedite his clients' applications.

On the morning of April 17, 2016, five FBI agents and one Sergeant from the NYPD's

Internal Affairs Bureau ("IAB") went to Lichtenstein's home.  The purpose of the visit was

twofold: first, some of the agents planned to ask Lichtenstein if he were willing to provide

information about his scheme with Villanueva, and, if so, to solicit his proactive cooperation

against Villanueva.  Second, if Lichtenstein denied bribing Villanueva or was otherwise

unwilling to proactively cooperate, agents were prepared to arrest him based on the evidence

amassed to that point.  An arrest warrant had not been obtained because the agents did not intend

to arrest Lichtenstein if he was in a position to help expand the investigation.

In fact, and as detailed herein, Lichtenstein invited the agents in, agreed to be

interviewed, and was untruthful, leading to the decision to arrest him.  In arguing that he did not

consent to the agents' entry and that they impermissibly interviewed him without reading his

2

*Miranda* rights, Lichtenstein submits as exhibits surveillance photographs and video from his home, all from April 17, 2016.[1]

The surveillance video and photographs show precisely what transpired at Lichtenstein's home, undercutting the need for a hearing. Below the Government sets forth what it believes the surveillance shows, and further notes what it expects additional agent testimony would establish in the event the Court believes that a hearing is necessary.

## I.   The Agents' Entry into Lichtenstein's Home

Nearly all of what happened when the agents arrived is captured on surveillance. Approximately three cars showed up in front of Lichtenstein's house. (Lichtenstein Ex. 11.) At first, three agents approached the front door to ring or knock (Lichtenstein Exs. 13, 15), while the other agents approached the side of the house (Lichtenstein Exs. 15, 25.) The right side of the house is Lichtenstein's driveway, ending in a garage and a gate to the backyard. (Lichtenstein Exs. 5, 6, 7, 9.) The agent who went to the right side stopped at that gate (Lichtenstein Ex. 25,

---

[1] With respect to the video footage, it appears that Lichtenstein has provided the video to the Court, but not denominated it an exhibit. The Government hereby denominates the entire video footage as "Exhibit A" to this motion. The video footage comes from several different internal cameras, the most pertinent of which depict (i) Lichtenstein's office, with audio (Camera 1); and (ii) the sliding door at the back of Lichtenstein's house leading to his backyard (Camera 7).

The surveillance photographs each depict four locations on the exterior of Lichtenstein's house – including Lichtenstein's front porch, and Lichtenstein's side gate where he first encountered the agents – at various moments in time.

As Lichtenstein's counsel has confirmed to the Government, the timestamps in the surveillance video *are not consistent* with the timestamps in the surveillance photographs. For example, the surveillance photographs show Lichtenstein outside at a particular time at which, on the video, Lichtenstein is still inside.

which is at the end of the driveway and can be seen from the street. (Lichtenstein Ex. 9; see also Government Exhibit B through E attached hereto.)

Lichtenstein himself *saw* the agents pull up to and approach his house, from a video monitor in his office that captured the outside of his property in real time.  (Ex. A, Camera 1, 6:57:09-6:57:34.)  As he later told his wife in a portion of the office video caught on tape, he "saw them on the camera coming, and I ran out.  I told them to come in, I didn't want them to wake you."  (Ex. A, Camera 1, 8:09:00-8:09:08.)

After leaving his office, Lichtenstein exited to another room, off of which was a sliding door to the backyard.  From that vantage point, to the right was the gate separating his driveway from his backyard.  After going outside, Lichtenstein returned inside less than 30 seconds later, and went back outside yet a few seconds after that.  (Ex. A, Camera 7, 6:57:34-6:58:07.). At that point, the video shows the first contact between Lichtenstein and the agent who had walked up the right side of the house to the gate.  As soon as he stepped outside, Lichtenstein waved to the agent as if to beckon him inside, and then put his hands in the air for two seconds. (Ex. A, Camera 7, 6:58:08.)   If called to testify, the Government expects that that agent would testify consistent with what the video makes clear: that Lichtenstein invited the agent inside, but that the agent first asked Lichtenstein to show his hands, while he waited for the other agents who had first approached the front door to come around the side.[2]

For a brief period of time – approximately 10 seconds – Lichtenstein remained outside, and no agent can be seen on the inside of his gate.  (Ex. A, Camera 7, 6:58:14-6:58:25.)  During this interval, the agents who had initially approached the front door and had not received a

---

[2]  The testimony would also show that the agent went alongside the house as other agents attempted to knock on the front door as a security measure, particularly where, as in this case, the agents knew that the suspect they were approaching owned a gun.

4

response were heading toward the right side of the house where their colleague had encountered Lichtenstein.  (Lichtenstein Exs. 20-23.)  Lichtenstein can then be seen making a second waving motion to invite the agent inside, and following it up by raising his right hand in the air for less than a second.  (Ex. A, Camera 7, 6:58:25-6:58:28.)  Seconds later, the three officers who had come from around the front entered the home with Lichtenstein through the back sliding door. (Ex. A, Camera 7, 6:58:28-6:58:49; Lichtenstein Ex. 28.)  Again, if a hearing is necessary, the Government expects the evidence will show what is evident from the video: that the agents who had not received a response at the front door joined the agent on the side, where they encountered Lichtenstein on the other side of the gate and he invited them in.

In his brief, Lichtenstein states on multiple occasions that the officers drew their guns. (*See* Def. Br. at 3 ("numerous police officers, all armed and some with guns drawn, descended upon Mr. Lichtenstein's single family home"); *id.* ("at least one [officer] drew his gun").)  But Lichtenstein does not attest to this in his affidavit, and none of the surveillance he has attached show any guns drawn.  The surveillance photographs show, at most, one agent putting his hand toward his back pocket while on Lichtenstein's front stoop, not in Lichtenstein's presence. (Lichtenstein Ex. 18.)

In addition, Lichtenstein's brief states that officers "opened the gate of the metal fence that surrounded his backyard, and entered his fence enclosed backyard," without his consent. Def Br. at 3.  Again, the surveillance disproves this.  The first moment an officer can be seen even putting his hand on Lichtenstein's gate is captured in a still photograph (Lichtenstein Ex. 26.)  As explained in more detail below *infra* p. 15, Lichtenstein's own surveillance video makes clear that by this time, Lichtenstein had already twice waved the officers in.

## II. The Interview of Lichtenstein

Once Lichtenstein and three of the agents entered his home, Lichtenstein brought them into his office. The three agents in Lichtenstein's home were: NYPD IAB Special Agent Marc Klausner, FBI Special Agent Jason Alberts, and FBI Special Agent Michael Buscemi. The interactions between Lichtenstein and the agents within his home were recorded (largely, with audio), and those recordings are captured on Camera 1 the attached Exhibit A.

