UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

                    **16 Cr. 342 (SHS)**

ALEX LICHTENSTEIN,
  a/k/a "Shaya,"

           Defendant.

**Government's Sentencing Memorandum**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Russell Capone
Kan M. Nawaday
Lauren B. Schorr
Assistant United States Attorneys
    *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

       -v.-

ALEX LICHTENSTEIN,
  a/k/a "Shaya,"

            Defendant.

**16 Cr. 342 (SHS)**

---

Defendant Alex Lichtenstein is scheduled to be sentenced on March 16, 2017, at 2 p.m. The United States of America respectfully submits this memorandum in advance of the sentencing proceeding and in response to the defendant's sentencing submission, dated March 2, 2017.

## I.      PRELIMINARY STATEMENT

For several years, the defendant, Alex Lichtenstein, a/k/a "Shaya," participated in a conspiracy with officers at the New York City Police Department ("NYPD") to corrupt the carefully regulated procedures by which New Yorkers obtain permits to carry weapons.  In the process, the defendant helped to undermine the public's faith in the NYPD by permitting people who had not been properly vetted, including individuals with prior criminal and domestic violence records, to obtain permits to carry guns.  In particular, the defendant, who held himself out as an "expediter" of gun licenses, bribed NYPD officials to obtain gun licenses for his clients.  The defendant charged individuals thousands of dollars purportedly to assist them in navigating the NYPD's application process for a license, but in fact he virtually guaranteed his clients' successful applications by paying tens of thousands of dollars in cash (and other perks) to the NYPD officers who were entrusted with conducting an independent review of applications for gun licenses.  In exchange for his bribes, the defendant obtained for his clients expedited license approvals from the police officers he bribed, and he personally made hundreds of thousands of dollars from his

satisfied clients.  Put simply, Lichtenstein engaged in long-standing, egregious bribery of police officials charged with ensuring the responsible approval of gun licenses, made considerable profits from doing so, and thereby significantly corrupted the gun licensing process, endangering the public which relies on the unbiased vetting of gun licenses.

The defendant's Guidelines range fairly reflects the duration and severity of his conduct. The defendant's range under the United States Sentencing Guidelines ("Guidelines") is 57 to 71 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR"), and the Probation Office recommends a sentence of 57 months.  In order to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range.

## II.    THE OFFENSE CONDUCT

### A.  The NYPD Licensing Division

The NYPD Licensing Division, located at One Police Plaza in downtown Manhattan, is responsible for evaluating all applications for handgun licenses within the City of New York. (PSR ¶ 9.)  In order for any individual to legally possess a handgun for any purpose in the five boroughs of New York City, he or she must be thoroughly vetted and approved by the Licensing Division.  The Licensing Division encourages prospective applicants to think carefully about their need for handguns "[b]ecause of the serious safety concerns inherent in the possession of handguns." (http://www.nyc.gov/html/nypd/html/firearms_licensing/ handgun_licensing_ information.shtml (last visited March 2, 2017)).

Individuals can apply to the Licensing Division for various types of handgun licenses. For example, "Premises" licenses authorize their holders to possess handguns only in their homes.  "Business Premises" licenses authorize their holders to keep handguns in their places of

business.  "Limited Carry" licenses authorize their holders to carry handguns in a concealed manner on their person at specified times and for specified (typically business-related) purposes. Finally, "Full Carry" licenses are effectively full concealed carry licenses enabling their holders to be armed at all times within the state of New York.  An individual with one type of license can also apply to the Licensing Division for an upgrade, such as from a "Business Premises" license to a "Limited Carry" license.  (PSR ¶¶ 9-10.)

The Licensing Division receives approximately 5,000 applications for gun licenses each year.  More expansive licenses such as Limited and Full Carry licenses are applied for and granted less frequently than more restrictive licenses such as Premises or Business Premises licenses.  Typically, the processing, investigation, and approval or rejection of an application can take from several months for less restrictive licenses and up to a year for Limited and Full Carry licenses.  The sometimes lengthy waiting period between the submission of an application and an eventual decision by the Licensing Division is due to the fact that, in the ordinary course, the Licensing Division conducts extensive diligence on individuals applying for gun licenses.  For example, the Licensing Division interviews every applicant about their background and need for a gun license.  Licensing Division investigators also review an applicant's criminal history, mental health history, and any other history of interaction with law enforcement, including incidents of traffic infractions and allegations of domestic violence.  (PSR ¶¶ 11-14.)

