UNITED  STATES  DISTRICT  COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
UNITED  STATES  OF  AMERICA,

        -against-                       S2   16 Cr. 342 (SHE)


ALEX  LICHTENSTEIN,

                Defendant.
--------------------------------------------------------------X


# PRE-SENTENCE MEMORANDUM


**RICHARD A. FINKEL, Esq., & ASSOCIATES, PLLC.**
*Counsel for Defendant Alex Lichtenstein*
**270 Madison Avenue, Suite 1203**
**New York, New York 10016**
**212-689-8600**


Richard A. Finkel
  *of Counsel*

# <u>CONTENTS</u>

*Page*

List of Exhibits ........................................................................ iii

Index to Letters ...................................................................... iii

Preliminary Statement ............................................................ 1

The Offense ............................................................................ 3

Remorse .................................................................................. 5

Personal Background ............................................................. 8

    Parents Background ........................................................ 8
    Shaya's Childhood ......................................................... 10
    Marriage .......................................................................... 12
    Business .......................................................................... 12
    Shaya's Family ............................................................... 15

Public Service, Charitable and Civic Activities,
Circumstances in Support of a Non-Guidelines Sentence ........ 21

    Shomrim ......................................................................... 22

        Kletzky Kidnaping ................................................... 23

        New Hampshire Forest Search ................................ 25

        Grand Canyon Crash Recovery ............................... 28

        Run-Away Girls ....................................................... 29

        Ehrenzweig Search .................................................. 32

        Massachusetts Forest Search ................................... 32

        Daily Patrols, Special Assistance ........................... 34

        Fire Rescue ............................................................. 36

        Near Fatal Car Accident, Disabled Vehicles ........... 37

i

Hurricane Sandy .................................................................. 39

September 11th, "Ground Zero" .................................. 40

Investigations ....................................................... 42
   Burglary ................................................. 43
   Sex Assault ........................................... 43
   Exonerating Wrongly Accused .................................. 44

Mediator ............................................................. 44

Continuing Dedication and Assistance .................................. 45

Other Charitable Efforts and Good Works .................................. 46
   Divorce Assistance .......................................... 46
   Personal Counseling .......................................... 48
   Business Assistance .......................................... 48
   Compassion and Assistance for Mourners ........... 49
   Daily Support and Assistance .................................. 50
   Support of Students and Education ...................... 50

   Support for Victims of Cancer and Other Serious Illnesses    51

Alcohol Addiction ........................................................................ 58

Deterrence, Protection from Further Crimes, Section 3553(a)(B)( C) .......... 63

Sentencing  Request ........................................................ 65

Conclusion

For the Reasons Set Forth Above and as Presented in the Many
Letters That Are Submitted Herewith, It Is the Respectful
Prayer of Counsel and of Alex Shaya Lichtenstein, That
This Honorable Court Will Favorably View and Credit
All the Circumstances of Shaya's Life,  Including His
Life Long Efforts to Care for and Help Other People,
Will Consider His Struggle to Overcome Alcohol Addiction,
and Will Grant Our Request for a  Non-Guidelines Sentence
and a Sentence That Does Not Include Incarceration ........... 67

## EXHIBITS

1.    U.S. Coast Guard Auxiliary Membership Certificate
2.    Press Releases, Kletzky Kidnaping
3.    NY Times Article, Search in New Hampshire Forest
4.    Photos, New Hampshire search
5.    Photos, Funeral Procession, Grand Canyon Crash Victims
6.    Photo, Run-Away Girls Return to Brooklyn
7.    Police Report, Fire Rescue
8.    News Photo, Hurricane Sandy Response
9.    Photos, 9/11 Ground Zero Response
10.   Photo, Pediatric Cancer Patient Support Activity
11.   Photo, Pediatric Cancer Patient Support Activity


## LETTERS [1]

### Family Letters

1.    Esther Lichtenstein           - Wife
2.    Kevin (Kivi) Lichtenstein     - Son
3.    Jacob (Yanky) Lichtenstein    - Son
4.    Menachem (Sol) Lichtenstein   - Son
5.    Faigy Lichtenstein            - Daughter-in-Law
6.    Ruchy Lichtenstein            - Daughter-in-Law
7.    Chaya Lichtenstein            - Mother (with typed copy)
8.    Shimon Lichtenstein           - Brother
9.    Yehoshua Lichtenstein         - Brother
10.   Yitzchok Lichtenstein         - Brother
11.   Lazer Lichtenstein            - Brother
12.   Ahron Lichtenstein            - Brother
13.   Joseph Lichtenstein           - Brother (with English Translation)
14.   Yaakov Lichtenstein           - Brother

---

[1] The many letters that have been written in support of Mr. Lichtenstein's request for a lenient sentence are submitted in a separate booklet that accompanies this Pre-Sentence Memorandum.  Many of these letters are quoted or referenced in this Sentencing Memorandum, and to facilitate the Court's review, each letter is numbered, each reference includes the Letter's designated number, and Number Tabs divide the letters in groups of five to facilitate review.

| | | |
|---|---|---|
| 15. | Raizy Pfeiffer | - Sister |
| 16. | Baila Fulop | - Sister |
| 17. | Esther Brach | - Sister |
| 18. | Rachel Rosenberg | - Mother-in-Law |
| 19. | Udi Lichtenstein | - Sister-in-Law |
| 20. | Raizy Freund | - Cousin |
| 21. | David Friedman | - Cousin |
| 22. | Chaim Franczoz | - Cousin |
| 23. | Shloimy & Raizy Lichtenstein | - Uncle & Aunt |
| 24. | Volvi Lichtenstein | - Cousin |
| 25. | Isidore & Lea Friedman | - Uncle & Aunt |
| 26. | Rivka Friedman | - Aunt |
| 27. | Sury Fuchs | - Cousin |
| 28. | Esther M. Lichtenstein | - Cousin |
| 29. | Baila Fixler | - Cousin |
| 30. | Tova Rubin | - Cousin |
| 31. | Sury Jakubowitz | - Cousin |
| 32. | Moses Lefkowitz | - Cousin |
| 33. | Shloimy Lichtenstein | - Cousin |
| 34. | Shloime Berkowitz | - Cousin |
| 35. | Brany Goldberger | - Wife's  Cousin |

**Friends & Acquaintances**

| | |
|---|---|
| 36. | William Adler |
| 37. | Rabbi Chaim Atik, Yeshiva Hamaylim |
| 38. | Yankel Bernath  (Fire Rescue) |
| 39. | Aron Blumenfeld |
| 40. | Hershel Brach |
| 41. | Abraham Brauner |
| 42. | Abraham Brauner, Shomrim |
| 43. | Sima Davidowitz,  Rofeh Cholim Cancer Society |
| 44. | Shia Dembitzer |
| 45. | Avrohom & Chana Ehrenzweig |
| 46. | █████████ E████ |
| 47. | Solomon & Bruchie Englander |
| 48. | Ernest Feldman    (Massachusetts Forest Search) |
| 49. | Simcha Franczoz |
| 50. | Jacob Freund |

51.  A████ F█████
52.  Chanie Friedman
53.  D█████ F██████
54.  Simon Friedman
55.  Benzion German
56.  Yaakov German (typed copy provided)
57.  Yuta German
58.  Yehuda Gewirtzman
59.  Shimon & Chanie Goldberg
60.  Rabbi Goldman, Vein Cheder
61.  █████ G██████
62.  Chaya Gottesman
63.  A██ G███
64.  Rabbi Michael Gutmacher
65.  Eli Hammerman
66.  Rebetzin Milka Lowy (Hauer)   (New Hampshire Forest Search)
67.  Menachem Herzog
68.  Frimchy Hirsch   (Arizona Run-Away)
69.  Tzippy Horowitz
70.  Yitzchok Horowitz, Bein-Ish Ubein Uchiv
71.  Beila Jakobovits   (Arizona Run-Away, Sister)
72.  Rabbi Aaron Kahn, Knesses Bais Avigdor
73.  Nachman Kletzky   (Search for Kidnaped Child)
74.  Simi Landau
75.  S███ L██████
76.  Mayer Lemberger
77.  Rabbi Dean Osher Levevitz, Yeshiva Ketana
78.  Sol Lichtenstein
79.  Rabbi Zalmon Lipschutz, Yeshiva Yesodei Hachaim
80.  Lezer Loewy
81.  Yumi Lowy
82.  Esther Mittelman
83.  Fraidy Myski
84.  J██ N██████
85.  Chilu Posen
86.  Rabbi Hershel Puretz, Mayan HaTorah
87.  Simon Reichman
88.  C█████ R██████
89.  Rimpler Family (4 Letters)
90.  Rabbi Saul Rosen, A Time

91.    Rabbi Yonoson Rosenbaum, Yeshiva of Brooklyn
92.    Bracha Rosenberg   (Grand Canyon Crash Recovery)
93.    Rabbi Shmuel Rosengarten, Dean, Yeshiva Ohel Torah
94.    G███ R███
95.    H████ R█████
96.    Moshe & Chani Seidenfeld
97.    S█████ S█████
98.    Hindy Spitz
99.    H██████ S█████
100.   Yosef Stern, Congregation Pomona Heights
101.   Bella Sternbuch
102.   N████ S██████z
103.   Joe Tabbouche
104.   Gitty Weingarten
105.   M████████████ W█████   (Hebrew with Translation)
106.   Mordechai & Hindy Weiss
107.   B. W████
108.   S████ C█████
109.   M████ D██████
110.   Y. Rubinstein


### Alcohol Addiction Rehabilitation Letters

111.   Cyd Blechman,              Sunrise Detox Counselor
112.   David Thompson,            Beachcomber Addiction Specialist
113.   Sandra Champa,             Beachcomber Addiction Director
114.   R████ D██████,             Beachcomber Addiction Patient
115.   C███ G█████,               Beachcomber Addiction Patient
116.   C███ H█████,               Beachcomber Addiction Patient
117.   B██ J████,                 Beachcomber Addiction Patient
118.   Z███ K███,                 Beachcomber Addiction Patient
119.   C█████████ M████,          Beachcomber Addiction Patient
120.   K████ S█████,              Beachcomber Addiction Patient

## PRELIMINARY  STATEMENT

On November 10, 2016, Alex (known to his family and friends as "Shaya") Lichtenstein pled guilty to two counts of bribery, 18 USC  section 666, of police officers in connection with expediting applications for gun licenses filed with the Licensing Division of the New York City Police Department.

It is well recognized that one of the most sensitive and difficult responsibilities of the judiciary is the sentencing decision.  Since the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), which made the Sentencing Guidelines "advisory" and caused the return to the primacy of judicial discretion pursuant to 18 USC section 3553, the role and responsibility of the sentencing Judge has been rendered all the more formidable. This Pre-Sentence Memorandum is respectfully submitted to assist this Honorable Court in exercising its discretion and determining the appropriate sentence for Shaya Lichtenstein.

After *Booker,* and the subsequent decisions of the United States Supreme Court in *Nelson v. United States*, 555 US 350 (2009), *Kimbrough v. United States,* 552 US 85 (2007), *Gall v. United States,* 552 US 38 (2007), *Rita v. United States,* 551 US 338 (2007), it is now absolutely clear that, "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. . . .[T]he district court must form its own view of the 'nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Cavera*, 550 F3d 180, 188 (2d Cir

1

2008)(*en banc*).  The Supreme Court's decision in *Gall* made it clear that the sentencing inquiry is to be broad, open-ended, significantly discretionary and on an individualized basis.

It is settled that under the post-*Booker* sentencing regime, the Guidelines are a guide; they are simply "advisory."  In fact, a District Court must conduct its own independent review of the statutory sentencing factors and may not presume that the Guidelines recommended range is reasonable. *United States v. Rita, supra;  United States v. Gall, supra; Nelson v. United States, supra*; *United States v. Cavera, supra*.  Thus, the clear goal of the post-*Booker* sentencing scheme has been to allow the sentencing court to reach  an informed and individualized judgment in each case by reviewing the factors set forth by 18 USC §3553(a).  There is no limit to the information concerning the background, character and conduct of the defendant that may be considered by the court. 18 USC § 3661.  A full and complete understanding of the defendant enables the court to comply with the dictates of section 3553 and of the Supreme Court for individualized sentencing.

In this Pre-Sentencing Memorandum, we present Shaya Lichtenstein's personal history, the circumstances of the offense, and the mitigating factors that we respectfully ask this Court to consider in making its sentencing decision.

Mr. Lichtenstein recognizes that he made a terrible mistake by giving gifts and money to police officers in order to expedite the gun license applications that he submitted on behalf of others, and he is extremely remorseful for his conduct.  Upon consideration of the conduct that led to the present criminal prosecution and following a review of the background and

personal history of Shaya Lichtenstein, and upon an application of the various sentencing factors of 18 USC section 3553(a), we respectfully request that the Court impose a non-guideline sentence, and a sentence that does not include incarceration.  We most respectfully suggest that a sentence less severe than that recommended by the advisory Guidelines will "be sufficient but not greater than necessary" to fulfill the purposes of sentencing.  18 USC § 3553(a).