As reflected in the recording, Lichtenstein and the three agents entered the office at approximately 6:59am. Lichtenstein asked, in substance, if he was "going in today," and Sergeant Klausner stated, in substance, "let's talk, we'll see." (Ex. A, Camera 1, 6:59:04.) Thereafter, the agents asked if Lichtenstein had any weapons in the room. Lichtenstein stated that he did and directed the agents to the guns in his desk drawer, which the agents removed. The agents also removed a police badge from the drawer. (Ex. A, Camera 1, 6:59:29-7:00:21.) Lichtenstein found his cigarettes and his cellphone near his couch and took them to his desk. Before he sat down, Lichtenstein observed through his surveillance cameras that there were other agents and several cars outside of his house. He asked the agents if they would move the cars to the driveway so that the neighbors would not see. Lichtenstein stated, in substance, that the agents could all remain in his house if they moved the cars into the driveway. The agents agreed, and Special Agent Alberts left the office—with the guns—to move the vehicles into the driveway. (Ex. A, Camera 1, 7:01:45-7:02:21.)

Lichtenstein then sat down at his desk, smoking a cigarette, with Sergeant Klausner and Special Agent Michael Buscemi seated across from him. Sergeant Klausner described to Lichtenstein the purpose of their visit and interview: the agents wanted to speak with Lichtenstein about his scheme with Villanueva, and if Lichtenstein was truthful and cooperative,

they were not going to arrest him.  (Ex. A, Camera 1, 7:02:36-7:04:03.)  The interview lasted

until just before 9:00 a.m.  During the interview, the agents asked Lichtenstein about his

relationship with certain officers in the Licensing Division and other units of the NYPD, among

other things.  Lichtenstein admitted to charging clients to process gun applications, and to his

connection to Villanueva and Ochetal inside the Licensing Division, but denied ever giving

either officer anything except for a menorah he once gave to Villanueva's mother-in-law.  (Ex.

A. Camera 1, 8:00:54.)

The atmosphere and tone of the interview was calm and respectful.  Neither the agents

nor Lichtenstein raised their voices, the agents never restrained Lichtenstein or threatened him,

and the agents never displayed their weapons.  Lichtenstein walked around the office on multiple

occasions, showing the agents gifts he gave to the police (Ex. A, Camera 1, 7:18:31), turning on

the air conditioning (Ex. A, Camera 1, 7:27:00), and walking from his desk to the other side of

the room to get a plastic bag that appeared to contain alcohol, (Ex. A, Camera 1, 8:32). Also

during the interview, Lichtenstein opened his desk drawer to retrieve his phone charger (Ex. A,

Camera 1, 7:58), he used his desk phone to call his wife (Ex. A, Camera 1, 8:41), and even used

his computer (Ex. A, Camera 1, 8:49:39).  Lichtenstein smoked cigarettes and drank what

appears to be alcohol during the interview.

Lichtenstein's wife entered the office on one occasion during the interview.  (Ex. A,

Camera 1, 8:07-39.)  While his wife was present, Lichtenstein's wife said, in substance, "it's

such an honor to have his guests here," and Lichtenstein responded, "I know, . . . why would FB

fucking I come into my house unless they have something really amazing going."  (Ex. A,

Camera 1, 8:08:51-8:09:00.)  As noted above, when Lichtenstein's wife asked why the agents

did not ring the bell, Lichtenstein said, "because I saw them on the camera coming, and I ran out. I told them to come in, I didn't want them to wake you."  (Ex. A, Camera 1, 8:09:00-8:09:08.)

Also on one occasion during the interview, Lichtenstein observed that Special Agent Alberts left the office.  Lichtenstein went to look for him, with Sergeant Klausner and Special Agent Buscemi following.  Together they walked into the room adjacent to the office, where the sliding door to the backyard was located.  (Ex. A, Camera 7, 8:41:00-8:42:06.)  Special Agent Buscemi appeared to put his hand toward his back pocket as they walked through that room. (Ex. A, Camera 7, 8:42:10.)  Another camera angle (Camera 6) shows that Special Agent Alberts went into the bathroom (Ex. A, Camera 6, ch06_20160417084142), and Lichtenstein walked in the direction of the bathroom looking for Alberts (Ex. A, Camera 6, ch06_20160417084142). Sergeant Klausner and Special Agent Buscemi then engaged in conversation (inaudible) with Lichtenstein.  Sergeant Klausner very briefly put his hand on Lichtenstein's arm in an apparent effort to have him return to the office.  (Ex. A, Camera 6, ch06_20160417084142.)  By approximately 8:42:22, Lichtenstein and the agents walked back through this adjacent room towards the office.  In his brief and affidavit, counsel for Lichtenstein attempts to characterize this encounter as an exchange during which the "forcibly stopped Mr. Lichtenstein, turned him around and returned him to the room where the questioning was conducted."  (Def. Br. at 19.) Defense counsel also claims that, during this exchange, "one of the agents grabbed his handgun from its holster."  (Def. Br. at 19.)  These assertions – which are not attested to by Mr. Lichtenstein – are not supported by the videos described above.

At approximately 8:55:24, the agents informed Lichtenstein that, in substance, they were going to arrest him and take him to Manhattan for processing.  Lichtenstein asked if he could have a few minutes, to which the agents agreed.  (Ex. A, Camera 1, 8:56:24.)  For several

minutes thereafter, Lichtenstein spoke with his wife, who had entered the room, he fed pets that were in a glass cage, and he walked around the office.  (Ex. A, Camera 1, 8:56:24-9:11:20.)  After his wife brought clothes to the office, one of the agents accompanied Lichtenstein to the bathroom – after they had determined they were placing him under arrest. (Ex. A, Camera 1, 9:12:15).  Conversations between Lichtenstein and his wife continued for several minutes.  At one point, Lichtenstein stated to the agents, "I really appreciate the courtesy." (Ex. A, Camera 1, 9:28:12.)  At Lichtenstein's request, the agents agreed to refrain from handcuffing him until they were inside the car.  (Ex. A, Camera 1, 9:32:30.)  At approximately 9:39:40, Lichtenstein and the three agents had left his office.

## ARGUMENT

### I.  Standard for Necessity of Hearing

It is well-settled that a defendant who moves to suppress evidence is not entitled to an evidentiary hearing unless he supports his motion with "moving papers [that] are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of" law enforcement's actions are in question.  *United States* v. *Pena*, 961 F.2d 333, 339 (2d Cir. 1992); *see also United States* v. *Marquez*, 367 F. Supp. 2d 600, 603 (S.D.N.Y. 2005); *United States* v. *Roberts*, No. 01 Cr. 410, 2001 WL 1602123, at *10 c (S.D.N.Y. Dec. 14, 2001); *United States* v. *Urena-Pere*, No. 91 Cr. 964, 1992 WL 17977, at *1 (S.D.N.Y. Jan. 24, 1992); *United States* v. *Viscioso*, 711 F.Supp. 740, 745 (S.D.N.Y. 1989).