Unsurprisingly, applicants who wish to obtain Limited or Full Carry licenses are subjected to additional scrutiny.  Most importantly, Licensing Division personnel evaluating these applications investigate whether there is a legitimate, justified and business-related need for an individual to be able to carry his or her gun in a concealed manner.  (PSR ¶ 12.) Applicants for these carry licenses, which permit their holders to carry guns outside of their homes or businesses, are required to submit business-related documents and bank account

statements, which assist investigators in evaluating the business-based need for a firearm. (PSR ¶¶ 11-12, 15.)

The Licensing Division may reject an application for a license because of either mandatory or discretionary criteria. For example, if the applicant has a prior felony conviction, his or her application must be rejected. Where no such automatic bar is present, Licensing Division officials use their discretion in evaluating applications. The exercise of that discretion includes evaluating the applicant's moral character and mental health, including reviewing prior arrests, driving infractions, and other past incidents, as well as deciding whether there is a true business-related need for a Limited or Full Carry license. (PSR ¶¶ 13-14.)

### B. Lichtenstein's Bribery Scheme

In addition to owning his own business brokering wholesale plastic bag transactions, Lichtenstein served for many years as a high-ranking supervisor in the Borough Park-based Shomrim, a volunteer neighborhood patrol. (Complaint ¶ 11(a); PSR ¶¶ 24, 79.) Through his connections to law enforcement, the defendant created a second business expediting gun license applications for members of his community. As a so-called expediter, Lichtenstein charged significant sums of money to assist individuals with filling out applications to the Licensing Division and to advise them throughout the process of seeking a gun license. (PSR ¶ 18.) In connection with his expediting business, the defendant sought to and did develop relationships inside the Licensing Division, ultimately engaging in a scheme to kick back some of his fees to Licensing Division personnel in order to ensure that the officials approved, or at the very least expedited, his clients' applications.

As a formal matter, the NYPD Licensing Division affirmatively discourages applicants from believing that they will receive any faster or favored treatment if they use an expediter. The Licensing Division, on its website, represents that:

> The License Division is aware that there are consulting companies which guarantee the issuance of a New York City handgun license … if a prospective applicant uses their services to complete the application form. These firms cannot obtain a handgun license … for you if you do not qualify, nor can they expedite your application. As an applicant, you should be aware that such services are not required or endorsed by the New York City Police Department and that only an attorney licensed by the State of New York can represent you before the License Division. … The License Division does not guarantee the issuance of a handgun license . . . to any individual who uses the services of a consultant. Each application is reviewed on its merits and under the qualifying criteria set forth by law. The application instructions are self-explanatory.

(http://www.nyc.gov/html/nypd/html/firearms_licensing/handgun_licensing_information.shtml)

(last visited March 2, 2017).[1]

Despite the formal policies and guidance promulgated by the NYPD regarding the use of expediters, the defendant conspired with at least two officers within the Licensing Division to guarantee that his clients received gun licenses in an expedited manner in return for cash bribes. In particular, as Lichtenstein became more familiar with Licensing Division personnel, he struck up a close relationship with Sergeant David Villanueva, which turned into a corrupt agreement to trade licenses for cash.  Beginning in at least around 2013, Lichtenstein was able to secure near-guaranteed approvals of his clients' applications within weeks, not months, by paying off Villanueva and Richard Ochetal, a police officer who performed the first-level review of Lichtenstein's applications.  (PSR ¶ 19.)  Because of his success in obtaining gun licenses for his clients, the defendant was able to charges his clients hundreds of thousands of dollars in fees over time.

As described in the PSR and in the charging documents in this case, Lichtenstein typically provided Villanueva with applications for gun licenses, as well as with cash payments to secure the expeditious treatment and approvals of those applications.  On average,

---

[1] These statements on the Licensing Division website were present before Lichtenstein's arrest and remain on the website today.

Lichtenstein paid Villanueva anywhere from hundreds of dollars up to one thousand dollars per application, over time bribing Villanueva with at least tens of thousands of dollars for his services.  (Id.)  Villanueva retained most of the cash for himself, but on occasion gave portions of it to Ochetal.  In addition to bribing Villanueva and Ochetal with cash, he also provided Villanueva and Ochetal with numerous perks, including bottles of expensive liquor, the use of a limousine, and tickets to Broadway shows.  (PSR ¶¶ 19-20.)