### THE OFFENSE

Shaya Lichtenstein was arrested on April 17, 2016, and arraigned on a Complaint on April 18, 2016.  On May 16, 2016, an Indictment was filed;  it was replaced by a Superceding Indictment on June 20, 2016.  On November 10, 2016, Mr. Lichtenstein pled guilty before this Honorable Court to Count Two charging Bribery, and Count  Four charging Making a Bribe Offer, of  the Superceding Indictment.

In his plea allocution, Mr. Lichtenstein admitted that:

• during the years 2013 to 2016, he had a good and friendly relationships with New York City police officers;

• during the years 2013 to 2016, he gave police officers in the Licensing Division things of value including money;

• that he understood that by giving the police officers things of value, the officers would do favors, including expediting gun license applications that he submitted for other people;

3

• and that in April 2016, he offered to give a police officer money to help expedite gun license applications that he had submitted for other people.

Mr. Lichtenstein's brother Yitzchok Lichtenstein has written to the Court in an effort to support Mr. Lichtenstein's application for a lenient sentence. In his letter (attached as Letter #10[2]) Mr. Lichtenstein's brother discusses several topics, including an explanation of Shaya's involvement in submitting applications for gun licenses:

> Shaya's involvement with gun license applications started because our community [the Orthodox Jewish community] is not very well versed in matters of law, some of us not even much in the English language, most of us especially not in what it takes to procure a pistol.
>
> Business men were concerned about robberies and wanted and believed that a gun would be a protection, but they didn't know the process.
>
> Now who does our community go to when we need help in ANY matter?
>
> It is always shaya [*sic*.] of course, particularly in police matters because of his Shomrim and liaison positions.
>
> Shaya's success in getting gun licenses became known by business men in our community and more people went to shaya for help.
>
> Shaya sat down with the people in our community that wished to procure a pistol, explained to them the great responsibility that comes along with it, helped them out with understanding the applications, filling them out.
>
> Shaya, did absolutely not do this to line his pockets with money to live a lavish life style. He's not that kind of person.

*Id.*

---

[2] Many letters have been written in support of Mr. Lichtenstein's request for a lenient sentence. These letters are provided to the Court in a separate booklet that accompanies this Pre-Sentence Memorandum. Many of these letters are quoted or referenced in this Sentencing Memorandum, and to facilitate the Court's review, each letter is numbered, and each reference includes the Letter's designated number.

Shaya's brother Yitzchok additionally explains that most of the money Shaya Lichtenstein received for assistance in submitting gun license applications was directed to charitable pursuits.  Notably, and as this letter further states, Shaya Lichtenstein initially did not charge for his assistance, but as the demand for his help grew Shaya began to charge, and later raised the amount of the charge, in order to minimize the requests for his help.  *Id*.

Shaya submitted applications that he believed had merit, he did not believe that unqualified applicants would be approved, and none of the guns of his clients were ever involved in an incident or crime.


**REMORSE**

As established by his guilty plea, Shaya Lichtenstein understands that providing cash and other things of value to police officers was morally wrong as well as criminal.  He is extremely remorseful, and has openly, frequently and strongly expressed his remorse to the members of his family, to his friends, and to his many acquaintances especially in the Orthodox Jewish community.

Shaya's Mother-in-Law, Rachel Rosenberg, in her letter to this Honorable Court (Letter #18), writes, "In addition to his deep remorse for his appalling actions that he candidly discusses, he has met with several community leaders to raise awareness about white collar crime and the devastating impact that it imposes upon the criminal's family." One of Shaya's sisters, Esther Brach, in her letter to Your Honor (Letter #17), expresses Shaya's remorse as, "I honestly believe, as Shaya has displayed, his full remorse to the unethical deed of bribery."   His sister-in-law, Udi Lichtenstein, adds, "He has learned from his mistake.  All his family and friends see how he is now suffering."  Letter # 19.

5

Abraham Brauner, in his personal letter (Letter #41 ) to the Court (Mr. Brauner is also the signatory of a letter on behalf of Shomrim), states, "Your honor please take in consideration that Shaya highly regrets the mistake he has done he constantly preaches to others not to get on the wrong side of the law."  Shaya, has repeatedly stated to counsel and others that he is particularly ashamed that his criminal  conduct undermined and contradicted his efforts to assist the Police Department as a liaison and as a member of Shomrim, and has sullied the reputation of Shomrim.

A long time friend  over 25 years  Simon Reichman, writes to the Court that Shaya "is remorseful and really ashamed of his actions that he let us all down."  Letter #87. Another long time 25 year friend, Aron Blumenfeld writes that:  "Your honor, I clearly understand that his actions for which you're about to sentence him are shameful and unfortunate, which he seriously regrets and is surely NOT proud of...."  Letter # 39. Similarly, Simon Friedman, in his letter to the Court (Letter #54), writes that Shaya "has, on innumerable occasions lamented his poor judgment, and expressed such deep and profound regret...."   And Fraidy Myski (Letter #83), writes that Shaya "regrets and accepts responsibility for the bad actions he committed."

As the Court is aware, Mr. Lichtenstein recently completed in-patient detox therapy and inpatient rehabilitation treatment for alcohol addiction.  During, the rehabilitation component of this regime, some thirty days, Shaya became closely acquainted with several other addiction patients.  Seven of these other patients, the members of his therapy group,

have submitted letters about Shaya, and these letters refer to Shaya's remorse and acceptance of responsibility.  Letters of C██████H████, Letter # 116, and B██████J███, Letter # 117.

The President of Shaya's local synagogue, Yosef Stern, of Congregation Pomona Heights (Letter# 100) writes of Shaya's "acceptance of wrong doing and clear remorse," and that "Shaya has  taken upon himself to educate and advocate in our community that crime indeed does not pay and cohorts [*sic.*] all to be law respecting and abiding."  Thus reflecting the perception and understanding of Shaya's conduct among members of the Orthodox Jewish community.

Mr. Lichtenstein is extremely remorseful.  He joined Shomrim to assist other members of his community and to assist law enforcement agencies.  In his exuberance to assist law enforcement and to gain the friendship and trust of police officials, and with his judgment clouded by alcoholism, he embarked upon an unlawful course of action.  At first he bought simple gifts, and this activity morphed and the gifts became cash payments.  He knows this was wrong, that it was corrupt, and he is truly sorry for these acts.  He feels tremendously embarrassed that his reputation as a leader in his community has been lost, and more importantly that the reputation of the Shomrim organization and its members has been severely and adversely affected by his illegal actions.  He is greatly pained that the reputation of this organization, established to provide services to the community and to assist police authorities, and that he worked hard to embellish, has been sullied and debased because of his own acts.

7

## PERSONAL  BACKGROUND

Shaya was born on July 4, 1971, to parents who resided in the ultra-orthodox Jewish enclave in the Williamsburg section of Brooklyn.  His parents, Samuel and Chaya, raised their eleven children, Shaya and his seven brothers and three sisters, in compliance with the strict rules and traditions of the Hasidic Jewish community.  Shaya is the fourth of the eleven children.  Shaya and his siblings all attended Yeshivas where they learned Jewish religious principles, customs and traditions,  and had virtually no exposure to secular subjects. Growing up in the Hasidic community in Williamsburg also substantially limited Shaya's exposure to the secular world.

### Parents Background

Shaya's father, Samuel, was born in Italy shortly after the second world war to survivors of the Holocaust.  Shaya's grandmother had toiled as a slave laborer in a Nazi munitions plant, and his grandfather survived a series of concentration camps.   After liberation by Allied armies, they were both transported to a displaced persons camp where they met and married.  As they were both born and raised in Hungary, as Italy was not their home country, and as most of their families had been exterminated by the Nazis, they sought to emigrate to the United States.  It was not until the early 1950's that their applications to immigrate were approved.  Assisted by Jewish organizations they traveled to New York.

Immediately upon their arrival in New York, the Lichtenstein family settled in the Orthodox Jewish enclave in Williamsburg Brooklyn, where many other holocaust survivors had settled.  Shaya's father obtained employment from other members of the Williamsburg community in a series of relatively menial jobs.  But encouraged by the American Dream and seeking to improve the living conditions of his family, he continued to move to slightly better paying jobs.  Finally, with another young man, he was able open a small general merchandise store.  Times were very hard for new immigrants, the store could not support two families, and the partner of Shaya's grandfather gave up hope and left the business.  Shaya's grandfather was determined and continued to operate the store.  While the store ultimately provided funds barely sufficient to support the family, it continues to serve as the family's income base.  Shaya's father and uncle began to work in the store  as young boys, and they are now in their 70's and continue to operate it selling hardware, housewares and toys.

As young boys, Shaya's father and his brother worked in the family store while they attended one of the local Yeshivas.  When they were old enough for marriage, before the age of 20, and in accord with Hasidic custom, marriages were arranged.  Samuel's wife Chaya (Shaya's mother) was also the child of holocaust survivors who emigrated to the United States in search of better circumstances, safety and religious freedom.

Shaya's parents started their family founded upon principles of Orthodox Jewish law and Hasidic traditions as members of the strict Orthodox Jewish community in Williamsburg Brooklyn.  Therefore, their eleven children, eight sons and three daughters, all attended

religious schools that strictly adhered to the teachings of Hasidic custom.

**Shaya's Childhood**

In Yeshiva and in the Williamsburg community, Yiddish was the spoken language. At home, for Shaya and his siblings, Yiddish was the main language. Hungarian was also spoken but it was the secret language that Shaya's parents spoke when they did not want the children to understand. Therefore, Shaya and his older siblings understand very little Hungarian, and his younger siblings understand almost no Hungarian. Shaya was really not exposed to English until he was about eleven or twelve years old. Moreover, the first Yeshiva in Williamsburg that Shaya attended until the age of 12 provided no secular studies. Beginning at about the age of 12, Shaya attended a second Yeshiva in Williamsburg that was slightly less strict and traditional, some secular studies such as math were offered, and some, but very little, English was spoken there. The following year he was transferred to a yeshiva in Borough Park where no secular subjects were provided. During summers, many of Shaya's friends attended summer camps in the Catskill Mountains that were run by Yeshivas, but because of the family's financial difficulties, Shaya was only able to attend summer camp for about two weeks when he was thirteen years old.

Shaya was raised in the Williamsburg section of Brooklyn. Until he was four years old, the family lived in a one bedroom apartment. Shaya's parents slept in the bedroom, Shaya and his five brothers slept in the dining room, and his sister slept at the end of a small

10

hallway.  Thereafter, the family moved to somewhat larger quarters in Williamsburg, where Shaya and his 10 siblings shared 3 bedrooms.  Mr. Lichtenstein shared one room with three of his brothers.

Throughout Shaya's childhood, his family suffered from financial difficulties.  The family hardware store where his father, grandfather and uncle worked did not yield sufficient income to support Shaya's family, his grandparents and his uncle and his family.  Financial conditions were so difficult that the family frequently lack sufficient food.  And Shaya remembers his mother standing at the stove cooking, and weeping because she knew she did not have sufficient food for her family.  He will never forget that scene.

Shaya and his siblings rarely had new clothes.  Rather, clothing was obtained from relatives and friends, and then handed down from sibling to sibling.  As Shaya has two older brothers, he does not recall ever receiving a new garment until the celebration of his Bar Mitzvah at age 13.  As Shaya's mother was adept at repairing and improving old clothes, the children were always dressed neat and clean.  For Shaya, clothing was not an issue, but, to the present day, the recollection of the lack of food remains emotionally very upsetting (when questioned on this subject during the Probation Department interview, Shaya became emotional and cried).

While Shaya grew up in a financially poor family environment, his life as a youngster was not unhappy.  The family unit was close, all the children helped their parents and each

11

other.  The older children assisted in the care of their younger siblings.  Shaya recalls religious studies and discussions with his father and brothers, and sometimes joined by his mother and sisters.  The family unit was always loving, caring, and supportive.

It was not until Shaya started working that he began to converse in English.  To this day, Yiddish is his preferred language.  While Shaya speaks and understand English, he often struggles with the meaning of conversational words and for the right English word for his own use.

### Marriage

When Shaya was about 20 years old and attending Yeshiva, and in keeping with the practice of their orthodox community, Shaya's parents contacted a matchmaker to find a wife for Shaya.  Ultimately an arrangement was made, and Shaya was introduced to Esther Rosalyn Rosenberg.  Esther, known to her family and friends as Roizy, was raised in the Borough Park orthodox community.  The couple was married on June 18, 1992, in an orthodox ceremony in Williamsburg Brooklyn.

### Business

The custom in the orthodox Jewish community is for the young groom to continue religious studies in Yeshiva for several years after marriage, supported financially by the couple's parents.  But recognizing the substantial financial difficulties that his parents had

long struggled with, Shaya wanted to reduce the financial burden on his father.  Therefore, prior to his wedding, Shaya began to seek employment within the Jewish community.  One of Shaya's uncles was employed as a manager in a lumber yard and construction supply business in Borough Park, and he promised  Shaya a job.   Immediately after the wedding, Shaya withdrew from Yeshiva, and began his first job: a stock boy at Boro Park Lumber on New Utrecht Avenue in the Borough Park section of Brooklyn.