Here, as argued in more detail below, Lichtenstein has not met this standard.  With respect to the alleged unlawful entry onto his property, his own surveillance footage shows him inviting the officers in and *admitting* to inviting the officers in, and nothing in his affidavit or the other evidence put forward calls into question the voluntariness of that invitation.  With respect

to the allegedly unlawful questioning, the video recordings provided by Lichtenstein and attached hereto as Exhibit A makes clear that Lichtenstein was not in custody when he was interviewed by the agents in his home, and that the officers lawfully seized his firearms, badge, and cellphone.  Those recordings show the entirety of the interview and seizures.  In his affidavit, Lichtenstein raises no issues of fact regarding the interview, simply stating that the agents never read him his *Miranda* rights and never advised him of any warrants, which is true. The affidavit does not create any factual disputes as to whether Lichtenstein was in custody.

## II. The Agents Legally Entered Lichtenstein's Home with His Consent

### A.     Applicable Law

In *Payton* v. *New York*, 445 U.S. 573 (1980), the Supreme Court held that absent exigent circumstances, the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576. The *Payton* Court explained that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590.

The prohibition on warrantless entries "does not apply, however, to situations in which voluntary consent has been obtained."  *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990); *see also United States* v. *Snype,* 441 F.3d 119, 130 (2d Cir. 2006).  Where a warrantless entry is based on consent, the government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973).

In order to seek such consent to enter a home, agents are permitted to approach it and inquire.  In particular, agents can enter upon areas outside a home that are accessible to visitors. *United States* v. *Reilly*, 76 F.3d 1271, 1279 (2d Cir. 1996); *Krause* v. *Penny*, 837 F.2d 595, 597

10

(2d Cir. 1988).  Agents cannot enter upon the "curtilage," which is an "an area around the home

to which the activity of home life extends." *Oliver v. United States,* 466 U.S. 170, 182 n.12

(1984).  In order to determine whether an area is "curtilage," courts look at four factors: the

proximity of the area to the main residence; whether the area is enclosed; the purpose for which

the area is used; and the steps taken to protect the area from view.  *United States* v. *Dunn*, 480

U.S. 294, 301 (1987).  "[F]or most homes, the boundaries of curtilage will be clearly marked."

*Oliver*, 466 U.S. at 182 n.12.

The Second Circuit has held that absent "any indication of any measures taken by [an

individual] to define the curtilage of his property or erect any barriers of his property," the

relevant outside area will not be considered curtilage.  *United States* v. *Hayes*, 551 F.3d 138, 148

(2d Cir. 2008).  Consistent with this, the Circuit has held that "driveways that are readily

accessible to visitors are not entitled to the same degree of Fourth Amendment protection as the

interior of defendants' houses," and that there is "no Fourth Amendment violation based on a law

enforcement officer's presence on an individual's driveway when that officer [is] in pursuit of

legitimate law enforcement business."  *United States* v. *Reyes*, 283 F.3d 446. 465 (2d Cir. 2002)

(quoting *Krause*, 837 F.2d at 596-97 (internal quotation marks omitted.");  *cf. also United States*

v. *Titemore*, 437 F.3d 251, 260 (2d Cir. 2006) ("We join our sister circuits in holding that when a

police officer enters private property for a legitimate law enforcement purpose and embarks only

upon places visitors could be expected to go, observations made from such vantage points are not

covered by the Fourth Amendment.").  Indeed, even where the police enter through an unlocked

gate to knock on a front or back door to a house, they will not have improperly invaded the

occupants' privacy if a visitor would be able to use the same route.  *United States* v. *Pena

Ontiveros*, 547 F.Supp.2d 323, 334 (S.D.N.Y. 2008) (citing *Reyes*, 283 F.3d at 465).

11

The Second Circuit's rulings in this regard are consistent with the rulings of numerous other courts of appeals that have declined to extend the area of curtilage to driveways. *See Rogers* v. *Vicuna,* 264 F.3d 1, 2-3, 5 (1st Cir. 2001) (officers can enter driveway visible to the occasional passerby); *United States* v. *Roccio,* 981 F.2d 587, 589, 591 (1st Cir. 1992) (driveway that is exposed to the public); *United States* v. *Smith,* 783 F.2d 648, 649-50, 651, 652 (6th Cir. 1986) (driveway accessible and visible from public highway); *United States* v. *Evans,* 27 F.3d 1219, 1222-23, 1228-29 (7th Cir. 1994) (no evidence that the public had limited access to the driveway); *United States* v. *Ventling,* 678 F.2d 63, 64, 66 (8th Cir. 1982); *United States* v. *Singer,* 687 F.2d 1135, 1144 n. 17 (8th Cir.1982), *rev'd on other grounds,* 710 F.2d 431 (8th Cir. 1983) (*en banc*); *Maisano* v. *Welcher,* 940 F.2d 499, 503 (9th Cir. 1991) ("In order to establish a reasonable expectation of privacy in [one's] driveway, [an individual] must support that expectation by detailing the special features of the driveway itself (i.e. enclosures, barriers, lack of visibility from the street) or the nature of activities performed upon it.").

Even if a particular driveway or other outside area is curtilage, an officer may perform a protective sweep "as a precautionary matter and without probable cause" where it is done to protect officers from the potential danger of arresting or approaching a suspect at home. *United States* v. *Guerrero*, 813 F.3d 462, 467 (2d Cir. 2016). The sweep must be limited in scope and "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States* v. *Gandia*, 424 F.3d 255, 261 (2d Cir. 2005). In *United States* v. *Magana*, 512 F.2d 1169, 1170-71 (9th Cir. 1975), the Ninth Circuit held that walking down a suspect's driveway to his garage before making a probable cause arrest was "reasonable" because the driveway was not protected by the Fourth Amendment and "the officers were providing security for their fellows who were known to be effecting the arrest of a narcotics dealer."

12

Finally, even if the area an agent enters can be considered curtilage, and even if it is not justified as a protective sweep, an individual may *still* later give consent if the consent is not tainted by the illegal entry.  *United States* v. *Oguns*, 921 F.2d 442, 447 (2d Cir. 1990).  Although typically analyzed in cases involving consent searches following an unlawful entry into a home as opposed to a consent entry into a home following an unlawful entry upon curtilage, among the factors typically considered are: (i) whether a *Miranda* warning is given; (ii) the temporal proximity between the illegality and acquisition of evidence; and (iii) the "purpose and flagrancy of the official misconduct."  *Id.* at 447; *see also United States* v. *Nicholson*, 15 Cr. 6143, 2016 WL 3360459 at *6 (W.D.N.Y. June 15, 2016) (finding entry for security sweep purposes lawful, and holding that even if entry were unlawful, subsequent consent was not tainted by earlier officer conduct).

## B.    Discussion

As confirmed by Lichtenstein's own surveillance video and still photographs, the agents lawfully approached his front porch and driveway, and Lichtenstein voluntarily invited them in from there.  His motion to suppress based on *Payton* violations should be denied.

### i.    *The Surveillance Stills and Video Alone Confirm That Lichtenstein Consented to the Agents' Entry Into His Home Before Any Agents Had Entered the Curtilage*

In support of his motion, Lichtenstein has put in an affidavit that speaks volumes by its silence on what is obvious from any rational view of Lichtenstein's own surveillance video: that Lichtenstein invited the officers into his home, thereby consenting to their entry and rendering his *Payton* argument irrelevant.