In exchange for the cash and perks, Villanueva and Ochetal violated their duty as officers in the NYPD Licensing Division by performing perfunctory reviews of Lichtenstein's clients' applications, approving nearly all of them, sometimes within a few weeks or less.  (PSR ¶ 22.) In contrast, applications submitted by individuals who had not retained Lichtenstein often took several months to be approved.  (PSR ¶ 15.)  In many instances, Ochetal and Villanueva did not conduct any substantive interview of Lichtenstein's clients, despite Licensing Division protocol requiring interviews.  They performed only minimal diligence, often doing no more than running an individual's rap sheet and mental hygiene history.  (PSR ¶ 22.)  These cursory checks sometimes even were performed after the officers had approved the application in order to add documents to an applicant's folder that reflected that at least a modicum of due diligence. Because of the bribery scheme in which Lichtenstein participated, individuals received gun licenses even though they had misdemeanor convictions and, in at least one instance, a felony conviction; a history of domestic violence; and substantial driving violations.  (Id.)  Individuals with significant arrest histories were also approved.  (Id.)  For example, one successful applicant had prior out-of-state arrests for criminal possession of a loaded firearm, reckless endangerment, and use of a dangerous weapon.  Another had a pending case for menacing with a firearm at the time his application was approved.

Moreover, because of Lichtenstein's bribes, Villanueva and Ochetal conducted little to no investigation into whether applicants for Limited or Full Carry licenses had a legitimate business need for those licenses.  (PSR ¶ 22.)  Applicants are required to fill out "letter of necessity" forms answering questions about those needs, and in some cases those letters of necessity were not even filled out for Lichtenstein's clients.  Other times, Villanueva filled out the letters of necessity himself on behalf of the applicants.

In several cases, Lichtenstein paid Villanueva to upgrade his clients' licenses, such as from Business Premises to Limited Carry licenses, or from Limited Carry to Full Carry licenses. Villanueva upgraded these licenses without requiring any additional paperwork, contrary to Licensing Division rules, and Lichtenstein paid him for the upgrades he approved.  In this manner, an individual could ultimately receive a carry license without ever having submitted an application justifying his or her need for such a license, by initially applying for a Premises license, after which Lichtenstein would pay Villanueva for an unjustified upgrade.  (PSR ¶ 22.)

Lichtenstein's reputation for speed and success enabled him to charge exorbitant amounts for his rather modest services.  Specifically, as the PSR notes, Lichtenstein typically charged applicants between $10,000 and $16,000 per license, and occasionally as much as $18,000, a small portion of which he kicked back to Villanueva.  (PSR ¶ 22.)

**C. Lichtenstein Is Barred from the Licensing Division and Attempts to Salvage His Illegal Business by Bribing Another NYPD Officer**

In approximately November-December of 2015, the Commanding Officer of the Licensing Division—who had been aware, at a minimum, of the exorbitant fees that Lichtenstein was charging clients—told Villanueva that he should stop expediting licenses for Lichtenstein. (PSR ¶ 23.)  Villanueva appears to have abided by this restriction, and ceased accepting bribes

from or expediting applications on behalf of Lichtenstein as of approximately the beginning of 2016. (Id.)

By March of that year, a desperate Lichtenstein began seeking other inroads into the Licensing Division. He approached an officer from the 66th Precinct in Borough Park with whom he was friendly ("Officer-1"), and told Officer-1, in substance, that his previous connections inside the Licensing Division had dried up and that he was looking for a new inside connection to continue his business. (PSR ¶ 24, Complaint ¶ 11.) Lichtenstein offered to pay Officer-1 for his assistance. (Complaint ¶ 11.) Rather than help Lichtenstein, Officer-1 reported the bribe offer to the NYPD's Internal Affairs Bureau ("IAB"). (PSR ¶ 25.) Officer-1 agreed to wear a wire to make recordings of Lichtenstein for the FBI and IAB. (PSR ¶ 26.)