At the lumberyard, Shaya quickly and unilaterally enlarged his role.  He recognized that the method of keeping track of inventory was grossly deficient, and that this deficiency had a negative impact on their satisfaction of customer requests.  He therefore began to reorganize the inventory records, and soon took control of ordering materials from wholesale suppliers.  As a result of Shaya's ingenuity, sales increased.

Shaya's responsibilities at the lumberyard quickly grew to include customer service. Because of his contact with customers, particularly contractors, Shaya implemented several changes in the inventory carried by the lumberyard. After several months, Shaya recognized that the contractors who were regular customers needed plastic bags for refuse and plastic containment sheets to contain dust and wall-off work areas.  Shaya, therefore, spoke with his uncle and then the owners, and these items were added to the stock carried by the lumberyard.  Shaya's prediction about the need for plastic goods proved correct, and as a reward, the owners of the lumberyard agreed to give Shaya a small commission on the plastic sales in addition to his salary.  As a salesperson for the lumberyard, Shaya was first exposed

to the practice of giving benefits to police officers who came in for supplies.

Sales of plastic bags and sheeting grew, and because of Shaya the lumberyard began to increase number of plastic products it sold. With the growth of plastic sales, the commissions he received also grew. From these sales, and with the blessing of the owners, Shaya began a semi-independent business within the lumberyard selling plastic goods. Eventually, the plastic sales began to consume Shaya's work at the lumberyard, and the owners allowed Shaya to set up a separate business operation selling plastic supplies. In order to maintain an inventory of plastic goods, Shaya was permitted to use the lumberyard's warehouse, by providing the lumberyard owners a fee based upon the amount of goods that were stored.

As Shaya developed a separate business, he increased the variety of plastic goods that he sold. Another of Shaya's uncles was a manager in a plastic goods manufacturing company in New Jersey that was owned by Orthodox Jews. This company agreed to assist Shaya in starting his own business by supplying the plastic goods on favorable payment terms. To increase sales, Shaya personally approached Jewish retail businesses and even schools in Brooklyn, and thereby enlisted a growing number of customers. As business grew, Shaya needed to employ as many as three truck drivers to deliver his goods, and needed to alter and enlarge his arrangement with Boro Park Lumber for warehouse space.

**Shaya's Family**

While Shaya's business grew, so did his family. His first apartment with his wife Roizy, was a small one bedroom apartment in Brooklyn, where they lived for five years. While they lived in this apartment, their first two sons were born. Kevin, known as Kivi, was born in 1993, and Jacob, known as Yanky, was born in 1995. The growth of the family required, and as the growth of his business allowed, Shaya, Roizy and their two sons to move to a larger apartment. They stayed in Borough Park, and their new three bedroom apartment was one block from their first apartment. In 2000, Shaya and Roizy celebrated the birth of their third son, Menachem, known as Sol.

Shaya and his family rented their second apartment for about five years. During this time Shaya and Roizy became close with, and they regularly assisted, the elderly couple that owned and lived in another apartment in the house. After five years, the elderly couple offered to sell the house to Shaya, and an arrangement was made. In 2010, with the economy and his plastic business in a slump, Shaya sold the house and the family moved into a rental apartment where they lived for five years.

After five years renting an apartment and with his rent increasing each year, and with the economy and his business improving, Shaya determined that it was time to consider buying a home again. He was aware that many Orthodox Jewish families were moving to upstate communities, where the real estate was significantly less expensive than in Borough Park, and where the neighborhood was countrified rather than urban and crowded. He

understood that such a neighborhood provided a better, less stressful and more relaxed atmosphere for living.  Shaya investigated, and found a twenty-year old  home on a quiet almost rural street in Pomona New York.  This home was significantly larger that any residence that he could consider in Brooklyn, and included a large backyard   something entirely unavailable in Brooklyn.  Moreover and surprisingly, the monthly charges on this home were less than rent he paid on his three room apartment in congested Borough Park. Therefore, in August 2015, Shaya and Roizy moved to Pomona New York.  They understood and planned that this home could be the family magnet and home for their growing family: their eldest son Kivi married in 2014, and Yanky married in 2015.

Shaya and his wife, Raizy, wanted to model their family unit after the environments in which they were raised:  loving, caring, supportive, and guided by the Orthodox Jewish principles and traditions.  But, Shaya was always additionally influenced and guided by his vivid recollections of being poor, of lacking sufficient food, never having new clothing, and watching his mother cry while cooking and mending old clothes.  He knew that he did not want his children to have similar memories, and he knew that he did not want others to suffer in that way.  He had learned from his parents and in yeshiva, that one of the most important principles of Judaism is "tzedahak"   charity, righteousness and the obligation to help those in need.  Shaya also understood that giving donations anonymously and to unknown recipients was a special and high level of tzedahak.  He consciously and intentionally decided that tzedahak would be the principle that would guide his life and that he would teach his

16

children.  Shaya's oldest son, Kivi, in his letter to Your Honor, reflects Shaya's success in living by "tzedahak:"

> The role models that I encountered in my childhood experiences pale in comparison to the singular and most effective influence in my life, my father. Watching him in action, providing me with constant exposure to altruistic kindness, compassion, self sacrifice, and consistent community work.

Letter #2.

The marriages of both Kivi and Yanky were arranged, largely through Shaya's many contacts and friendships in the Orthodox Jewish community.  Kivi and his wife Faigy and their young child reside in Borough Park, and Yanky and his wife Ruchy live in an Orthodox community in New Jersey.  Both Faigy and Ruchy are currently pregnant;  Ruchy is expecting in March, and Faigy in the summer.

While Shaya, Roizy and Sol live in their large Pomona home, a visit to this home reveals it is beautiful when viewed from the outside, but when entering the home, one immediately observes that most of the rooms are empty.  Most rooms have no furniture, as Shaya was not able to afford to furnish the home, but planned on purchasing furniture over time and as needed to accommodate his family.  The home includes a room in the basement from which Shaya conducts his plastics business.

In keeping with Orthodox custom, though married, Shaya's sons Kivi and Yanky continue religious studies at Yeshivas, and are supported by Shaya.  However, public knowledge of Shaya's arrest, indictment and guilty plea has had a tremendous adverse affect on Shaya's plastic business, as many customers are no longer willing to do business with

17

Shaya. Shaya and his family now understand that he can no longer support his two married sons. Shaya is additionally afraid that he will no longer be able to afford the mortgage payments on his Pomona home.

In addition to the substantial adverse financial impact caused by the current prosecution, the prosecution has substantially and adversely affected several members of Shaya's family. Shaya's parents are both 70 years old, and are understandably very distressed about the pending criminal prosecution. The family is particularly concerned for Shaya's father, who has been weak and somewhat frail since suffering a cardiac incident and resulting hospitalization and cardiac procedure within the last two years. Shaya's mother, who seemed to be the healthier of the two, had to be rushed to the hospital on December 9th. Her blood pressure, heart rate and temperature had dropped to dangerous levels. She was very dizzy, could not lift her arms, and could not keep her eyes open. It was initially feared that she had suffered a heart attack, but the situation was later diagnosed as an acute anxiety attack. She continues to suffer from acute vertigo, and her physicians attribute it to emotional stress and anxiety. The distress and concern of Shaya's parents is exacerbated by the fact, that of their children, Shaya is one of the most attentive. Despite having moved to Pomona, before his arrest, Shaya visited his parents at their home in the Williamsburg section of Brooklyn several times each week. He monitored their activities, ensured that they did not miss their frequent medical appointments, and arranged for a member of the family to drive them to each appointment. As one of Shaya's brothers, Yitzchok, writes about their parents

18

to Your Honor:

> If my brother will be sentenced to jail, it will really break them, especially my mother as they rely on his frequently [*sic*.] visits and helping them with doctors appointments and other requirements....

Letter #10.

And his sister Baila Fulop writes of the same concern:

> He is such a devoted son to our elderly parents and I am scared what can happen to them if Shaya is taken away, just a few weeks ago my mother was hospitalized for anxiety.

Letter #16.

Shaya's wife is also suffering from acute anxiety.  Virtually on a daily basis, she complains of some ailment or pain and goes to her physician.  These constant doctors visits have added stress to both Shaya and his wife, including because Shaya does not have medical insurance and these new and additional expenses have added to the family's financial burden. At the end of each visit, Shaya's wife is informed that the physician can find no specific cause for the complaint, and advises it is due to anxiety and stress.

For Menachem, Shaya's 16 year old son, the arrest and prosecution of his father has been a life changing event.  As Shaya's wife / Menachem's mother writes (Letter #1):

> [Menachem] looked up to his father's way of life he was a proud kid doing very well at school and great grades.  However since the arrest he is confused and traumatized, he cannot comprehend the turn it took in our life.  I am afraid to say but his grades in school have dropped, his focus is not there and he is very down to say the least.

Shaya's second son, Yanky writes in his letter (Letter #3)that, "My biggest concern is regarding my younger brother who is just 16 and is presently living with my dear father ever

19

since my father got arrested we can see how he is dropping in focusing in school and doing anything."

Menachem's teacher, Joe Tabbouche, has also seen a dramatic change for the worse. He writes (Letter #103) to Your Honor:

> Menachem is a very bright and eager young man that I have had the privilege of teaching for the past year and a half.  He was the top of his class.  In all the years that I have been teaching I have not come across a student with such eagerness to achieve scholastically, as well as one that possesses a strong giving nature towards others.  I have had many conversations with him.  In one of our conversations, I asked Menachem where he gets his kind and giving characteristics.  He told me that he gets it from his father.  He informed me that his father sets an example for him as well as for his entire family.  The kindness that he shows others is a direct result of his father's influence.  I must admit that it was very nice to see a young man want to take direction and to emulate his father.

> This ALL changed last April upon the arrest of the defendant.  Menachem has not been the same since that day.  He has been extremely depressed. His grades have dropped significantly and the spark of learning as dimmed.  That once eager student in now quiet and very introverted.  I have asked him why the sudden change.  He stated to me that he cannot understand how his role model, his father, can do such a thing.  His world has been truly shattered.

Mr. Tabbouche therefore requests that the Court consider the further adverse impact that would result if Menachem's father and role model, Shaya, is not part of his daily life.

A review of Menachem's own letter to Your Honor (Letter #4), reveals the impact that Shaya has had on Menachem, and the importance of Shaya's continued role in raising and mentoring  Menachem.

20

## PUBLIC SERVICE, CHARITABLE AND CIVIC ACTIVITIES, CIRCUMSTANCES IN SUPPORT OF A NON-GUIDELINES SENTENCE[3]

_____

Throughout his life, Shaya has personally dedicated himself to helping individuals in need of assistance.  His efforts are multi-faceted, that is, he has taken an active and leadership role in community, charitable, and religious organizations, he has actively raised funds and contributed personal funds to charitable causes, and most significantly and to a most unusual extent, he has personally devoted himself to aiding individual people who are in need.  Counsel has learned of numerous situations where Shaya has personally come to the aid of bereaved, needy and homeless people. Despite the awards and citations that he has received from organizations, when assisting individuals, Shaya endeavors to keep his assistance anonymous in keeping with Jewish orthodox teachings.  Therefore, while some of his activities as a leader of Shomrim are well known in the Jewish community and some have even been reported in the media, many of his efforts are not widely known. Accompanying this Sentencing Memorandum are dozens of letters recounting Shaya's many

_____

[3] Post-*Booker*, good works, charitable, public service and civic activities are considerations for a sentencing court in determining whether the imposition of a *non*-Guidelines sentence is appropriate.  *See United States v. Thavaraja*, 740 F3d 253, 262 (2d Cir 2014)*; United States v. Jones*, 460 F3d 191, 194 (2d Cir 2006); *United States v. Corrigan*, 2007 US Dist LEXIS 56232, at *4 (D Conn Aug. 3, 2007).  As the Guidelines are advisory, the federal courts have recognized that sentences are to reflect the application of the § 3553(a) factors, and therefore the goal is to achieve "individualized justice" based upon an application of the section 3553(a) factors specific to each defendant.  18 USC §3553(a)(1) ("history and characteristics of the defendant").

and varied acts to aid other people, particularly those in distress.

**Shomrim**

From 1993 through to his arrest in 2016 on the instant prosecution, Shaya was an active member of the Borough Park, Brooklyn, "Shomrim" Volunteer Neighborhood Patrol Organization (BSSP: Brooklyn South Safety Patrol).  For most of that time, beginning in about 1995, he was a high ranking officer, a "Coordinator," of the Shomrim organization. As a Coordinator, he organized, directed and personally participated in the activities of the Shomrim safety patrol.

To become a member of the Shomrim, Mr. Lichtenstein had to pass a screening test to determine his suitability and to ensure he had no criminal record or arrests.  He also was required and successfully completed a training program conducted by the NYPD as well as a training program of the Shomrim organization.  Throughout the years of his service with Shomrim, Mr. Lichtenstein has attended numerous other training programs conducted by various police and government agencies, including the NYPD and New York State police agencies.  In addition to volunteering for service to the community with Shomrim, Mr. Lichtenstein volunteered for the Coast Guard Auxiliary, and attended training by the U.S. Coast Guard in emergency procedures and techniques.  Exhibit 1.