As noted above, the videos provided by Lichtenstein show Lichtenstein walking out a sliding door at the back of his house, walking back in seconds later, and then stepping out to

13

immediately wave at the officers to come inside.  Only then does he show his hands for two seconds.  A few seconds later, Lichtenstein again waves at the officers to come in, and then again raises a single hand for one second.  The officers can *then* be seen approaching Lichtenstein and entering the residence with him.  The entire series of events lasts approximately one minute. (Ex. A, Camera 7, 6:57:36-6:58:49.)

Moreover, if there were any ambiguity as to whether Lichtenstein went outside and voluntarily invited the officers in, that is resolved during a later exchange with his wife, also captured on video.  Lichtenstein tells her that the agents did not have a chance to ring the bell "because I saw them on the camera coming, and I ran out.  I told them to come in.  I didn't want them to wake you."  (Ex. A, Camera 1, 8:09:00-8:09:08).  No witnesses are necessary for the Court to find what is crystal clear based on the evidence presented: that Lichtenstein consented to the agents' entry – indeed, affirmatively invited them in – and that *Payton* thus does not apply to this case.  *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990).

Faced with the fact that Lichtenstein clearly invited the agents inside—which Lichtenstein does not dispute in his affidavit—Lichtenstein instead asserts that the agents had already improperly entered his "curtilage" when he first encountered them.  Both the affidavit and defense brief are vague as to whether Lichtenstein is attesting that the agents had already gone through his gate when he first saw them.  Lichtenstein says only that he "encountered the law enforcement agents in my fence-enclosed backyard" (Aff. ¶ 5), which is both true and purposefully vague, as it does not clarify whether Lichtenstein encountered them there only after first inviting them to come past the gate.

Again, what Lichtenstein is silent on, the video and surveillance stills speak to: the agents did *not* go through the gate until after Lichtenstein waved them in.  The surveillance stills

14

show an officer first putting his hand on the gate at a time when Lichtenstein is standing on a mat outside the sliding door, holding a jacket in one hand and with his right hand partially in the air. (Lichtenstein Ex. 26.)   That *precise moment* is captured at approximately 6:58:28 of Camera 7 in the surveillance video, at which point Lichtenstein has already waved agents in *twice*.[3]  (Ex. A, Camera 7, 6:58:28.)  It is plain on the face of this evidence that the agents did not enter the backyard until invited in by Lichtenstein.

Lichtenstein also argues that even if the officers did not go through his gate uninvited, the officers' mere presence on the driveway side of the gate was an improper invasion of his curtilage.  But as noted above, a multitude of cases from both this Circuit and elsewhere have made clear that driveways are *not* curtilage and/or protected by the Fourth Amendment.  *See, e.g.*, *United States* v. *Reyes*, 283 F.3d 446, 465 (2d Cir. 2002) ("[D]riveways that are readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as the interior of defendants' houses"); *Krause* v. *Penny*, 837 F.2d 595, 597 (2d Cir. 1988); *Rogers v. Vicuna*, 264 F.3d 1, 2-3, 5 (1st Cir.2001); *United States* v. *Roccio*, 981 F.2d 587, 589, 591 (1st Cir.1992); *United States* v. *Smith*, 783 F.2d 648, 649-50, 651, 652 (6th Cir.1986); *United States* v. *Evans*, 27 F.3d 1219, 1222-23, 1228-29 (7th Cir.1994); *United States* v. *Ventling*, 678 F.2d 63, 64, 66 (8th Cir.1982); *United States* v. *Singer*, 687 F.2d 1135, 1144 n. 17 (1982), *rev'd on other grounds*, 710 F.2d 431 (8th Cir.1983) (*en banc* ); *Maisano* v. *Welcher*, 940 F.2d 499, 503 (9th Cir.1991); *cf. United States* v. *Titemore*, 437 F.3d 251, 260 (2d Cir. 2006); *United States* v. *Pena Ontiveros*, 547 F.Supp.2d 323, 334 (S.D.N.Y. 2008).

---

[3] It is not helpful to compare the time stamps in the surveillance stills and the surveillance video because, as noted above, they are inconsistent.  However, it is still possible to match up the relevant moments by closely reviewing the video and stills, as detailed above.

Further, among the factors considered in evaluating whether an external area is curtilage, only one – proximity to the house – counsels in favor of finding the driveway side of Lichtenstein's backyard gate to be curtilage. *United States* v. *Dunn*, 480 U.S. 294, 300 (2d Cir. 1987). The other three – whether the area is enclosed; the purpose for which the area is used; and the steps taken to protect the area from view – make clear that the area in question is not curtilage. As all of the relevant photographs make clear, the area *outside* of the gate to the backyard is, of course, not gated. Just adjacent to that area is a parking garage, outside of which visitors could park their cars. And while there are some trees and bushes near the area, they are plainly not indicative of purposeful measures to block the view of the area. *United States* v. *Hayes*, 551 F.3d 138, 148 (2d Cir. 2008). Indeed, while the relevant shrubbery somewhat blocks the area if one is approaching the house from the left, the area is plainly viewable when approaching the house from the right. (*See* Exhibits B through E attached hereto.)

At bottom, what is plain from the photographs is that if one were visiting Lichtenstein's house by car, one might very well pull up the driveway and park near the garage. Even if one were walking up to his house on a nice day, one might go along the driveway to the back gate to see if anyone was around back. Police officers are allowed to do the same, and this alone ends the inquiry. *United States* v. *Titemore*, 437 F.3d 251, 260 (2d Cir. 2006) ("We join our sister circuits in holding that when a police officer enters private property for a legitimate law enforcement purpose and embarks only upon places visitors could be expected to go, 'observations made from such vantage points are not covered by the Fourth Amendment.'"); *United States* v. *Pena Ontiveros*, 547 F.Supp.2d 323, 334 (S.D.N.Y. 2008) (quoting *Reyes*, 283 F.3d at 465).

16

Lichtenstein focuses on two curtilage cases that are inapposite.  In *United States* v. *Karagozian*, 715 F.Supp. 1160 (D.Conn. 1989) – which is not controlling authority – agents made a probable cause arrest of a drug dealer at his house.  The agents "parked in Karagozian's driveway . . . then walked up some stairs located at the side of the house, which led to a raised wooden deck behind the house," inside of which the agents saw Karagozian and asked him to come out before arresting him.  *Id.* at 1162.  Specifically distinguishing the wooden deck attached to the side of the house which wrapped around the back of the house from a driveway, Judge Cabranes noted the following:

> While 'there is substantial lower court authority for the proposition that areas such as driveways that are readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses,' *Krause,* 837 F.2d at 597 (emphasis added), the rear deck, being at the rear of the house, was not a place, like a driveway, with ready access to visitors. Furthermore, being in the rear of the house, it was not an area generally visible to members of the public.

*Id.*

In this case, the agents did not enter upon a deck attached to the house, nor did they enter the rear of Lichtenstein's house.  Indeed, the rear is guarded by a gate, and it is precisely there that the agents stopped, along the side of the house, toward the end of Lichtenstein's driveway.  As noted above, the surveillance video and photographs confirm as much, and *Karagozian* is thus easily distinguished.