On April 13, 2016, Officer-1 met with Lichtenstein and, on tape, told Lichtenstein he was nervous about proceeding but needed the money. (PSR ¶ 26.) At the direction of law enforcement, Officer-1 told Lichtenstein that, through Officer-1's involvement with the Patrolmen's Benevolent Association, he knew a union delegate from the Licensing Division that would be willing to help. (PSR ¶ 28.) Lichtenstein told Officer-1 that Lichtenstein would "give you and [the union delegate] more than you'll make in the police department," and specifically offered Officer-1 a bribe of $6,000 per license. (PSR ¶ 29.) Lichtenstein then estimated to Officer-1 that he obtained 150 gun licenses per year, and pulled out a calculator to demonstrate to Officer-1 that Officer-1 could make $900,000 on the scheme. (PSR ¶ 30.) Lichtenstein also complained that the Licensing Division ordinarily rejected applicants for issues that Lichtenstein found trivial such as traffic infractions, but that Lichtenstein's clients were in any event not scrutinized. (PSR ¶ 31.) Specifically, Lichtenstein told Officer-1 that for his clients, the investigating officer "understand[s] that the answer is yes," and that the Licensing Division "signs off because it's Lichtenstein." (Complaint ¶ 12(g), (h).) Lichtenstein further stated that

the Licensing Division ultimately shut him out because of how much money he was charging.
(Complaint ¶ 12(j).)

Lichtenstein told Officer-1 he would begin by sending Officer-1 the information for applications that Lichtenstein had already submitted before his relationship with the Licensing Division had been terminated.  However, four days later, prior to sending Officer-1 the list of applications, Lichtenstein was approached by the FBI and IAB.  (PSR ¶ 32.)  During an interview, Lichtenstein admitted to expediting gun licensing applications through Villanueva and Ochetal, but denied providing any cash or other things of value to them.  Lichtenstein was then placed under arrest and charged by complaint.

### III.     INDICTMENT, PLEA AGREEMENT AND GUIDELINES CALCULATION

Lichtenstein was originally indicted on May 16, 2016.  On or about June 20, 2016, the Indictment was superseded to add Villanueva, and a separate superseding information was unsealed against Ochetal, who had by that point pleaded guilty pursuant to a cooperation agreement with the Government.  The Superseding Indictment against Lichtenstein, S2 16 Cr. 342, charged him in three of four counts.  Count One charged Lichtenstein with bribery in violation of Title 18, United States Code, Section 666, and Count Two charged Lichtenstein with conspiracy to commit bribery, in violation of Title 18, United States Code, Section 371, both in connection with Lichtenstein's bribery scheme with Villanueva and Ochetal.  Count Four also charged Lichtenstein with bribery, in violation of Title 18, United States Code, Section 666, in connection with Lichtenstein's attempted bribe of Officer-1.  (PSR ¶¶ 1-5.)

On or about November 10, 2016, Lichtenstein pled guilty to Counts Two and Four of the Superseding Indictment pursuant to a plea agreement with the Government dated November 8, 2016.  As specified in the plea agreement, the applicable Sentencing Guidelines are to be calculated as follows:

- Pursuant to U.S.S.G. § 2C1.1(a)(2), because the defendant was not a public official, the base offense level is 12.

- Pursuant to U.S.S.G. § 2C1.1(b)(1), two offense levels are added because the offense involved more than one bribe.

- Pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1), ten offense levels are added because the total benefit received for the bribes paid was valued at more than $150,000 but less than $250,000.

- Pursuant to U.S.S.G. § 2C1.1(b)(3), four offense levels are added because the offense involved a public official in a high-level decision making or sensitive position.

- Pursuant to U.S.S.G. §§ 3E1.1(a) and (b), a three-level reduction is appropriate for acceptance of responsibility

- The applicable Guidelines offense level is therefore 25. The defendant has no prior convictions and is in Criminal History Category I.

(PSR ¶ 7.) As a result of these calculations, the parties have stipulated that the defendant's Guidelines range is 57 to 71 months' imprisonment. (Id.) The Probation Department has calculated the same Guidelines range, and recommends a sentence of 57 months' imprisonment.

The defendant's advisory Guidelines range is based on the Sentencing Commission's considered assessment of the harm caused by bribery. Indeed, more than a decade ago, the Sentencing Commission increased the offense levels applicable to corruption offenses. *See* Notice, U.S. Sentencing Commission, 69 Fed. Reg. 28994-01 (May 19, 2004). In doing so, the Commission explained:

> This amendment increases punishment for bribery, gratuity, and "honest services" cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses. This amendment reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses.

Id. at 29012.

Accordingly, the Court should give the advisory Guidelines range careful consideration as "the starting point and the initial benchmark" for the appropriate sentence in this case. *Gall* v. *United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4).