During his years of participation in Shomrim, Mr. Lichtenstein directed and personally participated in daily activities, as well as numerous major emergency situations, including

extraordinary activities involving many searches for missing persons.  It was not uncommon for Mr. Lichtenstein's phone to ring in the middle of the night with calls seeking his immediate assistance.  Abraham Brauner, a Coordinator of Shomrim, has provided two letters a letter in support of Shaya, one letter is Shomrim's declaration in support of Shaya, the second is his personal letter.  The Shomrim letter includes the following observation: "When a child or elderly (Alzheimer) individual goes missing, he is often at the other end of the frantic call.  Mr. Lichtenstein has been heavily involved in the search and rescue of missing and kidnaped children."  Letter #42.

<u>Kletzky Kidnaping</u>

In July 2011, a nine year old Hasidic boy in Borough Park, Leiby Kletzky, was reported missing.  Shomrim and the NYPD were notified.  Mr. Lichtenstein was the Coordinator (supervisor) in charge of organizing and directing the search for the young boy. (Exhibit 2:  CBS News release: http://newyork.cbslocal.com /tag/shomrim-safety -patrol /feed /[Showing Poster prepared by Mr. Lichtenstein attached to street pole];  Press release of State Senator Martin Golden:  https://www.nysenate.gov/newsroom/ press-releases/ martin-j-golden/search-continues-missing-brooklyn-boy-leibby-kletzky.   Both releases specifically refer to Mr. Lichtenstein as the search coordinator).  Mr. Lichtenstein immediately mobilized all available Shomrim personnel, including assistance he requested from Shomrim organizations of Williamsburg, Crown Heights and Flatbush, and from the neighborhood medical emergency corps of the Orthodox community:  Hatzolah.  Utilizing

the training he had received from New York State Police training programs, he organized and directed the search of the Borough Park neighborhood, designing and utilizing a grid search assignment system.  Approximately two thousand volunteers participated in the search, all under Mr. Lichtenstein's direction.  Mr. Lichtenstein assigned the volunteers to particular tasks.  One of the tasks he assigned was collecting surveillance videos from buildings and stores in the area that the child was believed to have walked.  Based upon reviews of the videos that were collected, the searchers were able to trace the movements of the boy, ultimately but unfortunately leading to the discovery of the boy's body.

Yaakov German, one of the search volunteers, and one of the people assigned to review surveillance video tapes writes in his letter to the Court:

> It was Mr. Lichtenstein who took control of the search.  He mapped out and enforced search grid.  He ensured that each house was searched as well.  No detail was too small for Mr. Lichtenstein.  When volunteers were beginning to despair, it was he who encourage [*sic*.] people to continue until closure is brought to the family.

Letter #56.

> As it was well reported it was me who was pouring over hours upon hours of video and ultimately led the authorities in the right direction of solving the case of the ill-fated child.

*Id.*

Young Leiby Kletzky's father, Nachman Kletzky, writes to Your Honor on behalf of Shaya.  In his letter (Letter #73), this father who lost his young son in this horrific and tragic kidnaping tells how Shaya lead the search for his son, and comforted the Kletzky family during the search and throughout the Shiva mourning week.  This letter explains that Shaya comforted the family and explained all the efforts during the search, including that he "did

not leave our side. ...He was our shoulder to cry on and cried along with us." Mr. Kletzky describes Shaya as the "unsung hero," and that the search team "under Mr. Lichtenstein's direction, worked ceaselessly until my son was found." *Id.*

Mr. Kletzky recounts that Shaya did not just lead the search, but that Shaya did much more. Shaya comforted the frightened, and then grieving, family:

> I lost trust in humanity. Mr. Lichtenstein, at all hours to speak to me, to listen to me, to provide all emotional and physical assistance and to ultimately revive that spark of faith in mankind. Although technically, his work was done once the cruel reality was discovered, Mr. Lichtenstein remained by my grieving family's side throughout the traditional seven day mourning period. He mourned with us and held our hand through the harshest of times. Mr. Lichtenstein is a man of action. He does not stand idle when someone is in need of assistance. More men like Mr. Lichtenstein would help make our community a safe haven and a kinder place for our families.

*Id.*

Mr. Kletzky concludes his letter with his plea to this Honorable Court:

> Dear Honorable Judge, please have mercy on a person that had mercy on me and mercy on my broken family in the most crying time of need and so many others he brought back hope and joy to their families. His misguided and unjustified act in one situation (which he strongly regrets) doesn't come close to so many good he has done. His family desperately needs him close by. We need him - Please!!!

*Id.*

### New Hampshire Forest Search

Another search, directed by Shaya, that ended tragically occurred in late August 2001, when a Hasidic man, Abraham Hauer, took a what was intended to be a short hike in the woods of New Hampshire; but he did not return. Local authorities and the New Hampshire Park Rangers were notified and a search began. Mr. Hauer's family sought help from

relatives and friends in Brooklyn, and they contacted Shaya Lichtenstein.

In her letter to Your Honor, Milka Lowy (Hauer), the wife of the deceased, explains, "Their first contact was Shaya Lichtenstein who was a well known go to person in the community for any crisis."  Letter #66.  Shaya reacted immediately, and as coordinator for Borough Park Shomrim, contacted its members, mobilized a group, obtained equipment, arranged for kosher food to sustain the group's efforts in the forest, and led the group to the New Hampshire forest.  He also contacted other Shomrim organizations for additional volunteers and equipment.  Mr. Lichtenstein arranged and coordinated bus and car-pool transportation to deliver the several hundred volunteers from Brooklyn to the search area.

At the New Hampshire Park, the New Hampshire State Park Rangers assigned search areas to Shomrim.  Mr. Lichtenstein, using the skills he learned from his NY State Park Rangers search and rescue training, divided the areas assigned to the Shomrim volunteers into grids and assigned teams for each grid area.  Unfortunately the search ended when the body of Abraham Hauer was discovered.

The unfortunate discovery of Mr. Hauer's body did not end Mr. Lichtenstein's involvement.  He comforted the grieving wife and family, personally accompanied the body back to Brooklyn and attended the funeral and the Shiva (religious mourning week).  During the years that followed, Mr. Lichtenstein has continued to remain in contact with the widow, and continued to provide assistance to her.   Milka Lowy (Hauer), the wife of the deceased, in her letter to Your Honor, describes Shaya as an "Angel."  *Id*.  She notes that the story of

her husband's death "was written up in all the newspapers 17 years ago, but the man behind

the scene that coordinated everything was never advertised until now...." *Id*. (See New York

Times article, August 2001, attached as Exhibit 3). Mrs. Hauer recounts Shaya's efforts and

his compassion:

> Shaya Lichtenstein got the WHOLE community involved...,
>
> A search was initiated immediately due to Shaya's tireless efforts...,
>
> Shaya coordinated buses with hundreds of volunteers...,
>
> Shaya ordered & had delivered thousands of kosher sandwiches & drinks for all the hundreds of volunteers...,
>
> At a point when all were frustrated already that my husband was still not found, Shaya and a handful of volunteers were the amazing people that actually found my husbands body...,
>
> Shayas [*sic.*] kindness did not end at that point...,
>
> follow[ed] the ambulance all the way back to New York...,
>
> the week of Shiva was chaos.....but Shaya was there every minute...,
>
> the morning we got up from sitting shiva, Shaya handed me his phone number and told me "anything, anything you need please feel free to call me 24/7."

Letter #66 (emphasis in original).

We attach as Exhibit 4, four photos taken during the search in New Hampshire. The photo

on the bottom right shows searchers removing the body of the deceased Mr. Hauer from the

forest, and Shaya is the individual in the rear holding the stretcher (second person from the

left). In the photo on the top right, Shaya is third from the left.

Mrs. Hauer closes her letter to the Court with the following request:

27

> In the merit of all the benevolence that Shaya has shown upon me and the
> many others, may you, your honour, bestow benevolence upon him.

Letter #66.

### Grand Canyon Crash Recovery

In early August 2001, Shaya led a recovery effort to Grand Canyon National Park.
Several Borough Park Hasidic families took a vacation trip to the Grand Canyon.  Part of the
trip included a helicopter tour of the canyon, but one of the helicopters crashed and burned,
killing its pilot, five of the Borough Park group, and grievously wounding the sole survivor:
one woman from Borough Park.  In keeping with Jewish law concerning prompt burial, Mr.
Lichtenstein and several members of the Hasidic community immediately volunteered to go
to the Grand Canyon in an effort to recover body parts of the deceased.  Mr. Lichtenstein was
one of the three who actually searched for and collected the bodily remains.  He traveled to
the crash site, combed through the wreckage, recovered body parts, and had the body parts
transported back to Brooklyn in accord with religious law.

The twin sister, Bracha Rosenberg, of the sole survivor of the helicopter crash, and
in which her sister's husband perished, writes to Your Honor on behalf of Shaya
Lichtenstein, and recounts of the extraordinary extent of Shaya's assistance, including:

> I don't have to elaborate how lost and confused our family was and what a
> tumultuous time it was for our family, it was then that our family was
> introduced to Shaya Lichtenstein who didn't spare money nor time to help in
> any way possible, starting with being one of the first volunteers to fly out to
> Arizona to identify and arrange for the bodies to be flown back to New York.

Letter #92.

Mrs. Rosenberg further details Shaya's assistance to the family members who flew

to Arizona and stayed for two months during her surviving sister's hospitalization which included amputation of both legs. She also writes that because of her sister's severe injuries and her brother-in-law's death, she had to care for her sister's two young children. To ease this new financial burden, Mrs. Rosenberg informs Your Honor that Shaya, "showed up with a substantial personal check saying that he got it for us from an unanimous [*sic.*] donor...." *Id.*

Mrs. Rosenberg concludes her letter to the Court on behalf of Shaya, with the following observation:

> ...we know that Shaya is at core a wonderful human being with a giant heart that doesn't hesitate about helping anyone that is in need. We were and are very saddened to have seen him succumb to an alcohol addiction within the last 8 years or so. I can truly say our hearts cried for him seeing how he was destroying himself. We hope your honor can recognize the same, that Shaya does not need punishment but rather to be rehabilitated so his true nature can shine once again, and be part of his wonderful family.

*Id.*

Attached as Exhibit 5, are two photos of the funeral procession in Brooklyn following the return of the bodies of the crash victims. Shaya is shown in both photos, front and center, accompanying one of the caskets.

### Run-Away Girls

Shaya has directed and participated in many search efforts (see Letter of Rabbi Yonoson Rosenbaum of the Brooklyn Yeshiva, Letter #91), and thankfully, many of the search efforts in which Shaya was involved ended successfully and happily. During the Labor Day weekend of September 2004, two teenaged Hasidic girls of Borough Park, Elky

29

Stern and Frimchy Hirsch, were reported missing. The Police and Shomrim were notified. Shaya assumed command of the Shomrim response, mobilized its members, contacted affiliated organizations and directed a search of first of Borough Park and then of other Jewish communities. Ultimately, the girls learned of the massive search, and contacted a friend in Borough Park to announce that they were safe. The person that the girls contacted called Shomrim, and Shaya personally interceded with the girls who had fled to and settled in Arizona.

Shaya's kind words and assurances convinced the girls, who had fled the strict constraints imposed by their families and the Orthodox community, to return to Brooklyn. One of the run-away girls, Frimchy Hirsch, has written a letter to advise the Court of the compassionate and heart-felt assistance that Mr. Lichtenstein provided to her. She writes:

> ...Shaya, he was the first person that made me feel comfortable, and offered any help possible, for my safe return, and promised to find for me a good home, and school, that would be right for me.

Letter #68. Attached as Exhibit 6 is a photo taken in the car, when the girls were driven from the airport with Mr. Lichtenstein back to Brooklyn upon their return to New York (Frimchy Hirsch on right).

After Frimchy returned to New York and was placed with a family as Shaya had promised, Frimchy explains that:

> Shaya was not finished with his task, he continued to check up on me, to make sure I was doing OK. He invited me to his home, and I was treated like family....

\*     \*     \*

30

> It was Shaya, and people like him, that helped me then, that I have to thank for giving me the life that I always dreamt of.

Letter #68.

Frimchy concludes her letter to the Court on behalf of Shaya, with the following entreaty:

> I plead with you honorable Judge Stein, PLEASE, PLEASE, PLEASE, when determining his sentencing, think of the many families he helped, and the happiness he brought back to my life, he is an extraordinary individual, and one of a kind.  So please judge him with kindness, and bring back joy to him [*sic.*] family.

*Id.* (Emphasis in original).