The second case relied on by Lichtenstein, *Florida* v. *Jardines*, 133 S.Ct. 1409 (2013), does not implicate *Payton* whatsoever.  In *Jardines*, the Supreme Court held that law enforcement violated the Fourth Amendment by sending a canine dog onto a suspect's front porch to detect narcotics.  The Supreme Court expressly noted that "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any

17

private citizen might do' . . . but introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else.  There is no customary invitation to do *that*."  133 S. Ct. at 1416 (quoting *Kentucky* v. *King*, 563 U.S. 452, 469 (2011) (emphasis in original).  In other words, the Supreme Court specifically exempted warrantless approaches in holding that law enforcement could not conduct an actual canine inspection on an otherwise lawful warrantless approach to the home.

Finally, even if the side of the house somehow constitutes curtilage, the Fourth Amendment does not prohibit an agent from walking along the curtilage of a suspect known to have a gun while his colleagues approached the front door, in order to make sure the area was safe.  *United States* v. *Gandia*, 424 F.3d 255, 261 (2d Cir. 2005); *United States* v. *Magana*, 512 F.2d 1169, 1170-71 (9th Cir. 1975).  To the extent testimony is necessary, the Government believes that the evidence on this point will establish that this is why three agents attempted to secure the two sides of the house while the other three approached the front door.

For these reasons, it is clear from the surveillance photographs and the video that Lichtenstein invited the agents in.  In his affidavit, he does not deny what is evident from that surveillance footage, or articulate any facts that should cause the Court to question what is readily apparent from the video.

     ii.     *Even If the Agents Had Improperly Entered the Curtilage, Lichtenstein's Consent Was Not Tainted*

Even if the agents had improperly breached the curtilage of Lichtenstein's home (which they did not), his subsequent invitation for the officers to come in—and the statements and evidence that were obtained therefrom—should only be suppressed if Lichtenstein's consent was

18

"tainted" by the unlawful presence of the officers on his property.  *United States* v. *Oguns*, 921

F.2d 442, 447 (2d Cir. 1990).

Here, it is plain that Lichtenstein was not influenced at all by the presence of the officers

by the gate to his backyard because he had made up his mind as soon as he saw the officers

approach to let them in to avoid waking his family.  As he told his wife, when he saw them

coming on the camera, "I ran out.  I told them to come in, I didn't want them to wake you."  That

at least one officer had already reached the gate of his house by the time Lichtenstein got outside

could not have induced him to invite the officers in when he had decided to do so at an earlier

point.[4]

### iii. *Lichtenstein's Consent Was Plainly Voluntary*

Although Lichtenstein's affidavit does not quite admit what is plain from the videos and

photographs – that he affirmatively invited the officers inside, thereby consenting to their entry –

he nonetheless argues that any consent he gave was not voluntary.  This argument should be

rejected without a hearing because Lichtenstein has not attested to any facts that would have

made the officers objectively unreasonable in understanding that Lichtenstein was voluntarily

---

[4] *Oguns* involved an individual's consent to *search* following an allegedly unlawful entry, and not consent to come inside the house following an allegedly unlawful entry onto the curtilage. Thus, two of the factors examined by the *Oguns* Court—the giving of *Miranda* warnings and the proximity between the illegality and the acquisition of evidence—are somewhat misplaced. *Oguns*, 921 F.2d at 447.  The third factor examined in *Oguns* – the "purpose and flagrancy of the official misconduct," *id.* – counsels in favor of finding that the officers' presence on the alleged curtilage did not taint Lichtenstein's subsequent consent.  If the Court finds that the officers had somehow gone too far by walking up Lichtenstein's driveway alongside his house, this was hardly a sinister or flagrantly illegal action by law enforcement, particularly given the justifiable safety concerns.  *See United States* v. *Nicholson*, 15 Cr. 6143, 2016 WL 3360459. at *6 (W.D.N.Y. June 15, 2016) (finding entry for security sweep purposes lawful, and holding that even if entry were unlawful, subsequent consent was not tainted by earlier officer conduct).

19

allowing them in.  If a hearing were necessary, however, the Government would meet its burden of establishing that Lichtenstein's invitation was voluntary.

Consent to enter or search must be voluntary, and when the issue of consent is contested, the Government has the burden of proving voluntariness.  *Schnekcloth* v. *Bustamonte*, 412 U.S. 218, 243 (1973).  Unlike in other contexts, consent to a Fourth Amendment entry or search need only be voluntary, not knowing and intelligent.  *Id.* at 241.  Once consent to search is given, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991).  "The ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'"  *United States* v. *Garcia*, 56 F.3d 418, 423 (2d Cir. 1985) (quoting *United State* v. *Sanchez*, 32 F.3d 1330, 1335-36 (8th Cir. 1994)).

Courts have considered a number of factors in determining whether consent was perceived as objectively voluntary: the youth of the accused or related factors, whether and how long the accused was in detention before giving consent, whether an interpreter was used for individuals with language difficulties, whether the accused was told of the right to refuse, the use of physical punishment, or other coercive elements.  *Bustamonte*, 412 U.S. at 226; *Garcia*, 53 F.3d at 423.  The number of law enforcement officers present is not in itself indicative of coercion.  *Garcia*, 56 F.3d at 424.  Indeed, in *United States* v. *Kon Yu-Leung*, 910 F.3d 33, 41 (2d. Cir. 1990), consent to search was found voluntary despite the presence of six DEA agents in the defendant's home late at night; the fact that the defendant was handcuffed at the time of consent; and the fact that the agents said they would not leave the home while they waited for a search warrant.  *Id.; see also Garcia*, 56 F.3d at 423;  *United States* v. *Ansaldi*, 372 F.3d 118,

129 (2d Cir. 2004) (upholding finding that consent to enter home was voluntary even after

defendant was arrested on his front lawn by five to six officers with gun drawn and was

handcuffed); *United States* v. *Feliciano*, 95 Cr. 468 (AGS), 1995 WL 710199, at *1, 4 (S.D.N.Y.

Dec. 4, 1995) (consent to search voluntary despite defendant having first been arrested by five

officers with guns drawn who asked defendant to see his hands, and officers first performed

security sweep of home).

      Here, as noted above, and as effectively conceded in Lichtenstein's affidavit, he invited

the agents into his home after encountering them near his gate.  Lichtenstein's affidavit is bereft

of allegations creating any controversy as to whether that invitation could objectively have been

perceived as involuntary.  Lichtenstein says only that "the observation of the arrival and actions

of numerous armed officers around my home terrified me."  (Aff. ¶ 4.)  But Lichtenstein's

subjective interpretation is legally irrelevant.  He does not allege that any weapons were

brandished at him, that he was handcuffed, or that any other events transpired that would render

it unreasonable for the agents to have thought his invitation for them to come in was involuntary.