## IV.  ARGUMENT

The factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a Guidelines sentence.

*First*, the seriousness of the offense warrants a significant sentence. *See* 18 U.S.C. § 3553 (a)(2)(A).  The defendant engaged in a sustained effort to bribe NYPD officials with money, liquor, limousines, and other perks.  He corrupted NYPD police officers charged with the important responsibility of deciding which New York City residents should be permitted to purchase lethal weapons.  Time and again – for more than 50 individuals – Lichtenstein gave envelopes full of cash to Villanueva, an NYPD Sergeant, as a bribe for Villanueva and Ochetal to act in Lichtenstein's interests, not the interest of the NYPD or the citizens of New York.  He did this not once or twice, not for weeks or months, but over a period of years.  As a result of the bribes paid by Lichtenstein, his co-defendants violated their duties as police officers by failing to properly vet individuals seeking to maintain and carry guns, and substantially weakened the public's faith in the NYPD and its commitment to gun safety, and allowed potentially dangerous individuals to obtain gun licenses.

For all of these reasons – the fact that Lichtenstein bribed the police; that, in doing so, he compromised one of the most important law enforcement functions imaginable; and that he did so repeatedly—this was an extremely serious corruption offense.  The stipulated Guidelines range of 57 to 71 months accurately reflects the seriousness of this crime and imposes a reasonable and not greater-than-necessary sanction for the wrongdoing at issue.

Lichtenstein argues that the reprehensible nature of his conduct was somehow lessened because he believed his clients' applications "had merit" and because, thankfully, none of the guns

purchased as a result of corruptly-issued licenses were involved in any reported criminal activity. This ignores both the truth and the significance of the misconduct.  Some of Lichtenstein's clients—including one with a felony conviction, others with misdemeanors or alarming arrest histories, and still others with domestic violence histories—were patently unqualified and would have been rejected either as a matter of law or in the exercise of a non-corrupt police officer's discretion.  More importantly, far from being a mitigating factor, that Lichtenstein was substituting his own judgment (to the extent he did in fact exercise any such judgment other than based on who was willing to pay his substantial fees) for the bought-off judgment of trained professionals demonstrates precisely the seriousness of the offense.  Lichtenstein was not a trained law enforcement officer with a sworn duty to the people of New York.  He was a businessman making money and bribing police officials, and his self-serving opinion of the merits of the applications is irrelevant.  Nor does the fact that there are no reported violent episodes involving Lichtenstein's clients matter; indeed, if there were, the presently-calculated Guidelines range would be woefully inadequate to reflect the seriousness of the offense or provide just punishment.

Lichtenstein also argues that his motivations were not nefarious because he was simply trying to help others in the community protect themselves, and because he gave some of his proceeds to charity.  As an initial matter, *nothing* in the record supports the assertion that Lichtenstein donated or directed a penny of his proceeds to charity, and the Court should not accept his mere assertion of this fact in imposing sentence.  Indeed, the Government has interviewed several of Lichtenstein's clients, none of whom were asked to donate the thousands of dollars Lichtenstein charged them to charitable entities.

Moreover, the defendant's strained effort to characterize the *bribery of police officers* as just another example of his propensity for charity is as offensive as it is unfounded.  If Lichtenstein was so concerned with ensuring that his community was armed, he could have donated his time to

helping people navigate the Licensing Division, rather than charging each one of them ten thousand dollars or more.   And if he was so concerned with raising money for charity, he could have raised money for charity.

He did not, because his actions were anything but charitable.   Perhaps the most evident indicator of Lichtenstein's unscrupulous intent is the course of conduct he chose when he was effectively banned from the Licensing Division.   Far from ending his involvement with gun licenses, or becoming an honest broker, Lichtenstein doubled down, trying to bribe yet another police officer.   In doing so, he bragged to that other police officer about the hundreds of thousands of dollars he could make in exchange for guaranteeing the approval of Lichtenstein's applications for licenses.   This is not behavior motivated by charity.   It is behavior motivated by greed and corruption.

*Second*, the history and characteristics of the defendant, the nature and circumstances of the offense, and the need for the sentence imposed to promote respect for the law warrant a Guidelines sentence.   *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).   The defendant did not commit bribery hesitantly, fleetingly, or in a small amount.   He committed bribery for years, in massive amounts, without any apparent hesitation, and his bribes were part of a corrupt scheme involving the abdication by NYPD officers of their duty to the police force and to the citizens of New York to ensure that gun license applications are carefully considered before being approved.