While Frimchy Hirsch ran away from her family and their Hasidic life style, and while Shaya arranged and assisted the girls in establishing an alternative life style, Shaya accomplished this while also re-establishing family harmony.  Thus, another Shomrim Coordinator, Abraham Brauner, writes in his letter on behalf of Shomrim "that Mr. Lichtenstein brokered peace between the children and their parents, ultimately spending untold hours guiding the youths to the correct professionals."  Letter #42.  Shaya reunited the family, thus, Frimchy's sister, Beila Jakobovits, who remained with their Hasidic family, has also written a letter (#71) in support of Shaya Lichtenstein;  she states:

> I believe that the Honorable Judge will apply leniency to this case based on the admirable work that Shaya has done personally for my family and for the community at large.

Writing about the time of the search, Beila Jakobovits explains,

> Shaya was there for us both by giving emotional support and searching with his devoted Shomrim team locally and nationally. ...After a couple of days of relentless searching, she was found in Arizona, thank God alive.  Shaya, being ever so thoughtful picked her up from the airport, and returned her safely to the comfort of our home.

31

*     *     *

> ...Shaya was there for us through thick and thin.  Regardless of the hour he was strategizing [sic.], made countless phone calls, searched nearby neighborhoods, and was selfless throughout our ordeal.

Her letter concludes with the following:

> Shaya is an influential community member who always makes himself available for others in need.  He has brought joy to our family and I wish the same for him.  I feel very strongly that a kindhearted, devoted family man who has helped my family remain intact should not be separated from his.

The story of Frimchy Hirsch and her family is one example of the many people who Mr. Lichtenstein truly saved by listening to the problems they faced, then taking those problems to heart and committing his own efforts to help to provide a solution.

### Ehrenzweig Search

In 2004, Shaya directed a search for a missing boy.  Thankfully, the search was successful and the boy was safely recovered and returned to his parents.  Following their son's return, the parents, Avrohom and Chana Ehrenzweig wrote a letter to Shaya with a financial contribution for Shomrim:

> Words cannot express our sincere appreciation for what you and many other special people did for us the night we could not find our precious son.

Letter #45.

### Massachusetts Forest Search

Shortly after Shaya joined Shomrim, in May 1994, a 14 year old girl became lost when her school bus stopped near the Connecticut    Massachusetts border during a school trip of a Borough Park girls school.  Shomrim mobilized and Shaya, not yet a Shomrim Coordinator,

32

immediately volunteered, rushed to the search area and joined the search that lasted more than two days.  While he did not yet have a leadership title in Shomrim, he was already well known in the Orthodox community for his dedicated efforts, and played a leadership role in mobilizing and organizing the search.

The Shomrim Coordinator at the time of this disappearance, Hershy Rubinstein, has written to the Court in support of Shaya. He recounts:

> During the tense search it was Mr. Lichtenstein who raced to and remained on site directing the massive search effort.  He coordinated hundreds upon hundreds of volunteers who came from far and wide to participate in the search.  He made sure all volunteers were fed and clothed properly ensuring their safety as well.  Of utmost importance to Mr. Lichtenstein was that Ms. Feldman's [the missing girl's] parents were let know of all updates and that no stone was being left unturned in the search of their precious daughter.  By the time the ordeal was over Mr. Lichtenstein hadn't slept in days.  He drove back to New York without any fanfare.  To Mr. Lichtenstein all children were like his own    If he would do it for his own child he would do it for yours as well.
Letter #95.

The search efforts were successful, and the young girl was found safe and healthy.

Ernest Feldman, the father of the rescued girl, has written a letter on behalf of Mr. Lichtenstein.  In this letter (Letter #48), Mr. Feldman writes:

> Mr. Shaya Lichtenstein ... took up arms.... lead the search..... For an exhausting, and frightening two days and nights Shaya and his team stayed up, scouring the region, never wavering in their search, only taking a breath when they knew she was safely returned to my arms."

In his request to Your Honor for "mercy" for Mr. Lichtenstein, Mr. Feldman pleads:

> Your Honor, when you are considering Shaya's sentence, please think of how much pain I went thru those two days when a part of my family was missing and how Shaya joined in that pain as if it was his own family member until we

33

were reunited.   Please have mercy on this man who has given up days and nights to find my precious daughter.  In the moment when all was lost and completely hopeless, Shaya was among those that stepped in with everything he had to offer.  He didn't leave the responsibility to 'others' as he could have. No, in fact he insisted on making the responsibility his.

*Id.*

### Daily Patrols, Special Assistance

Shaya responded to many emergencies as a member of Shomrim.   Despite being a Coordinator of Shomrim, Shaya also regularly performed the daily  and nightly  shifts patrolling the streets of Borough Park.  During these patrols, Shaya was always alert to signs of people in trouble, especially young people.  Whenever he observed a person that raised concerns, Shaya tried to intercede and assist.  A number of the letters written to Your Honor tell of Shaya talking to teenagers and young adults, as he did with the two girls who ran away to Arizona.  Shaya would offer any assistance, food, medical care, help in finding a job, a school placement, a professional counselor.  As Abraham Brauner, a Shomrim Coordinator, writes to the Court as a representative of Shomrim, informs the Court:

Mr. Lichtenstein has a soft spot for troubled people.  He has given hours, days and months  of his life to help people who have fallen hopelessly into the abyss of drugs and alcohol and those contemplating suicide.  From identifying these troubled souls who have flown under the radar to getting them into rehab and procuring a job or a school for teens - Mr. Lichtenstein stops at nothing in ensuring these people are able to live productive and healthy lives.   His kindness is unending in that he continuously checks up on them and maintains a relationship as a positive influence and guide for years to come.

\*     \*     \*

Mr. Lichtenstein would frequent the streets late into the night, an emissary of parents writhing their hands at home wondering where their dear and troubled children are.  He spends time with them and draws them towards his warm and caring  personality,  ultimately  becoming  a  mentor  to  many  troubled  and

34

forgotten teens.   Over the years his passion has become clear.   Mr.
Lichtenstein has a burning desire to see each troubled child get a second
chance and lead a successful and fulfilling life.

Letter #42.

Shaya's brother Joseph Lichtenstein also writes about Shaya's help for troubled

people:

> Through his work as a community activist, he would often encounter youth
> battling a drug addiction.   Time after time, he chose to intervene, express
> concern, and offer assistance.   Although he was never professionally trained
> for such situations, his warm heart enabled him to advance a caring and non-
> confrontational approach.   This maverick approach ultimately turned around
> the distraught lives of many who suffered from substance abuse.

Letter #13.

His ability to relate to people and gain their confidence and trust (see, for example,

accompanying Letters of Nachman Kletzky (#73), Frimchy Hirsch (#68 ), Bracha Rosenberg

(#92 ), Milka Lowy Hauer (#66), Ernest Feldman (#48)) also enabled him to assist teenagers

and young adults in the Borough Park community who were in trouble or headed for trouble.

Thus, while on patrol, he would walk up to people, especially young people, who seemed to

be wandering during nighttime hours.   He offered his personal assistance, arranged for job

interviews, provided a meal, or listened to their story of fears and stress.   Despite his own

addiction to alcohol, or because of it, he was compassionate and was able to direct people to

neighborhood counselors for assistance in dealing with drug and/or alcohol abuse.   He used

his many contacts with community members and organizations to enlist counselors or

mentors to help people in crisis, to find employment when unemployment was an issue, to

place a teenager in a yeshiva, or to raise funds when the crisis or stress was based upon

financial difficulties.

Fire Rescue

Thus, Shaya on patrol at night was attentive to a wide range of possible problems. One night, April 22, 2004, at approximately 3:00am, while on patrol as the supervisor for that night's Shomrim patrol of the Borough Park neighborhood, he and a partner were in a car patrolling when they received a call that a nearby residence was on fire.  They raced to the location, and were the first  first-responders at the scene.  Mr. Lichtenstein immediately jumped out of the vehicle, yelling to his driver/partner to call the Fire Department, and ran into the burning home. As the fire consumed the building, Mr. Lichtenstein ran into and through the building shouting a warning and searching for occupants.   Inside the burning residence, Mr. Lichtenstein awoke four residents;  an elderly couple, Peter Friedman and his wife Soshanna Friedman, both 69 years old, and Benzion Yerushalaim (61 years old) and David Yerushalaim (15 years old).   Mr. Lichtenstein and other Shomrim responders helped all of the occupants out of the building and literally into the hands of other first responders who had begun to arrive.   All four of the occupants required medical treatment at Maimonides Hospital, and the Police Department report of the incident credited Mr. Lichtenstein and three other Shomrim first responders with saving their lives and recommended Police Department recognition for heroism, stating that:

> When they responded and observed the large flames coming out of the building, they immediately ran inside and forcibly opened the doors to the second floor two (2) apartments.  The second floor rear apartment had two (2) elderly people sleeping at the time.  The Shomrim listed above [four, including

36

Mr. Lichtenstein] managed to get the elderly couple and the rest of the people in the other apartments out safely.

*          *          *

Without their response there most certainly would have been serious injuries and possible DOA(s)  [Dead on Arrivals].

A copy of the Police Report is attached as Exhibit 7.

One of the residents of this building, Yankel Bernath, who credits Shaya with saving his life, has written to the Court to help Shaya.  Mr. Bernath describes Shaya as "a super human," and explains:

> Out of nowhere, a person by the name of Shaya Lichtenstein, a young man, came running into the house as if he was super man and woke everyone up, pulled them out of the house, and saved everyone.  The house was engulfed in flames and the Fire Department of NY arrived and said "if hadn't been [*sic.*] for Shaya Lichtenstein that they would all have been dead."

Letter #38.

Mr. Bernath concludes his letter, by asking that the Court not sentence Mr. Lichtenstein to jail:

> Your Honor, a man that rushed into a burning building, should not be put behind bars.  He is a hero.  If he is jailed, he won't be around to continue to perform heroic acts.  He is a good person and believes in helping others. Please Your Honor, please have mercy on him if not for the good of mankind, but for his wife, three sons, grandchild, and especially his elderly parents. Have mercy on him because the community needs him.

*Id.*

### Near Fatal Car Accident, Disabled Vehicles

Shaya, was always on call, always ready to respond to help other people.  Although the Borough Park community has a very active and effective medical corps, Hatzolah, Shaya responded to any emergency call.  Thus, when a call came over the radio for an ambulance

37

to respond to a severe injury to a pedestrian hit by a car, Shaya responded.  Shaya arrived on

the scene as did a Hatzolah ambulance.  The wife of the severely injured pedestrian writes

to Your Honor and explains that it was Shaya who saved her husband:

> My husband was walking across Coney Island Avenue... when he was struck
> by a speeding car....  My husband was thrown into the air and then he went
> through headfirst into the next car's front windshield and landed in the seat
> inside the car.  My husband lost consciousness, his head was split open, his
> lungs collapsed and his right leg was broken in half.
>
>             \*     \*     \*
>
> Some other first responders were pessimistic about whether it was worth it or
> they weren't sure whether my husband was alive.  Mr. Lichtenstein was very
> instrumental in getting them convinced that he was alive and that he should be
> taken to the well known trauma center at NY Methodist immediately.  This
> saved his life. We owe him soo much.

Letter of Bella Sternbuch, Letter #101 (emphasis in original).

     As in so many other cases, Shaya did not end his involvement when he left the scene.

Rather, Mrs. Sternbuch's letter explains that, "Mr. Lichtenstein was also instrumental in my

husband's recovery...."  *Id*.  Shaya understands humanity, and recognizes that a true rescue

does not end at the scene of the event, rather the healing (or mourning) process begins when

the activity at the scene is finished.

     What constitutes an emergency can vary, and for some people a disabled automobile

can constitute an emergency.  Shaya does not discriminate when he receives a call for help

 he responds.  Thus, there are many instances where people in a disable vehicle sought his

help, and Shaya responded.  See, ie., Letters of Chanie Friedman (Letter #52); Letter of

Menachem Herzog (Letter #67).

38

Hurricane Sandy

These are but a few of the many cases where Shaya Lichtenstein, as a member of Shomrim, raced to save individuals.  Shaya has also personally responded to and led emergency efforts in the face of much broader emergencies.

In October 2012, Hurricane Sandy struck New York and caused severe damage.  As the Coordinator of Shomrim, Mr. Lichtenstein organized the effort to ameliorate the effects of the storm.  He dispatched teams of volunteers with chain saws to clear streets, sidewalks, driveways and entrances to homes that were blocked by fallen trees, tree limbs and debris. He sent other teams to secure areas rendered dangerous by fallen power lines.  Shaya additionally acquired electric generators and had them delivered and connected to nursing homes, adult homes and medical facilities in order that these important operations could continue until Con Edison crews could restore electric services.  Shaya's efforts to ameliorate the affects of Sandy are described in the Shomrim letter of Abraham Brauner (Letter #42). Mr. Brauner informs this Honorable Court that Shaya led the Shomrim response to Sandy, and that Shaya's efforts continued long after the storm subsided, as he "procured financial assistance" and "continues to keep up with the recipients of his kindness." *Id*.  A photograph from a news report of Mr. Lichtenstein (top photo, center) organizing Hurricane Sandy operations with senior NYPD officers, at the Borough Park Shomrim Command Center at 13th Avenue and 52nd Street, is attached as Exhibit 8.