Certainly, the presence of a number of law enforcement officers alone does not vitiate the

voluntariness of Lichtenstein's invitation.  *Garcia*, 53 F.3d at 423-24; *Kon Yu-Leung*, 910 F.3d at

41.

      In any event, the video recording makes clear that Lichtenstein's consent was voluntary.

Lichtenstein stated in his own words that he decided to invite the officers in when he saw them

approach.  His invitation to them was extended at the very beginning of their encounter.  No

guns were drawn or brandished toward him.  He had clearly not been placed under arrest or

handcuffed at that point.  He had been asked to show his hands, as the video suggests and to

which an agent would testify if a hearing were necessary.  But the video shows that even this

21

occurred after Lichtenstein had already made his initial wave to invite an officer in. Under all of the relevant case law, it was eminently reasonable for the officers to believe that when Lichtenstein invited them inside, he was doing so voluntarily.

*United States* v. *Vazquez*, 638 F.2d 507 (2d Cir. 1980) – relied on heavily by Lichtenstein – is off point. In *Vazquez*, after arresting one suspect outside of his home, the agents took that suspect back to his house and unlawfully entered the house without a warrant to arrest the suspect's wife. *Id.* at 526-27. The Court found that consent to enter the apartment was not given, not that consent was not voluntary. *Id.* at 527. The Second Circuit then remanded to the district court for a determination of whether the subsequent consent to *search* the apartment was tainted by the officers' unlawful presence inside the apartment or was instead voluntary, noting that the district court had not made a sufficient determination on voluntariness. *Id.* at 527. *Vazquez* is thus not instructive on the question whether Lichtenstein's consent was voluntary because it made no holding in this regard.

Because the surveillance photographs and video show Lichtenstein invited the officers in and admitted to inviting the officers in, and because neither that material nor any proffered facts in Lichtenstein's affidavit would have rendered the officers unreasonable in believing that invitation to be voluntary, Lichtenstein has not met his burden of establishing the need for a hearing on voluntariness.

### III. *Miranda* Warnings Were Not Required Because the Defendant Was Not in Custody When He Was Interviewed by the Agents

#### A.     Applicable Law

"An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a 'custodial interrogation.'"

*United States* v. *FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).  There must be (1) an interrogation of the individual (2) while he or she is in custody.  *Id.*

"Custody for *Miranda* purposes is not coterminous with . . . the colloquial understanding of custody."  *United States* v. *Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quoting *FNU LNU*, 653 F.3d at 152-53 (international quotation marks omitted)).  "The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue'" and, if not "(2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'"  *Id.* (quoting *United States* v. *Newton*, 369 F.3d 659, 672 (2d Cir. 2004)).  Although the court considers both elements, "the second is 'the ultimate inquiry' because a 'free-to-leave inquiry reveals only whether a person questioned was seized,'" and "[n]ot all seizures amount to custody."  *Id.* (quoting *Newton*, 369 F.3d at 672).  "Only if the answer to this second question is yes was the person 'in custody'" and entitled to *Miranda*'s protections.  *Newton*, 369 F.3d at 672.

Whether a person is in custody for purposes of *Miranda* "depends on the objective circumstances of the interrogation, . . . not the subjective views harbored by either the interrogating officer or the person being questioned."  *Stansbury* v. *California*, 511 U.S. 318, 323 (1994).  Courts consider several factors in determining in a defendant is in custody, including: (1) the interview's duration; (2) the location of the questioning; (3) whether the suspect volunteered for the interview; (4) whether any restraints were used; (5) whether weapons were present, and significantly, whether weapons were drawn; and (6) whether an individual was informed he was free to leave.  *FNU LNU*, 653 F.3d at 153.  "There is 'no requirement that an officer affirmatively advise [a suspect] that he is free to leave or terminate the interview'" in order for the suspect to not be in custody.  *United States* v. *Peterson*, 100 F.3d 7, 10 (2d Cir.

23

1996) (quoting *United States* v. *Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991)).  Courts consider

all the surrounding circumstances in conducting this analysis.  *Faux*, 828 F.3d at 135.

The occurrence of an interrogation in one's home is significant.  "[C]ourts rarely

conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'"

*Faux*, 828 F.3d at 135-36; *Newton*, 369 F.3d at 675 ("absent an arrest, interrogation in the

familiar surroundings of one's own home is generally not deemed custodial," but finding

defendant to be in custody when he was handcuffed while interrogated); *see also  United States*

v. *Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (finding interview conducted in defendant's home to

be non-custodial).

### B.       Discussion

Lichtenstein claims that he was in custody "from the moment [he] encountered the

agents."  (Def. Br. at 13.)  His claim is unsupported by the record in this case and the law.  As

noted above, the video provided by Lichtenstein (Ex. A, Camera 1) recorded the entirety of his

interview with the three agents who entered his home with Lichtenstein's consent.  A review of

the video recording establishes that Lichtenstein was not in custody for purposes of *Miranda*.

No further testimony is required to reach this conclusion, and indeed, Lichtenstein's affidavit

does not raise any issues of fact on this point to warrant a hearing.

As noted above, the test for determining custody is an objective two-pronged inquiry: (1)

whether a reasonable person would have thought he was free to leave the encounter, and (2)

whether a reasonable person would have understood his freedom of interaction to have been

curtailed to a degree associated with formal arrest.  *Faux*, 828 F.3d at 135.  Lichtenstein's claims

fail on both prongs of this inquiry.

24

First, a reasonable person would have thought he was free to refuse the agents' access to his house and terminate their encounter. Lichtenstein was not obligated to invite the agents into his home on the morning of April 17, 2016. As discussed above, he affirmatively invited them in, and as the video of the interview makes clear, at no time during the interview did the tenor of questioning or actions by the agents become coercive in any way. *See, e.g.*, *Mitchell*, 966 F.2d at 98 (finding that defendant was not in custody where defendant welcomed agents into his home and was cooperative). Second, even assuming that the Court finds that a reasonable person would have thought he was not free to leave, Lichtenstein's claim fails on the second prong. The circumstances of his interview make clear that a reasonable person would not have understood his freedom to "have been curtailed to a degree associated with formal arrest." *Faux*, 828 F.3d at 135 (internal quotation marks omitted).

The interview lasted approximately two hours and occurred in Lichtenstein's home, specifically, in his home office. Absent some restraint by the police or the presence of arrest or bench warrants, courts have consistently held that interviews conducted in a person's home are non-custodial. *See, e.g.*, *id.* at 135; *Newton*, 369 F.3d at 675 ("absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial," but finding defendant to be detained when he was handcuffed while interrogated); *Mitchell*, 966 F.2d at 99 (finding in-home interrogation non-custodial); *cf. United States* v. *Ortiz*, 943 F. Supp. 2d 447, 455-56 (S.D.N.Y. 2013) (finding defendant was in custody even though he was in his home and even though the interview was brief and officers did not use force or restraints, because defendant was informed that there were two warrants for his arrest, officers clustered around him, and officers threatened to arrest other family members). Furthermore, Lichtenstein was permitted to walk around his office, smoke cigarettes, drink, and access his phone and computer.