Unsurprisingly, Lichtenstein devotes only a few scant paragraphs of his sentencing submission to the crime he committed, and nearly the entirety of its 67 pages to describing a history of good works, as well as problems with alcoholism. To be sure, assuming the truth of the portrayal of Lichtenstein in his sentencing submission, the charitable efforts he has made on behalf of his community through his work with the Shomrim and otherwise is a factor that the Court may properly consider at sentencing.   But such efforts can only go so far in mitigating the need for a

substantial term of incarceration in light of the egregious pattern of bribery in which Lichtenstein engaged over a period of years – including during the same time as he was performing service with the Shomrim.  Lichtenstein's charitable acts should not be treated as a line of credit that Lichtenstein can redeem to lessen a prison sentence, particularly given the continuous and grave nature of the crimes he was committing at the same time as many of the charitable acts he highlights in his submission.  Further, while Lichtenstein may have engaged in charitable acts for his community, he had no qualms about charging members of that same community exorbitant fees, often in excess of $10,000, for his relatively simple assistance in filling out applications for near-guaranteed success at the Licensing Division.  Under any circumstance, a significant sentence is needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.[2]

   *Finally*, the need for general deterrence weighs strongly in favor of a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(2)(B).  It is particularly challenging to investigate and prosecute police corruption schemes.  Indeed, in this case, if Lichtenstein had not brazenly approached Officer-1

---

[2] Among the reasons that Lichtenstein asks for a non-incarceratory sentence are for the sake of his parents, wife, and children; and so that his alcoholism can continue to be treated.  These factors should not be given significant weight.  Lichtenstein's family situation is not one in which, unlike some other defendants, he is needed to take care of young children or support them financially.  Indeed, his children are grown, and the family support network is extensive.  The toll that Lichtenstein's sentence will take on his grown family is surely great, but it is a toll created by Lichtenstein, not the Court.  Nearly all defendants present before the Court for sentencing have families who are, in some ways, victims of their relative's criminal conduct.  Lichtenstein is no different, and it is not for the Court to compensate for the effect his conduct has had and will have on his family.

   With respect to Lichtenstein's alcoholism, the defendant cannot seriously maintain that it caused him to commit bribery over a lengthy time period any more than it caused him to commit the many good acts he so diligently recounts.  And in terms of future treatment, there is no argument that the Bureau of Prisons is unable to handle alcohol addiction, and there will be programs to help Lichtenstein continue his progress.  Further, upon his release, the Probation Department will be able to help Lichtenstein continue to remain sober by providing him with necessary outpatient or inpatient treatment.

after his bribery scheme with Villanueva was terminated, the crime may never have been uncovered, and Villanueva and Ochetal would still be working in the Licensing Division. When a scheme such as this is uncovered, and individuals are successfully prosecuted and convicted, substantial sentences are warranted. *See, e.g.*, *United States* v. *Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes[.]"); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

This is particularly so because there is only one Licensing Division, with a finite set of employees who are responsible for all handgun licenses in New York City. There has also historically been a relatively limited number of "expediters" that profess expertise at navigating the Licensing Division. And there are no recent federal criminal prosecutions of gun licensing misconduct. For these reasons, the small Licensing Division and expediting community will undoubtedly become aware of the sentences imposed by the Court in this case. The likelihood that the Court can disincentive future misconduct by imposing a substantial sentence in this case is thus considerable.

Lichtenstein argues that the publicity generated by this case is, on its own, sufficient for general deterrence purposes. But the publicity generated by a sentence that does not reflect the extreme seriousness of the defendant's crime would have the opposite of a deterrent effect. Imposing a non-incarceratory or modest sentence would suggest that the profits to be made from this crime may outweigh the minor punishment imposed if one is caught. That message should not be sent by this Court. Rather, because the crime committed by the defendant and his co-conspirators threatens to significantly undermine confidence in the NYPD and its role in gun

safety, the Court should fashion a sentence that will serve as a strong deterrent to others contemplating participating in similar crimes that abuse the public trust.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 57 to 71 months' imprisonment, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated:  New York, New York
        March 9, 2017

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney


                      By:     s/Russell Capone
                                Russell Capone
                                Kan M. Nawaday
                                Lauren B. Schorr
                                Assistant United States Attorneys
                                (212) 637-2247/2311/2299