<u>September 11th, "Ground Zero"</u>

Several of the letters to Your Honor state that Shaya's efforts on behalf of others 'show no bounds;' this statement is more than just repeating a colloquial phrase.   When terrorists hijacked airliners and used the airplanes to attack New York and the United States, and destroy the Twin Towers of the World Trade Center on September 11, 2001, Mr. Lichtenstein immediately mobilized Shomrim.  He instructed other Shomrim Coordinators to take charge of operations in Borough Park and insure that the numerous Jewish religious institutions in Borough Park, synagogues, schools and community buildings, each had security teams posted.  Knowing that activities to safeguard the Borough Park area were commenced, Shaya directed is attention to "Ground Zero."  First, he personally obtained a truck load of bottled water, and had another vehicle loaded with cases containing thousands of protective face masks.  Then, with seven other Shomrim members, this equipment was driven to "Ground Zero."  Immediately before leaving Brooklyn for Ground Zero and the unknown dangers that would be faced at Ground Zero, Shaya understood the severity of the situation and of the risks.  As his son Jacob ("Yanky") tells in his letter to the Court, "My father tearfully kissed us and said goodbye explaining that his return was doubtful."  Letter #3.

At Ground Zero, Shaya personally distributed the water bottles and face masks to the other first responders, including firefighters, police officers, ambulance-EMT and other medical personnel, who were engaged in rescue efforts.  While Fire Department personnel

were equipped with face masks and air tanks, police officers generally were not.  And, neither Department had sufficient drinking water for the hundreds of first responders at Ground Zero.  Because of Mr. Lichtenstein's personal efforts, drinking water and face masks were supplied during the first tumultuous hours of this national crisis.   Exhibit 9: Photographs of Mr. Lichtenstein and his Shomrim team at Ground Zero: Page 1, Mr. Lichtenstein center;  Page 2, top: Mr. Lichtenstein in the center, wearing his Shomrim hat, jacket, and Shomrim Police Clergy-Liaison Shield; Page 2, bottom left: Mr. Lichtenstein second from, right; Page 2, bottom right, Mr. Lichtenstein on right; Page 3, top, Mr. Lichtenstein center, Page 3 bottom, Mr. Lichtenstein distributing supplies with NYPD personnel.

After about two hours working at Ground Zero, Mr. Lichtenstein received a call on his cell phone from the Commanding Officer of the 66 Precinct, Inspector Robert Napolitano.  The Inspector asked where Mr. Lichtenstein was, and then requested that Mr. Lichtenstein immediately return to the 66 Precinct.  The Inspector explained that Police radio communications had been disabled and the Precinct needed immediate assistance and additional personnel.  Mr. Lichtenstein left his Shomrim colleagues to continue distributing the water and face masks, and immediately rushed back to the 66 Precinct in Borough Park Brooklyn.  At the Precinct, and with one of his younger brothers, they set up Shomrim communications in the Precinct police station-house to assist with Police communications. At the Inspector's request, Mr. Lichtenstein personally took command of dispatching

41

Shomrim members to cover all non-emergency calls within the Precinct, thereby freeing Police Officers to handle the many emergency and security activities that were required on this day of national infamy and tragedy.

Discussing Shaya's dedication to both the community and to individuals, and cognizant of the instant prosecution, one community member, Hershel Brach, in his handwritten letter to the Court, declares:

> With my full grasp and understanding of the guilty plea that Shaya took the courage, and with real remorse took responsibility to the actions done by giving bribery, I would still like to ask You Honored Judge to take into consideration what Shaya was and is all about, you are deciding here and judging a person that is one in a million.  Shaya for the last 30 years was a free public servant, serving every broken heart, serving the community, serving the state, serving the country, giving away last dollars to sorrowed souls with relation and no relation to him, serving the Boro in stopping crime with mostly sleepless nights fighting the darkness of evil by patrolling the neighborhoods.

Letter #40.

### Investigations

As a member and leader of Shomrim, Shaya did much more than respond to emergencies and patrol the neighborhood.  He also conducted investigations to assist the Police Department, the community, and individuals.  Thus, in Shomrim's letter to the Court, Coordinator Abraham Brauner advises that Shaya worked on many investigations, including into fraudsters posing as utility company employees, and Friday night burglary sprees.  In the burglary spree investigation, Shaya obtained and then personally reviewed video tapes of surveillance cameras in Borough Park near the targeted homes, and eventually Shaya was able to "find the footage of the criminal who was then brought to justice."  Mr. Brauner adds

that Shaya "was subsequently thanked by the NYPD."  Letter #42.  Notably, Shomrim

Coordinator Brauner advises that "Shaya never wanted to be awarded in public, he used to

say 'God will reward me.'" *Id*.

• Burglary

Fraidy Myski writes to Your Honor to advise that she was the victim of a burglary of

her home, that her jewelry was taken, and that when the police could not solve the case, she

turned to Shaya Lichtenstein.  As described by Ms. Myski, Shaya conducted an investigation,

including reviewing surveillance videos, identified the burglar, resulting in the recovery of

her jewelry.  Letter #83.  She additionally comments that, "Shaya has always been out to help

anyone in our community.  And he's always done it so graciously!  He never expects a thank

you, he's just relieved when he can help."  *Id.*

• Sex Assault

More recently, approximately one year ago on February 23, 2016, Mrs. B. W█████

and her daughter were the victims of a sexual assault.  Mrs. W█████ writes to the Court

to tell of Shaya's assistance to her:

> While the New York police took DNA samples and had us look at photo
> arrays, our case was not prioritized and there was no progress being made in
> identifying or apprehending the perpetrator.
>
> When Alex Lichtenstein heard about the incident he immediately reached out
> to me and offered his assistance.  He spent time speaking to me, the officers
> on the case, and members of the auxiliary police [Shomrim].  He then drove
> into Brooklyn multiple times and spent countless hours canvassing and then
> culling footage from security cameras along the route that my daughter and I
> followed and then attacked along.  He was indeed successful.

> ....Mine was not a case that received any media or communal attention and there was no financial or social gain to offering his assistance.  Indeed, he did not hesitate in spending his social capital when using his relationships within the police department to help me in my search for justice.

Letter #107.

This investigation is another illustration that Shaya Lichtenstein was able to use his friendly relationships within the Police Department for many good and lawful purposes.

• Exonerating Wrongly Accused

In another matter, Shaya was able to obtain evidence to exonerate a young boy who was about to be expelled from Yeshiva and ostracized by the Orthodox community.  As the letter from S██  L████████, the boy's mother, explains, her son was accused with having made a false telephone report of a shooting in his school.  After their initial efforts to obtain a copy of the 911 tapes ended in frustration, they turned to Shaya for assistance.  Shaya was able to promptly arrange for their review of the 911 tape recording which exonerated her son. Letter #75.

<u>Mediator</u>

A█  G███ writes to the Court that he was the victim of a private investment fraud,  and he explains that because of Shaya's efforts and investigation, the fraudster was convinced to agree to arbitration before a rabbinical court.  Mr. G███ prevailed at the arbitration and received restitution.  He additionally tells Your Honor that, "When I asked him [Shaya] for his fee, he was shocked, and told be that he never took a fee for helping people."  Letter #63.

As Abraham Brauner's Shomrim letter indicates (Letter #42), while Shaya was the

"go-to" person  when a search for a missing person had to be conducted, he was also the "go-to" person  for dealing with a wide variety of personal problems, domestic disputes, business and landlord tenant disputes.   Additionally, within Shomrim, Mr. Lichtenstein became known as the "go-to" person for dealing with domestic disputes.   Thus, when a domestic dispute was reported to Shomrim (often Shomrim received these reports, rather than the police or other city agency), Mr. Lichtenstein was often the person called to the scene.   He had a special ability to quickly gain the confidence of the disputing parties, to calm a stressful or emotionally explosive situation.   Moreover, because of his reputation in Borough Park, his presence at the scene often calmed tempers.   As the Shomrim letter of Abraham Brauner explains:

> Mr. Lichtenstein has negotiated countless business and landlord/tenant disputes that have arisen throughout the years.   Thus avoiding lengthy court battles and a fractured community relations [sic.].   His utmost desire is a peaceful resolution to problems.   His clear direction is appreciated and respected by the parties on either side of the dispute.

Letter #42.

### Continuing Dedication and Assistance

Counsel emphasizes that while Mr. Lichtenstein was a high ranking member in Shomrim, he did much more than give orders and hand out assignments.   Mr. Lichtenstein took every assignment, and especially every emergency, personally.   He dedicated his efforts to the immediate goal, and then he went beyond what others might have perceived as the final goal.   As many of the accompanying letters attest, when the immediate goal was completed (ie., a search, and the missing persons were found), all the other volunteers and

45

first responders packed up and went home.  But not Mr. Lichtenstein, he continued with his efforts, and in the most personal and dedicated manner.  He  and he alone  counseled, assisted and supported the victims and their families, and often he continued to do so for years.  Because of his efforts and daily dedication to helping others, Mr. Lichtenstein was known in the Orthodox Jewish community as the ultimate "Mensch," a person of noble character ("Mensch," see ie., Letter of Dovid Friedman (#53).  Mrs. Hauer, whose husband died in a forest New Hampshire despite a search organized by Mr. Lichtenstein, and who subsequently married a renowned Grand Rabbi writes that the Grand Rabbi referred to Shaya Lichtenstein as not a "mere man," rather the equivalent of "a Sefer Torah (a torah scroll) a holy object."  Letter #66.

### Other Charitable Efforts and Good Works

<u>Divorce Assistance</u>

As the Court is probably aware, divorce in the Orthodox Jewish community remains an unusual occurrence and often stigmatizes the parties, particularly the woman.  In one such situation, Shaya helped a woman who was recently divorced.  The woman, C███ R███, writes to the Court on behalf of Shaya, and explains how he helped her:

> My name is C███ and I'm a Hasidic girl from Boro Park, I have four children and recently divorced, as I'm sure you know how a divorced woman in my community is stigmatized ostracized and frowned upon, I was left with 4 children with no money no help and a painkiller addiction to boot, and the whole town against me even my own family.

The only person that was there for me was Shaya (Alex)....

Shaya (Alex) would come to my house a few times a week to make sure my family was taken care of, if it was to put food on the table, to get schools to accept my children.  He even got me into rehab.

I wouldn't have survived my ordeal without him and he did it because he's pure heart which is so rare in my community where most people have an agenda.

Letter #88.

In the Hasidic community, divorce often has a severe adverse impact on the man as well.  In the aftermath of one Hasidic divorce, H███████Rubinstein received counseling and personal emotional support from Shaya.  Mr. R███████, in his letter to Your Honor, first tells of Shaya's help in several other cases as a member of Shomrim.  Then H███████ R███████explains:

In another instance, it was I who was the recipient of Mr. Lichtenstein's compassion and benevolence.  I went through a terrible divorce.  Suffice it to say that I was so depressed that I did not want to go to my own daughter's wedding in Belgium.  Mr. Lichtenstein could not handle the thought of a broken man like myself missing his own daughter's wedding.  He booked a ticket for himself and me, promising to be there for me emotionally.  His goal? To unite the family.

Letter #95.

H█████ R███████ concludes his letter with the following plea:

Honorable Judge, please have mercy on a man so full of mercy for others.  A man who's efforts to help his brethren know no bounds.  I beg please spare his life that he spends doing for others.

*Id*.

One of Shaya's own brothers encountered major distress in the aftermath of a divorce; the emotional and financial impact, and having his children refused admission to yeshiva.

47

Until Shaya became involved.  Shaya interceded with the Yeshivas, and counseled ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

<u>Personal  Counseling</u>

N▮▮  S▮▮▮▮  writes in support of Shaya, as it was Shaya who saved his life.  In

his letter, Mr. S▮▮▮▮  writes that his business failed, his personal life suffered, he became

addicted to anxiety medication, and he "was losing my will to live."  Letter #102.  Mr.

S▮▮▮▮  writes that he was introduced to Shaya, and that Shaya "encouraged me to tell him

my story."  Mr. S▮▮▮▮  continues:

> Within days Mr. Lichtenstein guided me, in a most gentle manner, to
> a counselor who helped me to get my life back on track.  He found me a job
>  a job I would enjoy.  He would not settle for finding me just any job.  To this
> day, he calls me to make sure that I enjoy my job and am doing well.  He ends
> each call reminding me that he is always a phone call away to help in any way
> that I may need.  Mr. Lichtenstein has become not just my mentor but a dear
> friend.  As previously stated, how can I possible thank someone who saved my
> life just as I was hoping it would end?

*Id*.

<u>Business Assistance</u>

Shaya has helped many people whose business was in difficulty   he has even helped

his own competitor.  J▮▮ N▮▮▮, a young man with five children, was struggling to make

a living by selling plastic bags.  He had sought assistance from a number of people, but none

were willing to help.  He then sought assistance from Shaya, who also was in the business

of selling plastic bags.  Mr. N▮▮▮ writes in his letter to the Court, "without hesitation that

he might set up a competition for himself he devoted his time and resources to me...."  Letter

#84.