25

*See, e.g.*, *United States* v. *Groezinger*, 625 F. Supp. 2d 145, 158 (S.D.N.Y. 2009) (finding interview to be non-custodial where defendant allowed agents to enter his home, agents executed search warrant, questioned defendant for an hour and a half, and during which defendant was permitted to brew coffee, "a privilege not usually bestowed upon a person under arrest"). Lichtenstein completely ignores these facts when claiming that he was in custody.

In addition, not once during the interview did the agents handcuff Lichtenstein or physically restrain him. Although the agents had weapons on their person – which they brought with them for officer safety and with the knowledge that Lichtenstein had weapons in his home – the agents never drew their weapons or even showed them to Lichtenstein. The agents made no threats to him, either verbal or physical, and they were not intimidating; to the contrary, the agents and Lichtenstein were calm and respectful for the duration of the interview. *See, e.g.*, *Faux*, 828 F.3d at 138-39; *Groezinger*, 625 F. Supp. 2d at 158.

Lichtenstein attempts to distinguish the circumstances of his interview from those in *Faux*, which the Second Circuit found to be non-custodial. Those efforts necessarily fail, as the factors present here are quite similar to those present in *Faux*, if even less indicative of a custodial interrogation. In that case, approximately 10 to 15 agents arrived at Faux's house just around sunrise, at which time they saw the defendant's husband and advised him they were there to execute a warrant. *Faux*, 828 F.3d at 132-33. When the agents entered the house, they approached Faux and told her they had warrants to search her house. The agents then interviewed Faux in her dining room, while her husband was separately questioned in the living room. According to Faux, the agents escorted her to the dining room while one agent held her arm. *Id.* at 133. The interview lasted for approximately two hours, during which time Faux "was not allowed to move freely in her home," and an agent "accompanied her to the bathroom

26

and stood outside the door," and "accompanied Faux to her bedroom when she wanted a sweater." *Id.* The questioning was described as "conversational and [the agents] did not raise their voices." *Id.* at 134. Faux was never informed that her participation was voluntary, but 20 minutes into the interview, she was informed she was not under arrest. *Id.*

The Second Circuit found that Faux was not in custody during this interview, vacating the district court's ruling. The Circuit focused on several factors present in that case that were also present here. First, the court noted that 10 to 15 agents present for the search of the defendant's home "gives considerable pause," but did not find this factor to be dispositive. *Id.* at 136-37. By contrast, there were only three agents present in Lichtenstein's house, and the remaining three agents who stayed outside left during the interview. *See also Newton*, 369 F.3d at 675 (noting that the number of officers is not typically dispositive, and the presence of six officers "would not, by itself, have led a reasonable person in [defendant's] shoes to conclude that he was in custody").

Second, the court observed that, although Faux was physically separated from her husband, she was permitted to go to the bathroom and her bedroom. *Faux*, 828 F.3d at 137. The court further noted that any claim that the agents restrained her movements by shadowing her or putting a hand on her did not amount to custody. *Id.* Similarly, Lichtenstein was free to roam about the office, he was permitted to move to the adjacent room in his house with agents shadowing him, and he was even permitted to have his wife come to the office during the interview. There is no indication on the video that Lichtenstein was restrained or any physical force was used, other than one instance where Sergeant Klausner very briefly placed his hand on Lichtenstein's arm. (Ex. A, Camera 6, ch06_20160417084142.) Like *Faux*, that gesture was not forceful. *Faux*, 828 F.3d at 137-38 ("A reasonable person would understand that being

accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution and that (absent other hallmarks of custody) freedom of action is not being curtailed 'to a degree associated with formal arrest.'" (quoting *Newton*, 369 F.3d at 672 (internal quotation marks omitted)). Lichtenstein tries to argue that the conduct here was more forceful than in *Faux*, but that is unsupported by the video. Lichtenstein's assertions to the contrary (which are notably contained only in his brief and not in his affidavit), the agents did not grab him, turn him around, and return him to the room. And, none of the agents drew their weapons.

In addition, the Second Circuit in *Faux* considered the fact that Faux was told that she was not under arrest approximately 20 minutes into the interview. *See Faux*, 828 F.3d at 138 ("A reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station – a significant factor in assessing the degree to which one is at the mercy of the authorities.") (internal quotation marks omitted). Similarly, when the agents first began to interview Lichtenstein, they made clear to him that they wanted to talk to him and they were not arresting him at that point. In any event, "[t]here is no requirement that an officer affirmatively advise [a suspect] that he is free to leave or terminate the interview" in order for the interview to be deemed noncustodial. *Peterson*, 100 F.3d at 10 (quoting *Springer*, 946 F.2d 1012, 1016 (internal quotation marks omitted)).

In sum, the Second Circuit found that Faux was not in custody in light of the circumstances of her interview: "the defendant was questioned in the familiar surroundings of her home, . . . seated at her own dining room table;" "[s]he was not handcuffed during the interrogation and was not arrested at its conclusion;" "the agents did not display their weapons or otherwise threaten to use any physical force;" the defendant was told she was not under arrest, and she was never told she was not free to leave; "the tone of the questioning was largely

28

conversational;" and "her movements were monitored but not restricted, certainly not to the degree of a person under formal arrest." *Faux*, 828 at 138-39. Nearly all of those circumstances were present here and support the conclusion that Lichtenstein was not in custody during his interview.

In further support of his position that he was in custody, Lichtenstein claims that the agents "repeatedly lied to [him] about the circumstances of their presence in his home." (Def. Br. at 20.) He asserts that the agents' statements that "if he cooperated and provided truthful information, he would be permitted to remain home," were "deliberately false to entice Mr. Lichtenstein to answer their many questions." (*Id.*) To the extent Lichtenstein is claiming that he was misled or deceived by the agents, any such argument fails. "[S]tatements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive," as "[s]tatements such as these are merely common sense factual observations." *United States* v. *Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995). The agents truthfully told Lichtenstein that if he was truthful and cooperative, then they were not going to arrest him. There is nothing false, misleading, or coercive about those statements, and they do not rise to the level of creating a custodial setting.

In any event, were a hearing necessary, it would be clear through agent testimony that there was no deception at all. As discussed above, the exact purpose of the agents' presence at Lichtenstein's home on April 17, 2016 was to ask Lichtenstein if he were willing to provide information about his scheme with Villanueva, and to solicit his proactive cooperation against Villanueva. But, if Lichtenstein denied bribing Villanueva or was otherwise unwilling to proactively cooperate, agents were prepared to arrest him based on the evidence amassed at that point. Throughout the two-hour interview, Lichtenstein did not provide truthful answers.

Among other things, he lied about his dealings with Villanueva and Ochetal.  Only after Lichtenstein provided false statements to the agents did they decide to arrest him that morning.[5]

## IV. The Agents Properly Seized Lichtenstein's Guns, Police Shield, And Cellphone

Lichtenstein argues that the agents improperly seized his guns and police shield at the outset of the interview, and improperly seized his cellphone toward the conclusion of the interview.  These arguments should be rejected.