Shaya has helped many other businessman, some by giving advice as in N█████'s

case, others by pitching-in and working when additional work had to be done (Letter of

Simcha Franczoz, Letter #49), or by interceding and negotiating to encourage immediate

assistance from a third person (Letter of Simon Friedman, Letter #54, where Shaya

convinced a tow truck operator to immediately tow a filled with dairy products to prevent

spoilage).

<u>Compassion and Assistance for Mourners</u>

Shaya is well known for having a special soft spot for children and widows.  Simi

Landau writes to Your Honor that has a young girl of 14 years old, tragedy struck her family

when her father died suddenly of a heart attack.  She, her mother and her five young sisters

were left without a real source of support.  "[U]ntil Shaya Lichtenstein with his kindness,

warm, heart, and generosity stepped in."  Letter  #74.  At first Shaya "would bring ready

cooked meals for the whole family.  He made sure the fridge was stocked every week."  *Id*.

And Simi explains that Shaya added his very personal touch, "[o]ften he would come by just

to talk and always consoled and comforted us by saying our dad was in a good place."  *Id*.

She characterizes Shaya as the family's "knight in shining armor."  *Id*.

See also, Letters of Milka Hauer (#66), Nachman Kletzky (#73), Bracha Rosenberg

(#92).

49

<u>Daily Support and Assistance</u>

Many letters recount Shaya's acts of kindness, particularly to children, the elderly and widows.  See, ie., Letter of Hindy Spitz, Letter #98 (elderly); Sol Lichtenstein, Letter #78 (toys for children).  Shaya never forgot being hungry as a child, and often assisted by providing food, organizing food drives.  See, ie., Letter of Y. Rubinstein, Letter  #110 (a Brooklyn grocer, before Jewish holy days, Shaya asks Mr. Rubinstein for the outstanding balances of his most needy customers, and then Shaya anonymously makes the payment); Benzion German, Letter #55 (Passover food distribution).

<u>Support of Students and Education</u>

Shaya is a strong believer in education, and has therefore arranged financial assistance for many schools,[4] and has helped individual students gain admission to particular yeshivas, helped other students with tuition funding,[5] and on occasion has personally tutored students in religious subjects (Letter of Shimon and Chanie Goldberg, Letter #59).

Children with 'special needs,' is one of the areas of special concern to Shaya.  In the

---

[4] Among the many schools that Shaya has helped financially, by organizing fund rasing activities, by personally seeking out individual donors, and by making personal donations, are Yeshivas Amailim, an Israeli school for troubled children (Letter of Rabbi Chaim Atik, Letter #37); Yeshiva Ketana of Bensonhurst (Brooklyn) (Letter #77, Rabbi Osher Levevitz: "I can honestly say that our school would have ceased to function without Mr. Lichtenstein's devotion), Yeshiva Ohel Torah (of Monsey New York)(Letter #93, Rabbi Shmuel Rosengarten).

[5] See, ie., Rabbi Zalmon Lipschutz of Yeshiva Yesodei Hachaim of Staten Island (Letter #79);  Letter of Yuta German (#57);  Letter of S████ S███████ (#97); Letter of M███████ W█████ (#105).

letter of ██████████ E██████ (Letter #46), they tell of difficulty placing their 14 year old niece in a school because she had behavior issues due to her inability to deal with family issues.  They turned to Shaya, and as they write, "Shaya thru his connections and good reputation was able to arrange with a school that were willing to accept her and work with her issues...." *Id* [*sic.*].  Their letter also tells of Shaya's help for another special needs young girl.  *Id.*

Shaya's reputation for good works is recognized in Orthodox communities in Israel. Thus, when a cousin was sending one of their sons to Israel for religious studies, and they desired to place him with a family that would supply emotional support and a safe and friendly residence, they turned to Shaya.  The result, "Shaya set him up with wonderful people...."  Letter of Volvi Lichtenstein, #24.

### Support for Victims of Cancer and Other Serious Illnesses

Another area of special concern for Shaya is cancer victims, and Shaya has made great efforts to assist cancer sufferers and their family in coping with the many issues that arise in fighting these dread diseases.  One of the cancer patients that received Shaya's help, ██████ G██████ has written a letter in support of Shaya.  She explains that, "When I was diagnosed with cancer, Shaya was there to help me with moral and emotional support, He called Drs and made sure I get the most proper care necessary as if we were family." [*Sic.*] Letter #61. She concludes her letter to the Court with the following: "No words can express the good heart that shaya has From a Cancer Patient begging for leniency for my Dear Friend."  *Id*

[*sic.*].

Another cancer patient assisted by Shaya is S████ C███. Mr. C███'s dire medical situation was exacerbated by the nervous breakdown his wife suffered when she learned of the diagnosis. Mr. C███ could not handle ths situation, and he did not have the funds needed to treat his wife's breakdown:

> With no cure in sight and a broken wife, my life was a ticking time bomb and a living hell. I was in a state of total dispair, a dark hole with no way out. My cry for help did not bring me any hope And then finally when we exhausted every option for help I tasted the sweetness of redemption. I was put in touch with Shaya Lichtenstein. ...Shaya took our tremendous burden, and made it his own.

Letter # 109 [*sic.*].

Shaya raised the funds needed to treat Mr. C███'s wife, and arranged for her professional care. Mr. C███ writes, "I am awed a Shaya's ability to take a bleak and hopeless situation and infuse life into our dark existence," and "beseech[es]" the Court for "mercy on Shaya Lichtenstein" *Id*.

H████ S███ writes to Your Honor about Shaya's assistance when his 15 year old daughter was diagnosed and treated for cancer. He writes that:

> Overnight, we became desperately needy and at the mercy of others' kindness. There were many who came to our aid but one story stands out. Mr. Lichtenstein undertook the feat of raising money for my daughter's wig. He gave her a reason to get out of bed in the morning and not shudder when looking in the mirror. He gave her fortitude to move on. He also prepared a gala BBQ for her and her friends, truly lifting her depressed spirits. This man is an angel.

Letter #99.

Mr. S███ concludes his letter with the following observation: "I know we would have

crumbled without his kindness and I have no doubt that so many others will fall without Mr.

Lichtenstein." *Id*.  Mr. S███'s daughter is seen in the photo, third from right, attached as

Exhibit 10, unfortunately the second young girl (fourth from right) subsequently succumbed

to cancer.  Mr. Lichtenstein is second from left in these photos.

Shaya organized parties to bring happiness and enjoyment to young cancer patients.

Exhibit 11 is a photo of another such activity organized by Shaya for children suffering from

cancer, Mr. Lichtenstein is in the center of both photos wearing large "shtrimel" hat.  The

young cancer patient standing on a platform to the left next to Mr. Lichtenstein is S███

D████████.  S████'s father, M███ D████████, who brought his son to the United States

from Israel for cancer treatment, but arrived as Hurricane Sandy struck New York, has

written in support of Shaya.  Mr. D████████ writes that because of Hurricane Sandy he

could not get his son to the hospital.  Shaya was contacted, and "Shaya arranged for my son

travel ability to get to his doctors and treatment's in a safe way."  Letter #110 [*sic.*].  Mr.

D████████ further explains that Shaya's assistance, "didn't end there it just got started, Mr.

Lichtenstein went much beyond the extra mile, realizing the depression and pain that my son

was going thru, he arranged entertainment to chair [*sic.*] my son and others that were in the

same night mare, finally it lifted my spirit when I saw the huge smile on my son's face."  *Id.*

Mr. D████████ submits this letter, unfortunately, despite that the treatments were not

successful and  his son subsequently died from the cancer.  "It was Shaya and the others like

him that shined the light on the darkest moments and brought happiness in the most shattered

53

times of our lives." *Id*.

Rabbi Yitzchok Horowitz, of Bein-Ish Ubein Uchiv, an organization that assists patients and their families confronted by serious illness, writes to the Court concerning the purchase of wigs for these cancer patients:

> Although it rarely happens, there was one instance in which there was simply not enough money to provide wigs for two cancer patients, S███ ███, age 15, and S█ K██████ age 10.  When Mr. Lichtenstein was notified about this situation, he immediately sprang into action.  The importance of preserving the dignity of these two young patients was so significant to him. He personally arranged enough funds to purchase wigs for the girls.

Letter #70.

Rabbi Horowitz also writes to the Court that Shaya "did not stop at" the purchase of the wigs, that Shaya "organized a BBQ with entertainment to cheer up these patients who were in such pain from their chemo treatments."  *Id*.

Sima Davidowitz, a leader in the Rofeh Cholim Cancer Society, a Jewish organization dedicated to assisting cancer patients and their families, writes that Shaya "CAN NEVER SAY "NO," and that "he has gained the reputation for being the turn-to guy whenever we needed someone to step up to the plate."   Letter #43 (emphasis in original).  Explaining the many ways that Shaya has provided assistance, she states:

> Either going to visit the sick, raising money for cancer patients or just be a listening ear.  Shaya has the power of listening and comforting and always having the right words in times of need.

*Id*.

Eli Hammerman has long volunteered for several organizations that assist families facing a serious illness or death.  He writes that, "[t]hroughout the years of volunteering for

[four named] organizations, I have come to know Mr. Lichtenstein as an outstanding individual who can be counted on in all ways:  physically there, emotionally there and when needed, digging into his own pockets and fundraising."  Letter #65.

Shaya has not only made special efforts to assist cancer patients, especially children, but he also has personally dedicated himself children suffering from many serious illnesses.  Thus, ███████, a mother with a child severely afflicted with Down Syndrome writes of "how difficult physically and mentally this was for me to handle, the special care that my child required was not something that I was able to handle on my own" ████████ She explains that Shaya, "came through to help and support me in my very difficult hours. *** He was there for me with a wealth of information and lots of leads that enabled my family to function....  He helped me place my son in a warm environment to better care for his special needs and continues to be a very helpful, active, warm and understanding man in my family...."  *Id.*

Regarding an entirely different medical problem, Rabbi Saul Rosen of A Time, an organization dedicated to helping couples experiencing infertility, writes to advise the Court of Shaya's assistance.  Letter #90.

Thus, because people have heard of Shaya's assistance concerning medical issues, many reach out to him for assistance.  G██ R███'s young son was afflicted with migraine headaches, and she sought Shaya's help.  She writes that "he was very supportive, & helped me find the right doctors, & do the right testing."  Letter #94.

In helping people suffering with medical problems, and their families, Mr. Lichtenstein personally provided or enlisted other volunteers to provide all forms of assistance. Shaya's activities included raising and contributing money, organizing several annual fund raisers, enlisting drivers to provide transportation to medical facilities, arranging for housing and kosher food for family members of medical patients from out of New York City who were in New York for treatment, etc.

Mr. Lichtenstein is also well known in Borough Park and orthodox Jewish circles as a source of money for persons confronted with financial difficulties. When learning of the need for money for a crisis such as medical bills, mortgage foreclosures, grocery and utility bills, or to assist in financing happy occasions such as weddings, Mr. Lichtenstein reached out to his network within the orthodox community for funding. As Simon Reichman explains in his letter (#87), "since he is also a strong community activist on numerous occasions he would reach out to our circle of friends to raise large sums of monies to help out complete strangers whether it be for medical expenses for a family with a sick child or just helping out tuition bills or to help pay someone's rent while they were behind a few months and were about to be evicted...." See also, Letter of Rabbi Aaron Kahn of Knesses Bais Avigdor (Letter #72). Many people, knowing his reputation for helping others and knowing him to be an honest and trustworthy person, provided funds. In addition, Mr. Lichtenstein contributed his own funds, and in accord with orthodox Jewish practice, Mr. Lichtenstein and his contributors generally remained anonymous. Additionally, Mr.

Lichtenstein, on many occasions, told gun license clients to submit their fees for his services to a specified Brooklyn community and charity organization.  Mr. Lichtenstein was also a contributor to numerous police charity fund raising activities (ie., "10-13" drives) for the benefit of seriously injured officers, and for the families of deceased officers.

Counsel respectfully submits that a review of the many letters provided to the Court establishes that, when a person was in need for any reason, Shaya Lichtenstein "would NEVER EVER say NO to anyone that reached out for his help that he knew or didn't know personally."  Letter of Shia Dembitzer (#44)(emphasis in original).  Sima Davidowitz of the Rofeh Cholim Cancer Society, makes the same observation, Shaya "CAN  NEVER SAY "NO."  Letter #43 (emphasis in original).  Tzippy Horowitz, in her letter, makes the same point:

> Mr. Lichtenstein never turns away a fellow community member in need. He goes over & beyond any expectations.  He lets nothing stand in his way when he hears of someone in distress, until he successfully resolves the situation.  He doesn't give up until he knows he did all he could.  We, and the entire community look up to him for his personality, joyful character, selflessness & generosity.

Letter #69.