Lichtenstein's argument that his guns were improperly seized is without merit.  The Supreme Court has recognized a "public safety exception" to *Miranda*, which provides that "law enforcement officers may ask about the location of a firearm prior to providing *Miranda* warnings, and may subsequently seize the firearm, in order to ensure their own safety and that of others."[6]  *United States* v. *Calix*, 13 Cr. 582 (RPP), 2014 WL 2084098, at * 7 (S.D.N.Y. May 13, 2014) (citing *New York* v. *Quarles*, 467 U.S. 649, 657-58 (1984)); *United States* v. *Estrada*, 430 F.3d 606, (2d Cir. 2005) (upholding the admissibility of statements and gun recovered pursuant to the public safety exception).  Courts in this Circuit have considered three factors in determining whether this exception applies: "(1) whether the questioning related to an 'objectively reasonable need to protect the police or the public from any immediate danger'; (2) whether the facts suggest that the question was a 'subterfuge' that was 'designed solely to elicit

---

[5] Lichtenstein argues that if the Court grants his motion, the April 18, 2016 search warrant on Lichtenstein's office should be invalidated.  However, the search warrant should upheld even if the Court finds that the interview of Lichtenstein violated *Miranda*, so long as the Court does not find that the agents were inside the home in violation of *Payton.*  A review of the search warrant makes clear that the observations of the agents once they were invited inside, combined with the details of the investigation and their training and experience, provided ample probable cause to search Lichtenstein's office.

[6] As noted above, the Government submits that *Miranda* warnings were not required here because Lichtenstein was not in custody.

testimonial evidence from a suspect'; and (3) whether the question was routinely put to arrested

suspects, or was supported 'by an objectively reasonable need to protect' against a perceived

danger." *Calix*, 2014 WL 2084098, at *7 (quoting *United States v. Ferguson,* 702 F.3d 89, 94

(2d Cir.2012)).

A consideration of those factors in this case makes clear that the agents lawfully

questioned Lichtenstein about weapons in the house and lawfully seized the guns found in the

office.  As noted above, the agents were aware that Lichtenstein owned guns.  When the agents

entered his office, they asked him if there were any weapons in the room.  Furthermore, the

agents' questions were targeted; agents did not ask where weapons were located in the house, but

rather focused on the area in the agents' and Lichtenstein's immediate vicinity.  The agents had

an objectively reasonable need to protect themselves from immediate danger in Lichtenstein's

home, and their limited questioning of Lichtenstein regarding weapons and seizing of guns in his

office was appropriate.  When the officers lawfully found and seized the gun, they also found a

police badge.  (Ex. A, Camera 1, 6:59:00.)  That badge was evidence in their investigation into

Lichtenstein's dealings with the Licensing Division.  Accordingly, once they saw the badge, they

were permitted to seize that as well under the "plain view" exception.  *See, e.g.*, *Estrada*, 430

F.3d at 613 (finding that drugs that were found incident to recovering a gun pursuant to the

public safety exception were admissible); *see also Kentucky* v. *King*, 563 U.S. 452, 463 (2011).[7]

---

[7] Lichtenstein complains that the officers unlawfully removed the guns from his home.  As noted above, the agents lawfully seized the guns, and they removed them from the home as a safety measure.  The fact that the agents removed them from the home does not change the analysis.  In any event, Lichtenstein consented to their removal from the house, and even offered the agents a bag to carry out the guns.  (Ex. A, Camera 1, 7:02:17.)

Lichtenstein's argument that his cellphone was impermissibly seized is dispensed with

easily.   As noted above, law enforcement officers may seize evidence in plain view so long as

they are lawfully in the place where the evidence is seen.   *King*, 563 U.S. at 463; *see also United

States* v. *Gamble*, 388 F.3d 74, 76 (2d Cir. 2004); *U.S.* v. *Echevarria*, 692 F.Supp.2d 322, 332

(S.D.N.Y. 2010).  In addition,  the Supreme Court has noted that a cellphone can be seized

incident to arrest but (as a general matter) cannot be searched until a warrant is obtained.  *Riley*

v. *California*, 134 S. Ct. 2473, 2486, 2495 (2014).

Here, the surveillance video makes clear that Lichtenstein's phone was in plain view in

Lichtenstein's office upon his arrest.  (Ex. A, Camera 1, 9:24:50-9:25:30.)  In addition, as the

search warrant obtained the next day made clear, the agents had probable cause to believe that

Lichtenstein used his cellphone in furtherance of the crime.  (*See* Lichtenstein Ex. 54, ¶ 10.)

Accordingly, if the Court finds that the agents lawfully arrested Lichtenstein in his office, the

phone was lawfully seized in plain view, subject to the warrant later obtained to search it.[8]

### V.  The Indictment Should Not Be Dismissed

Lichtenstein's motion to dismiss the indictment barely merits a response.  As an initial

matter, of course, if the Court denies his suppression motions, his motion to dismiss necessarily

fails.   But his motion also fails independently.

Dismissal of an indictment is "the most drastic remedy" and rarely used.   *United States*

v. *Fields*, 592 F.2d 638, 647, 648 (2d Cir.1978); *see also United States* v. *Casamento*, 887 F.2d

---

[8] Lichtenstein's cite to *United States* v. *Scopo*, 19 F.3d 777, 782 (2d Cir. 1994), is entirely
misplaced, as that case governs officers' ability to search individuals and their immediate "grab
space" in order to protect the officers' safety during routine traffic arrests.  Further,
Lichtenstein's argument that the officers tried to trick him into voluntarily taking his phone with
him, and then told him they had a warrant when they did not, is beside the point.  In any event,
the video appears to indicate that an officer told Lichtenstein they were getting a warrant, not
that they had one.

1141, 1182 (2d Cir. 1989) (dismissal of indictment is "extraordinary remedy").  Dismissal may

be warranted only in cases of extreme prosecutorial misconduct or whether the function of the

grand jury has been so compromised as to render the proceedings fundamentally unfair.  *Bank of*

*Nova Scotia* v. *United States*, 487 U.S. 250, 255-57 (1988).  Lichtenstein cites no cases

dismissing an indictment as a result of the subsequent suppression of evidence, because such

cases do not exist.  Moreover, Lichtenstein cites no reason for the Court to believe that anything

Lichtenstein said on April 17, 2016 or any evidence connected to the police's visit to his house

that day was even presented to the grand jury, let alone was a determining factor in the grand

jury's probable cause finding.  Indeed, in a single-spaced, ten-page complaint filed on April 18,

2016, only three sentences on the 9th page were dedicated to the events of April 17, 2016.  An

examination of the complaint, attached hereto as Exhibit F, makes clear that events surrounding

Lichtenstein's arrest were not necessary to a determination of probable case.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Government submits the defendant's motion should be

denied in its entirety.

Dated:  New York, New York
         November 8, 2016

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney
                                        Southern District of New York

                              By:       /s/ Russell Capone_____
                                        Russell Capone / Lauren Schorr
                                        Kan Nawaday
                                        Assistant United States Attorneys
                                        Southern District of New York
                                        (212) 637-2247

33