### ALCOHOL ADDICTION

Shaya Lichtenstein has been addicted to alcohol for in excess of twenty years. He reported that he consumed not less than one full liter bottle of vodka each day, except on Shabbos (the Sabbath) and religious holy days. On the Sabbath and religious holy days, while he did not consume a liter of vodka, he drank at traditional settings, ie.: religious based and traditional "kiddish" where wine is consumed as part of a religious service, and a drink or two of "schnapps" (whiskey) immediately after religious services. On non-holy days, Shaya began each day with a cup of coffee accompanied by a glass of vodka. Thereafter and throughout the day he continued to drink vodka. When traveling from his home, Shaya carried one or more plastic-disposable water bottles filled with vodka. During the times he was out of his home, he often stopped at liquor stores to refill his water bottle with vodka.

Shaya's wife writes in her letter (Letter # 1) to the Court: "He was an alcoholic for many years and he drank constantly from early morning to night. Every day that he tried to stopping for real he just didn't have the strength to stop, every time he stopped he was unable to handle the pressure of work and helping others but he couldn't say no to anyone that needed help...."

Bracha Rosenberg, whose letter recounts Shaya's efforts after the fatal crash of the tour-helicopter in the Grand Canyon, recognized that alcohol was consuming Shaya. She writes,

> We were and are very saddened to have seen him succumb to alcohol addiction
> within the last 8 years or so. I can truly say our hearts cried for him seeing

how he was destroying himself.
Letter #92.

Shaya's brother Yehoshua Lichtenstein also expresses personal pain in seeing Shaya's alcohol addiction. He writes to Your Honor that he "couldn't watch the great brother that I knew, destroying himself with excessive drinking of alcohol." Letter #9.

In view of his long term, chronic alcoholism, that he reported to PreTrial Services, and with Your Honor's approval, Mr. Lichtenstein was assigned to attend the out-patient alcoholism treatment program of Samaritan Village, supervised by PreTrial Services in June 2016. However, counsel informed the Court by a letter dated December 8, 2016, that despite initial progress with his long term alcoholism through the rehabilitation program selected by PreTrial Services, Mr. Lichtenstein regressed due to the pressures of deciding whether to enter a guilty plea and the sentencing preparations undertaken after entering that plea. Notably, during this initial rehabilitation program, Mr. Lichtenstein decreased his intake of alcohol but never truly obtained sobriety.

In view of the regression in his progress of fighting chronic alcoholism, PreTrial Services suggested and Mr. Lichtenstein agreed to seek admission into an intensive in-patient program. With the Court's approval, Mr. Lichtenstein was admitted to the Sunrise Detox facility in Lake Worth Florida, where he was treated from December 21 through December 27, 2016. As a result of the treatment received at Sunrise, it was determined that Mr. Lichtenstein had become "medically stabilized" (Letter #111, of Cyd Blechman, Mr. Lichtenstein's counselor at Sunrise Detox), and he was then transferred to the Beachcomber

59

Rehabilitation Center in Delray Beach, Florida.    We emphasize that even early in his treatment at Beachcomber Rehabilitation, the professional staff recognized that he "demonstrates a sincere desire to live sober." Letter #113, of Sandra Champa, Director of Therapy, Beachcomber Rehabilitation Center.

Shaya remained under treatment at Beachcomber Rehab from December 27, 2016 through January 23, 2017.  He then was discharged, having successfully completed the initial rehabilitation regimen.  Upon his discharge from the Rehabilitation facility, his counselor advised, "numerous, substantial stressors have been identified that he [Mr. Lichtenstein] will encounter that could threaten his sobriety.... In view of these factors, Mr. Lichtenstein will remain high risk and requires support to prevent relapse." Letter #112, of David Thompson, BS, CAP, of Beachcomber Rehabilitation Center.

Following his Detox and Rehabilitation treatment, Mr. Lichtenstein returned to New York, and returned for further treatment at the Samaritan Village rehabilitation facility where he was admitted to and currently attends an "Intensive Out-Patient Rehabilitation Program." This program involves three hour group therapy and counseling sessions three days each week (Monday, Wednesday, Friday), in addition to a one hour individual counseling session each week.  Mr. Lichtenstein has learned and now accepts the fact that addicts and alcoholics are never cured, rather, when they stop taking the addictive substantive they become and forever remain "recovering addicts."  Currently, with assistance from the "Intensive Out-Patient Rehabilitation Program" at the PreTrial Services designated Samaritan Village

facility, Mr. Lichtenstein is working to remain sober.

Shaya has been sober since his detox treatment at the Sunrise Detox facility in late December. He, however, currently reports that he fears relapse, that he regularly is drawn to 'get a drink,' and often struggles to remain sober. He advises that he relies on the strategies he learned at rehab to withstand these desires. On at least one occasion, the urge to drink was so strong that he felt it necessary to call his counselor at Samaritan Village for support and assistance.

Shaya reports that the current pressures of seeing and hearing the stress and fears of his wife and children concerning the forthcoming sentencing are immediate and major stress factors. The virtual collapse of his business due to the publicity of this case, and therefore the necessity of terminating his sons' continued religious education add additional significant stress. Shaya also states that his own concerns and fears about sentencing, that are enhanced and exacerbated by the frequent inquiries of his counsel in preparing the Sentencing Memorandum and preparing for the forthcoming sentencing, are immediate and major stress factors as well. We therefore respectfully request that the sentence that is imposed include an alcohol rehabilitation component. See 18 USC §3553(a)(1)(D).

Concerning Mr. Lichtenstein's progress in rehabilitation and his dedication to succeeding in remaining sober for life, we attach seven letters from other patients that were patients with Shaya at the Beachcomber Rehabilitation facility. These patients write of the support and encouragement that Shaya  who was, like them, another addict under treatment

provided in helping them to remain focused and dedicated to the goal of ending their addiction. Thus, R███  D█████ (Letter #114) writes that Shaya gave him fatherly advice, that Shaya "has giving me [*sic.*] so much courage and hope.  ... [Shaya] is so much of the reason I'm moving forward in life." Another patient, 23 years old C███ G████, considered quitting, until Shaya spoke with him. He recounts that, "I had urges to leave treatment cause I didn't think I could stay for a whole 28 days and Alex came and talked to me and encouraged me to stay and complete the program.  Letter #115.  A third patient, C████ H███, a 50 year old wife, mother and graduate of the University of Pennsylvania, writes (Letter #116) that "Alex helped & achieved in gaining my mental & spiritual strength and foreseeing the better, when others could not."

Z█████ K██, another young alcoholic writes of the significant role Shaya had in his "daunting" rehab experience:

> Alex has served as a father-like mentor every-single day I was with him. ...he also provided significant life-skills and ethical decision making advice. Alex added valuable principles to our mental and emotional lives that most could not.  Throughout my first week at Beachcomber (the rehab facility) I relentlessly tried to leave and give up;  however, I managed to push through and successfully stick out my rehabilitation which is solely accredited to Alex's assistance.

Letter #118.

Another patient C███████  M████ also writes (Letter #119)that Alex was instrumental to the group's success: "Without the support of Alex on a daily basis I don't think I could have gotten through this with a positive attitude.  He is the glue that kept the whole group together."

Shaya will always be an alcoholic, and Shaya will always need professional support and counseling to ensure he remains cognizant of the strategies required to remain sober, particularly in the face of life's stresses, obstacles and burdens.

**Deterrence, Protection from Further Crimes, Section 3553(a)(B)( C).**

Most respectfully, in this Sentencing Memorandum we present numerous reasons that Shaya Lichtenstein is very different and distinguishable from the typical defendant appearing before this Court for sentencing. Included among these factors, we request that the Court consider the extreme personal-psychological injury sustained by Mr. Lichtenstein due to the substantial publicity this case has received, and the resulting extraordinary shame and embarrassment that he feels. As soon as he was arrested, he instantly lost his position as a highly respected and trusted member of the large Orthodox community. He also lost his role and responsibilities as a member and leader of the Shomrim organization; a role that was and remains very dear to his heart and soul. His feelings of shame and embarrassment are greatly enhanced because the Shomrim organization, to which he devoted and dedicated himself, has been disgraced and sullied by his criminal conduct. In addition, because of the nature of the Orthodox Jewish community, his disgrace is visited upon his entire family and will personally affect and burden his sons.

One of the goals of sentencing is the deterrent effect the conviction and sentence will have on the defendant and on others. Mr. Lichtenstein has learned a very painful lesson. He

63

set out to volunteer to assist in law enforcement, to protect and improve his community, and to help all the members of our society. His enthusiasm and exuberance became misdirected, and his judgment impaired by his alcohol addiction.  He understands that his crimes contradicted and subverted the laudable goals he sought to achieve.  When his conduct and life style, excluding the instant offense, are considered and when his efforts and dedication to achieve and  remain sober are considered, counsel is confident to declare that Shaya Lichtenstein will not again violate the law.

Concerning general deterrence, the prosecution and plea of Mr. Lichtenstein are well known  in the New York metropolitan area because of the significant publicity this case has received.  The notoriety of this prosecution is especially well known in the Orthodox Jewish communities in this area, as well as in other Jewish locales, because of the publicity this case has received in Jewish journals, and because of the many connections among Orthodox Jews worldwide.

Moreover, as established by the many letters submitted to Your Honor, many people are aware of Mr. Lichtenstein's prosecution and guilty plea.  The suffering of Shaya, because of his transgression, who was highly respected, is a highly visible event particularly to those in his religious community, in his charitable and organizational circles, and to the many people who know of Shaya as a Shomrim and community leader.  It is respectfully suggested that the deterrent effect of Mr. Lichtenstein's conviction is therefore tremendous.

## SENTENCING  REQUEST

Mr. Lichtenstein is truly an extraordinarily charitable and giving person.  He dedicated his life to helping others, and helped people on a daily basis.  He assisted in the widest array of situations, both joyous and tragic.

When funds were needed to purchase wigs for young cancer patients, or for school tuition, or food for a struggling family, or even to finance a wedding, Shaya raised money and contributed his own funds to ensure that the need was satisfied.

When a person was stressed to the point of considering suicide, or needed support to deal with a domestic dispute or a business decline, Shaya listened patiently, provided advice, suggested professional assistance often from the large network he acquired through years of helping people.

And, when a crisis developed, Shaya put the interests of others ahead of his own personal interests.  Thus, when a person was lost or missing, Shaya totally disregarded his personal life and raced to help, whether the scene was in Borough Park, a New England forest, or the Grand Canyon.

And, on the modern U.S. day of infamy, September 11th, Shaya rushed to Ground Zero to aid rescue efforts, and told his wife and sons that he could not anticipate the dangers he would face, and therefore of the possibility he would never see them again.

Counsel most respectfully submits that these are characteristics and actions that merit

65

substantial recognition.  We are mindful of the serious nature of the crimes for which Shaya Lichtenstein has admitted his guilt, and for which he will appear before this Honorable Court for sentencing.  But we respectfully submit, that Shaya Lichtenstein's personal history and characteristics are truly unique.  The extent of his dedication to our community and to many individual people, on a daily basis, is unparalleled.

Since the decision of the Supreme Court in *Booker*, it is clear that the goal of sentencing is to achieve individualized justice based upon an application of the section 3553(a) factors specific to each defendant.  Consistent with the statutory directive for "a sentence sufficient, but not greater than necessary...," we most respectfully request that the Court fashion a non-Guidelines sentence that reflects the years of truly extraordinary "good works" of Shaya Lichtenstein, and that

does not include a term of incarceration,

does not remove Shaya from his parents, his wife and his children,

will allow Shaya to continue to serve our community and improve the lives of so many others, and

that provides for continued alcohol addiction rehabilitation.

Counsel respectfully suggests that a sentence that balances "the nature and circumstances of the offense [with] the history and characteristics of [Mr. Lichtenstein]" including all the extraordinary activities and circumstances of Shaya's life  will demonstrate in a most meaningful way that a life of good deeds is recognized as benefitting

the recipient of the good deeds, society in general, *and* the donor as well;  and therefore that

justice rewards good deeds, and that justice and mercy are truly the goals of the American

judicial system.


### CONCLUSION

**FOR THE REASONS SET FORTH ABOVE AND AS PRESENTED IN THE MANY LETTERS THAT ARE SUBMITTED HEREWITH, IT IS THE RESPECTFUL PRAYER OF COUNSEL AND OF ALEX SHAYA LICHTENSTEIN, THAT**
**THIS HONORABLE COURT WILL FAVORABLY VIEW AND CREDIT ALL THE CIRCUMSTANCES OF SHAYA'S LIFE, INCLUDING**
**HIS LIFE LONG EFFORTS TO CARE FOR AND HELP OTHER PEOPLE, WILL CONSIDER HIS STRUGGLE TO OVERCOME ALCOHOL ADDICTION,  AND**
**WILL GRANT OUR REQUEST FOR A NON-GUIDELINES SENTENCE AND A SENTENCE THAT DOES NOT INCLUDE INCARCERATION.**

_____


Dated:   New York, New York
          March 2, 2017                  *Respectfully submitted,*



                                         Richard A. Finkel
                                         Richard A. Finkel, Esq., & Associates, PLLC.
                                         *Counsel for Defendant Alex Lichtenstein*
                                         270 Madison Avenue, Suite 1203
                                         New York, New York 10016
                                                 212-689-8600