1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          16 CR 342 (SHS)

5   ALEX LICHTENSTEIN,

6              Defendant.

7   ------------------------------x

8                                   New York, N.Y.
                                    March 16, 2017
9                                   2:15 p.m.

10

    Before:
11
                        HON. SIDNEY H. STEIN,
12
                                        District Judge
13

14                          APPEARANCES

15  JOON H. KIM
         United States Attorney for the
16       Southern District of New York
    RUSSELL CAPONE
17  KAN MIN NAWADAY
    LAUREN SCHORR
18       Assistant United States Attorneys

19  RICHARD A. FINKEL
         Attorney for Defendant
20

21

22

23

24

25

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3    appearances for the record.

4          MR. CAPONE:  Russell Capone for the government.  With

5    me at counsel table are AUSAs Lauren Schorr and Kan Nawaday.

6          Good afternoon, your Honor.

7          THE COURT:  Good afternoon.

8          MR. FINKEL:  Good afternoon, your Honor.  Richard

9    A. Finkel, counsel for Mr. Lichtenstein, who is standing next

10   to me, your Honor.

11         THE COURT:  Good afternoon.  Please be seated.

12         MR. FINKEL:  Thank you, your Honor.

13         THE COURT:  We're here for the sentencing of

14   Mr. Lichtenstein.  Let me inform counsel of the materials that

15   I have.  Counsel, let me know if I'm missing anything.

16         I have the presentence report prepared on December 22

17   and revised on March 8 -- it says 2016, but it's March 8 of

18   2017 -- along with the addendum and the sentencing

19   recommendation by the probation department of 57 months'

20   incarceration on a guideline range of 57 to 71 months.

21         In addition, I have the 67-page presentence memorandum

22   of Mr. Finkel dated March 2, along with a series of

23   attachments, Exhibits 1 through 11.  I have the government's

24   sentencing memorandum filed on March 9.

25         I have a letter from Mr. Finkel also dated March 9

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    which has attached Exhibits 12 through 23.  I have a separate

2    binder of letters in support of the sentencing requests of Alex

3    Lichtenstein.  There are approximately 120 letters.  I have a

4    letter dated March 12 from the government, and I have a letter

5    from Mr. Finkel dated March 9.

6           Mr. Finkel, is there any additional written

7    information I should have that I don't?

8           MR. FINKEL:  No, your Honor.  You have them all.

9           THE COURT:  Mr. Capone?

10          MR. CAPONE:  Nothing else, your Honor.

11          THE COURT:  Mr. Finkel, have you and Mr. Lichtenstein

12   had a full opportunity to read and discuss with each other the

13   presentence report, the recommendation, the addendum, and all

14   the materials that I have in front of me?

15          MR. FINKEL:  Yes, we have, your Honor.

16          THE COURT:  Have you in fact read and discussed it

17   with your client?

18          MR. FINKEL:  Absolutely, your Honor.

19          THE COURT:  Do either you or your client have any

20   objections to the findings of fact in the presentence report?

21          MR. FINKEL:  Yes, we do, your Honor.

22          THE COURT:  What are they, sir?

23          MR. FINKEL:  With regard to paragraph 74, your Honor,

24   my objection is noted --

25          THE COURT:  Let me just take a look at it.  I note

1    that a number of the objections were raised at the probation

2    department and handled by them.  Let me turn to 74.

3            MR. FINKEL:  While you're doing that, your Honor, if I

4    may, they comment on my objection on page 22 of their final

5    submission, as well as on page 15, which is where paragraph 74

6    actually resides.

7            THE COURT:  I'm reading paragraph 74.  What was the

8    other reference you made?

9            MR. FINKEL:  On page 22, they comment on the

10   objections.

11           THE COURT:  "They" being the probation department?

12           MR. FINKEL:  Yes.  Page 22.

13           THE COURT:  Let me take a look at it.  I see.

14           So what's your request then?

15           MR. FINKEL:  My request is to correct the situation.

16   The report, as it reads now -- and I'm reading from paragraph

17   74 -- "The defendant indicated that he drinks approximately

18   once a week when he drinks about a half to one bottle of

19   liquor."

20           It's actually the reverse of that.  The statement that

21   Mr. Lichtenstein made that is consistent --

22           THE COURT:  He drinks daily except on the Sabbath.

23   That's what you're saying?

24           MR. FINKEL:  Yes, your Honor.

25           THE COURT:  There are a number of references to that

1    in the materials.

2            Mr. Capone, I don't have any objection to changing

3    that.

4            What's the position of the government?

5            MR. CAPONE:  No objection, your Honor.

6            THE COURT:  Then I will change paragraph 74.  I'll

7    delete the phrase "approximately once a week" and insert "six

8    days a week" so that that paragraph will read, "According to

9    the Samaritan Village outpatient intake interview conducted on

10   June 21, 2016, the defendant indicated that he drinks six days

11   a week when he drinks about half to one bottle of liquor.  The

12   defendant acknowledged drinking while at work.  An assessment

13   of alcohol use disorder severe was given."

14           So I've adopted your objection to paragraph 74.  What

15   else?

16           MR. FINKEL:  Thank you.  That's all, your Honor.

17           THE COURT:  Does the government have any objections to

18   the findings of fact in the presentence report?

19           MR. CAPONE:  No, your Honor.

20           THE COURT:  Then I adopt the findings of fact in the

21   presentence report with the correction that I've made in regard

22   to paragraph 74.  I'm going to return all of this information

23   to the probation department at the end of the sentencing

24   proceeding today.

25           Mr. Finkel, let me hear from you.  Actually, before I

6

1     do that, I have a question for the government because it's a

2     little unclear to me how much money was involved, how many

3     permits were involved, how much money the government believes

4     the defendant made out of this bribery scheme.

5              Specifically, as I understand it, the record evidence

6     is that he charged individuals who wanted gun licenses

7     approximately $10,000 each but up to $18,000.  It looks like at

8     least Officer Villanueva was given I think the evidence is up

9     to $1,000, which would, therefore, yield anywhere from $9,000

10    to $17,000 for Mr. Lichtenstein's pocket; but it's also unclear

11    how many licenses he bribed the police department to handle.

12             We know that when he was stymied in his efforts to use

13    the same policeman he had been bribing, he sought somebody else

14    ought, and he told him he could expect to make $900,000 a year

15    it was, if I remember; that the policeman would get $6,000

16    times 150 licenses would be about $900,000 a year.

17             Now, that doesn't mean that actually happened, given

18    the fact he was trying to entice somebody into his bribery

19    scheme.  It may not have been the truth, but I guess my

20    question to the government is:  What are we talking about in

21    dollars here and number of licenses, to the extent the

22    government knows?  Indeed in the plea agreement, the defendant

23    consented to a forfeiture of $230,000.

24             Speak to me, government.

25             MR. CAPONE:  Your Honor, there is a distinction

1    between licenses that we have identified, specific applicants

2    that Mr. Lichtenstein put forward and that we can trace to him,

3    and his statements and other evidence about how many applicants

4    there were that we haven't necessarily identified.  That may

5    explain some of the differences in the numbers that we agreed

6    on in the plea agreement as opposed to what Mr. Lichtenstein

7    has said.

8         THE COURT:  That's why I said he may have been pumping

9    the number that he was actually handling in order to entice

10   somebody else into the scheme.

11        MR. CAPONE:  Yes.  But the plea agreement is a loss of

12   $150,000 to $250,000.  That's based on what we've agreed on in

13   terms of the value of the licenses.  I think it's somewhere

14   between 25 and 50 licenses that we have identified.  It may

15   have been more, but for purposes of what we agreed upon in the

16   plea agreement, 25 or 50 licenses would represent $150,000 to

17   $250,000 value.

18        THE COURT:  Where did the value of those licenses come

19   from?

20        MR. CAPONE:  The value of the licenses was based on

21   what was being charged for them by either Mr. Lichtenstein or

22   expeditors.  Expeditors charged less money.  So it's the value

23   of a gun license to somebody seeking a gun license through an

24   expeditor in New York City.

25        THE COURT:  It's not the value of the license.  It is

1    the value of the market cost to use an expeditor.

2          MR. CAPONE:  Yes, your Honor.  It's what people will

3    pay for a license.

4          THE COURT:  For which there was no requirement.

5          MR. CAPONE:  Yes, your Honor.

6          THE COURT:  All right.  Go ahead.

7          MR. CAPONE:  So I think we're talking about between 20

8    and 50 identified licenses.  It may have been more.  Obviously

9    Mr. Lichtenstein bragged about more, but for purposes of this

10   sentencing, I think that's the number the Court should use, and

11   that's what was established in the investigation and the

12   discovery.

13         THE COURT:  What about how much money he put into his

14   pocket?

15         MR. CAPONE:  He put into his pocket, we believe, at

16   least $230,000.

17         THE COURT:  Hence the forfeiture amount.

18         MR. CAPONE:  Yes, your Honor.

19         THE COURT:  He agreed to that?

20         MR. CAPONE:  Yes.

21         THE COURT:  Thank you.

22         Mr. Finkel, let me hear from you, sir.  I'm here to

23   listen to whatever you want to say.  Obviously I'll hear from

24   Mr. Lichtenstein as well.

25         Let me help guide your presentation.  You're free to

1   do whatever you like in the presentation, but I can tell you a

2   couple of things.  It's a nonstarter to argue that

3   Mr. Lichtenstein should not go to prison.  He's going to go to

4   prison; that is, from my standpoint it's a nonstarter.

5            The crime is so extensive, and the corruption of the

6   New York City Police Department is so important to avoid, and

7   in a way, it seems to be a bit pervasive within the licensing

8   division, based on this testimony, that primarily for purposes

9   of general deterrence but also punishment, a prison sentence is

10  appropriate here.

11           Now, again, you can make whatever arguments you want.

12  That's my starting point.  As of now, the man is going to go to

13  prison.  The real issue, the real play in the joints, is where

14  within the guideline range he should go to prison.  That's one

15  point.  Again, do with that what you wish.

16           The second point is you spent almost all of your 60

17  some odd pages talking about the good works Mr. Lichtenstein

18  has done and precious little telling me about the crime.

19           From my standpoint, I have absolutely no doubt that

20  Mr. Lichtenstein is tremendously generous and has done a great

21  number of charitable things, no question.  I can assure you

22  that I have read, not skimmed, read, every one of the

23  approximately 120 letters.  I've read, not skimmed, all of the

24  other material here.

25           So I am fully aware of just the wonderful, pervasive,

1    charitable activities he has engaged in.  You don't really have

2    to tell me about them.  You can if you want, but you don't have

3    to convince me.

4            People are complicated, and along with this charitable

5    side, obviously Mr. Lichtenstein has pled to a serious federal

6    felony in which, as I say, he was corrupting the New York

7    Police Department.

8            My job is to try to do what's reasonable and

9    appropriate and sufficient but not greater than necessary under

10   the law using all of the factors that you're aware of in 18

11   U.S. Code, Section 3553, including the history and

12   characteristics of the defendant and the crime.

13           Again, I repeat.  I'm fully convinced he is very

14   charitable.  Now, it happens it looks like a lot of his charity

15   was using the cash derived from his illegal bribery scheme, but

16   his charitable efforts cannot be denied.

17           Proceed, sir.

18           MR. FINKEL:  Thank you, your Honor.  Mr. Lichtenstein

19   and I understand that he's convicted.  He admits to the bribery

20   that you just described, your Honor.  There's no question as to

21   that.  He understands the serious nature of the charge as

22   you've just expressed it as well, your Honor.

23           I will add that his guilty plea, his admissions before

24   your Honor, are only a small part of his acceptance of the

25   responsibility for those crimes.

1          May I add to that that all the people here,

2     your Honor, and the people that didn't get into the courtroom

3     and are in another courtroom understand that Mr. Lichtenstein

4     admitted to bribery.  This is not a case, they understand,

5     where he challenged the government and lost at a trial.  They

6     understand he admitted to bribery.

7          They understand that and that he did the bribery

8     because Mr. Lichtenstein personally told them, all of them, and

9     many others.  They all understand the very serious nature of

10     the charge itself.

11          But they all came here to demonstrate that they know

12     Mr. Lichtenstein from the other side that you mentioned also,

13     your Honor.  They all are beneficiaries of his good works, his

14     charity, all of them.  Sometimes they worked with him to

15     benefit people, but many, many, probably almost all of them,

16     are direct beneficiaries of his work.

17          As you pointed out, your Honor, Section 3553 instructs

18     us to consider the history and characteristics of the

19     defendant.  Most respectfully --

20          THE COURT:  As well as the crime.

21          MR. FINKEL:  As well as the crime.  Yes, your Honor.

22     Most respectfully I would suggest to the Court that the

23     government in its presentence memo doesn't follow that dictate.

24          They say -- and I quote from their presentence memo --

25     that the line of credit that the charitable acts should not be

1    considered "a line of credit that he can redeem for a lesser

2    prison sentence."

3         I think that's a great sentence from a literary

4    standpoint, but if it means that the charitable good works of

5    Mr. Lichtenstein should not be considered by your Honor --

6         THE COURT:  Whether it means that or not, I am going

7    to consider his charitable works.

8         MR. FINKEL:  Thank you, your Honor.  That's the first

9    point that I want to make.

10        May I add to that --

11        THE COURT:  The charitable works -- obviously I know

12   you'll agree -- or I assume you will -- don't wipe out the

13   crime.

14        MR. FINKEL:  We are not suggesting that they do,

15   your Honor, not for a moment.  We understand that the

16   sentencing decision that you're going to make is a difficult

17   one.

18        Sentencing is, from my perspective, more so difficult

19   in this case, because of the exceptional and extraordinary

20   nature of what Shaya Lichtenstein did on the good side, on the

21   good works side, to balance against the crime that he admits

22   that he committed.

23        THE COURT:  It's fair to say, although it's not clear

24   in the record, that the man throughout this period, which was

25   2013 to 2016, was awash in unreported cash.  I think it's safe

1    to infer that he was taking the money that he got from his

2    customers for his illegal bribery scheme and distributing it in

3    his charitable efforts.

4                MR. FINKEL:  Into where, your Honor?

5                THE COURT:  His charity.

6                MR. FINKEL:  Yes, your Honor.

7                THE COURT:  His charitable efforts.

8                MR. FINKEL:  Yes, your Honor.  That, to be sure, did

9    happen.  Yes.  That's correct.

10               I want to add to that, if I may.  What you just said

11   is not, as the government suggests, an effort by us to

12   characterize the bribery as an example of, to use the word that

13   the government uses, the "propensity" of Mr. Lichtenstein

14   towards charity.  They're separate.  We are not suggesting

15   that.

16               We are not suggesting that the money that he took from

17   his clients with regard to the gun licensing and then gave to

18   charity lessens the crime.  We are not.  They're separate.  One

19   side is the crime, and the other side is the good works.  They

20   are separate, and we recognize that.

21               The government also says -- and the word they use is

22   "confounded" -- that they are confounded that we submitted

23   photographs as exhibits, and several of those photographs have

24   police officers in the photographs.

25               Mr. Lichtenstein understands that he committed a

1   serious crime, but one of the facts of this case -- not one,

2   but a fact in this case is that Mr. Lichtenstein had a

3   relationship with the police department.  That is a fact.  Part

4   of that relationship was a crime, the bribery.  That is another

5   fact.

6          But separate and apart from that is a third fact, that

7   he worked with the police department, he assisted the police

8   department, he got assistance from the police department, and

9   he worked separate and apart from the police department for his

10  good works, to the benefit of the city of New York, to the

11  benefit of his community in Brooklyn.

12         THE COURT:  I don't disagree with you.  It's a

13  balancing issue.

14         MR. FINKEL:  I'm sorry, your Honor?

15         THE COURT:  It's a balancing issue.

16         MR. FINKEL:  Yes, your Honor.  That's exactly what I

17  said a moment ago.

18         So I'm not confounded with regard to the use of those

19  photographs.  Those photographs are not tied to the bribery in

20  any respect.

21         THE COURT:  I think Villanueva is in one or more of

22  the photographs.

23         MR. FINKEL:  No, he's not, your Honor.

24         THE COURT:  All right.

25         MR. FINKEL:  He's not.

1          THE COURT:  Okay.

2          MR. FINKEL:  Those photographs are photographs of the

3    good works that Mr. Lichtenstein did, for example, in

4    conducting searches for missing people.  They were with other

5    police officers where he was coordinating searches.  They're

6    separate and apart from the bribery.  They have nothing to do

7    with the bribery.

8          We ask your Honor to consider all these works as part

9    of the history and characteristics of the defendant, of this

10   defendant.

11         THE COURT:  I'm going to.

12         MR. FINKEL:  Charity and good works is a relative

13   term, at least I consider it to be.  Mr. Lichtenstein's actions

14   were truly extraordinary.  That's what the people here are here

15   to demonstrate to the Court.

16         THE COURT:  And you agree with me so was his crime.

17         MR. FINKEL:  Yes.  His crime was a very serious crime,

18   your Honor.  I do agree with that.  I might add -- and your

19   Honor probably doesn't know that -- I was a prosecutor for ten

20   years, and I prosecuted some official corruption cases.  So I

21   understand that.  It is a serious crime.

22         THE COURT:  It hindered the services of the New York

23   Police Department to do their jobs and to protect the people of

24   the city from wrongdoers, but he was subverting that by bribing

25   police officers to issue various gun licenses, various levels

1    of gun licenses, without the required due diligence.  He was

2    lessening the faith of the people of the city of New York in

3    their own police department.  That goes beyond

4    Mr. Lichtenstein.

5           Go ahead.

6           MR. FINKEL:  Most respectfully, your Honor, I don't

7    believe it's that simple.  It takes two to tango, as they say.

8    So, to the extent that the government suggests --

9           THE COURT:  He's not the only defendant in this

10   indictment.

11          MR. FINKEL:  Yes, your Honor.  I understand that.  To

12   the extent that the government suggests that it's

13   Mr. Lichtenstein who corrupted the police department, I don't

14   agree with that at all, because it does take two to tango.

15   There was a bribe giver and a bribe receiver.

16          THE COURT:  When he ran out of the old, reliable bribe

17   receivers, he tried to hunt up a new one.  In fact, when he met

18   with the new potential bribe receiver, he said, are you wearing

19   a wire?  He said, in words -- I don't have the exact -- I'd

20   rather be meeting you in your underwear.

21          Since you're a prosecutor of official corruption, you

22   know what that means.  He was concerned that the potential new

23   bribe receiver who turned him down was wearing a wire.

24          So it looks like he's, at least in this one instance,

25   pretty much the initiator of the bribe.  I don't think I have

1    to worry too much about who initiated it.  It does take a bribe

2    giver and a bribe receiver.  There's no question about that.

3              MR. FINKEL:  The police officer to whom you refer,

4    your Honor, had a longtime relationship with Mr. Lichtenstein.

5    This was not their first meeting, not by any stretch.  They had

6    a very longtime and close relationship.

7              THE COURT:  He was using his good and true

8    relationships with the police.  I think in his plea allocution

9    he said something like a good and friendly relationship.

10             Indeed he did because as a member of the Shomrim, he

11   had a lot of opportunity to work and to assist the New York

12   Police Department.  But at least in terms of his bribery

13   scheme, he's using, he's leveraging, he's corrupting those good

14   and true relationships with the police in order to commit a

15   crime and line his own pocket.

16             MR. FINKEL:  Your Honor, again, most respectfully, it

17   takes two to tango.

18             THE COURT:  I agree.

19             MR. FINKEL:  If these police officers were truly

20   corrupted -- let me back up half a step.

21             It's not that they were corrupted.  It's that they

22   were already interested and willing to accept a payment.

23             THE COURT:  Not the man I'm talking about who turned

24   him down.

25             MR. FINKEL:  I'm talking about a larger number of

1    people here.

2            THE COURT:  Yes, there were police officers who

3    accepted payment.  That's correct.

4            MR. FINKEL:  When the government fully investigates

5    the case, they may well learn something quite different about

6    the police officer who wore the wire because of the nature of

7    his longterm relationship with people.

8            THE COURT:  What is your point here?  It takes two to

9    tango.

10           MR. FINKEL:  It takes two to tango.

11           THE COURT:  I have no problem with that concept.

12           MR. FINKEL:  So my point here is that it's not as if

13   Mr. Lichtenstein dragged these police officers kicking and

14   screaming to get them do something.

15           THE COURT:  That's correct.  He bribed them with cash,

16   up to $18,000.

17           MR. FINKEL:  No.

18           THE COURT:  I'm sorry.  That was how much he charged.

19   Yes.  We don't know exactly --

20           MR. FINKEL:  That only occurred on one occasion,

21   $18,000.

22           THE COURT:  No.  The $18,000 was what he charged a

23   customer.

24           MR. FINKEL:  A customer.  Yes, your Honor.

25           THE COURT:  He bribed them with money.  That's what --

1          MR. FINKEL:  That's what he admitted to.  Yes,

2     your Honor.  Yes, he did.

3          THE COURT:  There's also evidence, according to the

4     government, in addition to cash, there were a variety of other

5     perquisites given to the police.

6          MR. FINKEL:  Yes, your Honor.  That's not the entirety

7     of Mr. Lichtenstein.  As you point out, 3553 instructs us to

8     consider his history and characteristics, and his history and

9     characteristics are exemplified by the 120 letters that

10    your Honor read that we submitted.

11         And the people here today, as some of them wrote in

12    their letters, viewed Mr. Lichtenstein, not knowing about the

13    bribery, as a hero.  Several of the letters actually use that

14    word.

15         THE COURT:  Many, one or more, also call him "rabbi,"

16    a term of great respect.

17         MR. FINKEL:  Yes, your Honor.  That is also true.  But

18    you'll notice, I used the word "viewed" Mr. Lichtenstein as a

19    hero, past tense, because he's not on that pedestal, as you

20    point out, the respect when you use the term "rabbi."  He's no

21    longer on that pedestal.

22         They no longer look at him that way, and he no longer

23    feels that way because his life has changed because he is no

24    longer the role model that he once was or once was perceived to

25    be.  He's off that pedestal.  People don't come to him anymore

 1    for advice and for help.  He doesn't have that anymore.

 2          These people who are here now and the others who are

 3    not here that wrote letters and many beyond those all know

 4    that.  It's very widely known, particularly in this orthodox

 5    community in New York, because Mr. Lichtenstein is still a very

 6    well-known person, no longer a well-respected person by any

 7    means.

 8          But, your Honor, when your Honor looks at the

 9    guideline calculation level 25, as your Honor well knows,

10    there's not part of that calculation that subtracts or adds

11    levels for good works.  The guidelines don't consider good

12    works at all.

13          Therefore, I would respectfully submit to your Honor

14    that the guideline calculation, the level 25, and the guideline

15    range, 57 to 71, is not appropriate here.

16          THE COURT:  You've reserved the right to argue that in

17    your plea agreement which he agreed to.  I understand that.

18          MR. FINKEL:  That's what I want to argue, your Honor.

19          THE COURT:  Again, it's a balancing because you can't

20    possibly be arguing that if somebody commits a crime but also

21    does good works, that wipes out the crime.  It just isn't so.

22          MR. FINKEL:  I'm not suggesting that.  You've said

23    that before, and I agree with that again.  I'm not suggesting

24    it.  I'll use the phrase we both used a few moments ago.  It's

25    a balancing.  You have on one side the nature of the crime,

1    serious, and the other side the nature of his good works,

2    extraordinary.

3          THE COURT:  In terms of general deterrence, it's a

4    dangerous argument because you would not want to argue -- nor

5    would I want to accept an argument -- that as long as you do

6    good works, you get, as it were -- I don't mean this

7    literally -- dollar-for-dollar credit and, therefore, because

8    everybody knows about the crime and everybody knows he's done

9    good works, let's call it even Steven.  You're not arguing

10   that, and, as I say, I wouldn't accept it.  But how do you draw

11   the line?

12         MR. FINKEL:  Yes, your Honor.  If I may paraphrase,

13   it's not a get-out-of-jail-free card.  It's not.

14         THE COURT:  That's exactly what your 60 some odd pages

15   argue, a nonincarceratory sentence.

16         MR. FINKEL:  Your Honor, what I'm saying to you now is

17   what we said just now, that it's a balancing.  The guidelines,

18   the calculation under the guidelines law, does not include good

19   works at all.  There's no subtraction for good works.

20         As your Honor well knows, there are subtractions for a

21   host of different reasons -- a major player, a minor

22   participant.  There are many subtractions in the guidelines

23   calculations.  There is no entry whatsoever for good works, no

24   consideration.

25         Because there's no consideration whatsoever for good

22

1    works, I would submit to the Court that the guideline

2    recommendation -- and that's what it is now, a

3    recommendation -- cannot be applicable because it doesn't

4    consider one of the factors -- and the factor that I'm pressing

5    today that is included in 3553 -- and that's good works.

6          If the guidelines had a section for good works and a

7    5-point deduction, a 10-point deduction, a 12-point deduction,

8    I could not make that argument because then the guidelines

9    result would somehow incorporate good works, but the guidelines

10   are absent entirely for good works.

11         Therefore, any calculation under the guidelines cannot

12   apply to a person like Shaya Lichtenstein who did good works

13   and certainly cannot apply to a person like Shaya Lichtenstein

14   who was extraordinary in his good works because it's not a

15   consideration.

16         And that's a failure of the guidelines, but it doesn't

17   bind Your Honor because your Honor has the authority, since

18   Booker, to render a nonguideline sentence, and that's what

19   we're asking, a nonguideline sentence.

20         But as I'm trying to persuade your Honor most

21   respectfully, the starting point must be below the guidelines

22   because the guidelines don't consider these factors.

23         Mr. Lichtenstein is not someone who just was a nice

24   guy, who wrote checks during the year to a host of charities.

25   He didn't do that.  As your Honor knows because you read our

1    sentencing memo and the letters in support, he did a lot more.

2          I want to go into some of those now because the people

3    who wrote the letters and the people who were involved are

4    here.  They didn't just write letters.  They came here to

5    demonstrate the sincerity that they saw in Mr. Lichtenstein and

6    the great efforts that they saw in Mr. Lichtenstein.

7          THE COURT:  You can do that.  You don't have to.  I've

8    accepted that he undertook each of the charitable efforts that

9    are outlined in the 120 letters.  I have every reason to

10   believe he was sincere in that charity.  I have every reason to

11   believe the people who received the charity, many of whom

12   received it anonymously at the time it was given, are extremely

13   appreciative.  That's not at issue here.

14         Again, do what you want, but that's not at issue.  I

15   can recite, probably as well as you can, the incidents that

16   were set forth, perhaps not as well as you can, but from the

17   New Hampshire search to the chartered plane to get the remains

18   in the Grand Canyon to the finding the young ladies in Arizona

19   to the anonymous donations for schooling to the wiping out of

20   food bills at holiday times.  I understand those.  I have no

21   doubt of his sincerity.

22         I question how this all came about since he was using,

23   one presumes, illegally obtained funds, but was he giving

24   charity to people who needed it?  Absolutely.  It raises all

25   kinds of issues.

1        For example, where is his personal financial

2   statement?  Paragraph 85 says he never gave it.  I'm sure there

3   are good reasons he never gave it, but I'm going to require, as

4   a special condition of supervised release, that he provide all

5   required financial information.

6        He pays two mortgages on what appears to be a very

7   nice house as well as an -- I don't know whether it's an

8   apartment.  I think it's an apartment -- in Brooklyn.  He has

9   five cars that he leases.  He has a driver at $1,500 a week,

10  according to this information.

11        If you do add up his expenses, his expenses for just

12  those -- mortgages, cars, and a driver -- add up to more than

13  he reports on his income tax.  It raises all kinds of issues.

14  He's not being sentenced for income tax fraud here, but there's

15  that in your information as well.

16        MR. FINKEL:  Your Honor started that discussion with

17  New Hampshire.  Let me just step from there.  In the courtroom

18  today is the woman whose husband died in the forest in New

19  Hampshire.  She married a grand rabbi --

20        THE COURT:  And the grand rabbi stood up when

21  Mr. Lichtenstein came into the room which the letter says was a

22  most unusual mark of respect, and she said, why are you doing

23  this?  He explained what a special person Mr. Lichtenstein was.

24  I don't question any of that.

25        MR. FINKEL:  She came from Montreal for one reason,

1      your Honor, to be here today.  She had no other business in

2      New York.  She came because she knows how important

3      Mr. Lichtenstein was to her.

4              You mentioned the girls who ran away to Arizona.

5      Frimchy Hirsch is here today also with her husband.  In the

6      picture we submitted there's a third woman.

7              THE COURT:  And in the letter she's talking about how

8      she's married, how she has a wonderful family, and how

9      Mr. Lichtenstein helped her understand the situation she found

10     herself in, and I remember the pictures of her.

11             Go ahead.

12             MR. FINKEL:  That picture, you'll recall, has a third

13     woman who was a teacher who was close to the girls who worked

14     with Mr. Lichtenstein to get them resettled, and Esther is here

15     as well.

16             THE COURT:  Welcome to everybody who is here.

17             MR. FINKEL:  And Frimchy Hirsch's sister who also

18     wrote a letter to the Court who remained orthodox, Beila

19     Jakobovits, is here.

20             THE COURT:  Everybody is here, and the support of each

21     and every one of you is appreciated.  It shows how much

22     Mr. Lichtenstein has meant to you.

23             I'm not quite sure why you're going down this road

24     when I've told you I accept all of that.

25             MR. FINKEL:  Your Honor, I would like to do that

1    because I think it demonstrates the extent to which

2    Mr. Lichtenstein helped people.  As I point out in my

3    memorandum, he didn't just conduct a search or help somebody

4    and walk away with other first responders.

5              THE COURT:  He stayed with the people, and he talked

6    to them, and he even did it in the alcohol rehabilitation

7    program.  The last four or five letters are from people -- my

8    guess is from the names at least -- are not members of the

9    orthodox Jewish community, but he was of a great help to them

10   in the 28-day alcohol program in Florida, and he stayed with

11   them from the very beginning and since and has given them great

12   comfort.

13             MR. FINKEL:  I don't wish to try your Honor's

14   patience.  So, rather than continue down that course, I will

15   just assure your Honor that the people in this courtroom are

16   many of the people who wrote the letters, almost all of the

17   people who wrote the letters, that you've referred to.

18             There are members of the Shomrim here, including the

19   men who ran following Shaya Lichtenstein to ground zero.  There

20   are members of Hatzalah here, sort of the sister organization.

21             THE COURT:  I'm familiar with them.  They run the

22   ambulances; right?

23             MR. FINKEL:  Yes, your Honor.  They're all here.  All

24   these people are here --

25             THE COURT:  The record should reflect that individuals

1    were standing up as Mr. Finkel referred to Shomrim and

2    Hatzalah, and the 911 rescue.

3          MR. FINKEL:  Thank you.  Many of the other

4    letter-writers are here -- people who had cancer, the woman who

5    gave birth to a child with Down syndrome -- she's here as well.

6    The people who he counseled through divorce proceedings, which

7    is a very difficult thing in the orthodox community, men and

8    women -- they're here as well.  Mr. Feldman, whose daughter was

9    in the other search, in the Massachusetts forest -- Mr. Feldman

10   is here.  It was not easy for them to come here.

11         The woman, Ms. Weissman, who was assaulted with her

12   daughter -- she's here as well.  They're all here, your Honor.

13         THE COURT:  He worked with them and the police and

14   scoured the neighborhood to obtain private security films to

15   assist in what ultimately turned out to be the successful

16   capture of the assailant.

17         MR. FINKEL:  Yes, your Honor.  For all these reasons,

18   your Honor, although he committed a serious crime,

19   Mr. Lichtenstein is not that person only.  Mr. Lichtenstein did

20   much good for many people and the city of New York and the

21   United States, and the sentence needs to reflect both sides of

22   him.

23         THE COURT:  I don't disagree with that.

24         MR. FINKEL:  So, in making the balance, your Honor, we

25   ask you to consider the good as well as the not good, as well

 1   as the bad.  In making that decision, to understand that the

 2   guidelines range is a calculation that does not include any

 3   good, and there is a ton of good here to be considered.

 4          Therefore, we -- "we," me, Mr. Lichtenstein, his

 5   brothers and sisters that are here -- his father is here -- and

 6   all the people that he helped -- all have the same request.

 7   They request understanding and leniency from the Court.

 8          Mr. Lichtenstein's middle son is here.  He shouldn't

 9   be here today.  His wife just gave birth to a little boy.

10          THE COURT:  Very nice.  Congratulations.

11          Congratulations, sir.

12          MR. FINKEL:  He should be at home with his wife and

13   the baby.  He's here worrying about his father.  He should be

14   home planning the bris for next week.  He's here with his

15   father.  They are all here requesting the Court's understanding

16   and leniency, and that's what we request, your Honor.

17          THE COURT:  All right.  Thank you.  I appreciate your

18   remarks.  I'm not sure that there's much that you said that I

19   disagree with in terms of I obviously need to balance the good

20   with the bad.  Just as in your papers though, you focus

21   primarily on the good and don't really explain the bad.  I

22   understand your comments, sir, very much.

23          Mr. Lichtenstein, you have the right to address the

24   Court, sir.  You don't have to say anything, but you do have

25   the right to speak to the Court.  I do need to tell you or want

1    to tell you that anything you say can be used against you, but

2    I'm here to listen to whatever you want to say, if anything,

3    sir.

4         THE DEFENDANT:  Your Honor, I have destroyed my life.

5    I have hurt the people that mean the most to me -- my wife, my

6    children, grandchildren, my parents.  I was respected in the

7    community.  People came to me for advice and for help.  All

8    that has ended.  I worked hard with Shomrim.

9         THE COURT:  I'm sorry.  I didn't hear that last bit.

10        THE DEFENDANT:  I worked hard for Shomrim so that

11   people would rely on Shomrim for help, and the many projects I

12   did through Shomrim increased Shomrim's reputation.  Shomrim

13   was respected.  Now my acts have hurt Shomrim.  I have poisoned

14   its relationship with the NYPD.

15        When I was a child, I learned what it was like not to

16   have.  I tried to help people so they wouldn't suffer the way

17   my family did.  I worked with Shomrim to help make the city

18   safe, to help people in danger, but I broke the law.

19        When people called me for help, when the police asked

20   me for help, I came running.  My family got used to me running

21   out to help at all hours of the day and night.  When I helped

22   people, I always did it with heart.  I tried to help and

23   comfort.

24        I was proud of my help to many people.  I made

25   terrible mistakes.  I know that.  I'm very, very sorry for my

1    mistakes, and I'm disgraced by these mistakes and by having to

2    be here.

3            Over the years, I became an alcoholic.  I drank from

4    waking up to going to sleep and often in the middle of the

5    night.  It affected my brain and added to my present problem,

6    but because of this case, I have been to rehab, and I'm trying

7    very hard not to drink again.

8            My life was helping people.  My life is my family.  I

9    pray and ask that your Honor allow me to continue both, and I'm

10   so very, very sorry to all the people who relied on me -- the

11   Shomrim, the police, your Honor, and especially my family.

12           THE COURT:  Thank you, sir.  I know that was difficult

13   for you.

14           Let me ask you a question, sir.  If you think you can

15   say and answer, do so.  If you don't want to, you don't have

16   to.

17           Why did you commit this crime?

18           THE DEFENDANT:  Originally the people came to me

19   asking me to help them out with licenses, and the truth of the

20   matter is I did it originally without asking anything, without

21   asking any money.  Later on it became something that I became

22   busy with, and -- may I ask something?

23           THE COURT:  You can talk to your lawyer at any point,

24   sir.

25           (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      THE DEFENDANT:  Yes.  So I did start charging money,

2  and it went from little to more and more.

3      THE COURT:  But you were using this criminal scheme to

4  fund, in significant, if not the entire part, the charitable

5  activities.  It doesn't make sense to me.  It doesn't compute.

6      THE DEFENDANT:  My intention was first to help the

7  people.

8      THE COURT:  Again, I've told you anything you say

9  could be used against you.  You don't have to respond, and your

10  lawyer is putting a hand on your arm.

11      Mr. Finkel, go ahead.

12      MR. FINKEL:  Your Honor, you make an important point.

13  That is that he didn't take all this money that he made and buy

14  elaborate things for himself.

15      THE COURT:  He certainly did.  He has two homes.  He

16  has a very nice home which he couldn't possibly afford on the

17  amount of money that he reports in income taxes for adjusted

18  gross income.  He gives away tens of thousands of dollars in

19  charity.  As I've said, he leases five cars for his family

20  members and himself.  He certainly did.

21      MR. FINKEL:  Your Honor, one of the homes is really

22  not -- he never paid for it, and we tried to point that out in

23  our paperwork, and it's reflected in the probation report.

24      THE COURT:  You're going down a dangerous path here,

25  sir.

1          MR. FINKEL:  Yes.  I understand that, your Honor.

2          THE COURT:  You're certainly entitled to, but let me

3    point out in regard to the home he supposedly doesn't own, in

4    paragraph 86, it states that the second mortgage he has is for

5    a condominium at 200 Wallabout Street, Brooklyn, in which his

6    uncle Leo has resided.

7          The property was initially purchased with Lichtenstein

8    Family Trust funds in October 2009.  That's what apparently you

9    and your client told the probation department.

10          Now, it's a hard argument, sir, for you to make that

11    when Mr. Lichtenstein's father had 11 children living in a

12    one-bedroom apartment and then moving to a two- or

13    three-bedroom where many children all lived in the same bedroom

14    and his father worked impoverished at a hardware store, that

15    his brother Leo was the recipient of Lichtenstein Family Trust

16    funds from Mr. Lichtenstein's great grandfather.

17          MR. FINKEL:  That's what happened, your Honor.

18          THE COURT:  That's the inference that you're asking me

19    to make, that of 11 children, one received family trust funds

20    to buy an apartment and the other one was left completely

21    impoverished.

22          MR. FINKEL:  The facts are a little different than

23    that because Leo Lichtenstein and Shaya Lichtenstein's father

24    are brothers, and the trust fund money came from their father,

25    Leo's father, who is also the grandfather of Shaya

1    Lichtenstein.  That's where the trust fund came.  The funds

2    were made available after the great grandfather, the

3    grandfather, passed away, your Honor.  They were not available

4    earlier.

5            THE COURT:  Mr. Lichtenstein's father still is

6    impoverished, according to the presentence report.

7            MR. FINKEL:  His father.  Yes, your Honor.

8            THE COURT:  That's right.  Again, you want me to think

9    one son was showered with trust funds and the other one wasn't.

10   Correct?

11           MR. FINKEL:  No, your Honor.

12           THE COURT:  Explain it again.  One son is Leo; the

13   other son is this defendant's father.

14           MR. FINKEL:  Yes, your Honor.

15           THE COURT:  One son, Leo, is given trust funds.  The

16   other son of 11 is left impoverished.  That's what you want me

17   to infer.

18           MR. FINKEL:  The 11 children -- Mr. Lichtenstein is

19   one of 11.  There were --

20           THE COURT:  I'm sorry.  You are quite right.  You're

21   quite right.

22           MR. FINKEL:  That doesn't change your Honor's point.

23           THE COURT:  No, it doesn't.

24           MR. FINKEL:  I understand that, your Honor.  I

25   understand that.  That is what happened here, your Honor.

1    That's what I can tell you.

2              THE COURT:  Do you want to argue that

3    Mr. Lichtenstein's standard of living is supported by the

4    amount he reports on his income tax?

5              MR. FINKEL:  Mr. Lichtenstein's business in the last

6    year has, since his arrest, collapsed substantially, more than

7    half.  So Mr. Lichtenstein is in difficult financial stress

8    right now, your Honor.  That I can say to you.

9              THE COURT:  Again, that's not the main thrust here.

10             MR. FINKEL:  That's correct.

11             THE COURT:  The main thrust is the crime lessened by

12   his good works.  Thank you, Mr. Finkel.

13             Mr. Capone, what did you want to say on behalf of the

14   government?

15             You heard the defense argument, which is in essence --

16   and I haven't disagreed with the facts -- the argument is look

17   at all the people who are here.  Read all the letters.  I don't

18   doubt that Mr. Lichtenstein did everything these letters say he

19   did.

20             Mr. Finkel seemed to think I had an issue with that.

21   I don't.  Mr. Finkel 's argument is that forgives a great deal.

22   He doesn't really want to talk about the crime.

23             What do you want to tell me, government?

24             MR. CAPONE:  Thank you, your Honor.

25             I'll start with that.  I don't dispute either that

35

1    Mr. Lichtenstein has done a number of charitable and good

2    things.  It makes sense that Mr. Finkel is highlighting them,

3    and I agree that it's appropriate for the Court to consider

4    them.

5            THE COURT:  I must say I've seen a lot of people who

6    have done charitable things.  Mr. Lichtenstein seems really to

7    have devoted himself to those charitable enterprises, using,

8    one can infer, the fruits of the crime.  But, nonetheless, he

9    devotes himself to charitable works.

10           MR. CAPONE:  Yes, and he was a member of the Shomrim

11   for quite some time, but I don't know that it's as simple as

12   the guidelines don't take this into account, and the guidelines

13   shouldn't because I don't think you can just, for example, give

14   the defendant a 2-point departure because he has done a number

15   of good things.  You would not be able to do that because every

16   person is different, and you need context.

17           Part of the context here is that he's done a number of

18   good things, but part of it is also that that is balanced here

19   against not a one-time crime, not something that happened over

20   a brief time period or that did not lead to significant profit,

21   and it's not as if this is a crime that he committed in the

22   past and/or then rehabilitated himself.  This is a crime that

23   went on over a period of years at the same time as he was doing

24   some of these good deeds.  It's a crime that earned him

25   considerable profit.

1          The other context that's important is that a lot of

2     what the defendant was able to do was because of his

3     relationship with law enforcement.  Most of these good works

4     are related to law enforcement efforts.

5          One thing I tried to highlight in the government's

6     supplemental letter is that his relationship with the police

7     department -- it's a relationship he highlighted in pleading

8     guilty -- is based, at least in significant part, on money.

9          It's not just the money he was paying his two

10    codefendants in this case who have also been charged and who

11    are in the licensing division, but it's money that he was

12    spreading to other police officers throughout Brooklyn,

13    including high-ranking officers.

14         He made a significant habit of giving money and gifts

15    to the police.  He kept detailed records of this.  I have some

16    of them right here.  There are more than 100 entries of

17    payments to or things bought for police officers, largely in

18    Brooklyn, some of the same officers that he worked with.

19         He cultivated a relationship with them that was based,

20    at least in significant part, on the money that he was giving

21    to them or the gifts that he was buying for them.  Part of that

22    relationship was used for good for sure.

23         When I say context matters, I don't think that the

24    sentence the Court imposes should sanction that behavior or

25    should give him significant credit for the good works he was

1    able to do through law enforcement when some of that was

2    predicated on a relationship based on graft with law

3    enforcement.  So I think that undercuts not all but a good part

4    of Mr. Finkel 's argument.

5            To the Court's belief that a lot of what he was making

6    from this effort he was putting back into his charitable

7    efforts, I'm sure that some of that is true.  He obviously

8    spent money on some of those efforts.  Some of this money came

9    from this.  Some of it came from his other business.

10           There's certainly an element of greed here beyond

11   charity.  He was charging people thousands upon thousands of

12   dollars for relatively simple work, and it was made more simple

13   by the fact that he had guaranteed or near guaranteed success.

14   If it was really just based on trying to help people, when he

15   was stopped in December of 2015, he would have cut his losses,

16   your Honor, and found other ways to help people.

17           He did not.  He went back and tried to find other

18   officers that he could bribe so he could keep making money.  So

19   charity is part of the context here, part of his motivation,

20   but there is a larger context here, your Honor.  That's what I

21   would say with respect to the balancing of his good works,

22   which are relevant but I think need to be placed in context.

23           I don't think I need to spend much time on the

24   seriousness of the offense.  Your Honor clearly understands

25   that this offense significantly abused the public's trust in

1    the police and in a very important function of the police.

2    That's gun safety.

3         Put simply, people were getting gun licenses because

4    the defendant was paying for them and because people in the

5    NYPD were selling payment.  That's a frightening prospect, that

6    you can buy gun licenses, that people in New York City can be

7    awarded gun licenses not based on merit, not based on law

8    enforcement diligence and evaluation, but based on their

9    ability to pay.  It wasn't a crime that was limited in scope.

10   It wasn't a crime that was limited in time.

11        THE COURT:  I take it you have no evidence that any of

12   the guns whose licenses Mr. Lichtenstein bought, as it were,

13   through corrupting the police officers were used in any crimes.

14        MR. CAPONE:  No, your Honor.

15        THE COURT:  Apart from the fact that due diligence

16   apparently wasn't done, what examples are there of licenses

17   that were issued that shouldn't have been issued or the level

18   of the license was inappropriate, given the facts of the

19   application?

20        MR. CAPONE:  The licenses in many instances were

21   issued for individuals to be able to carry weapons around the

22   city concealed.

23        THE COURT:  Rather than a premises license?

24        MR. CAPONE:  Yes, your Honor.  In the normal exercise

25   of diligence, the police department would probe as to the

legitimate need for people to carry weapons around the city.
These are individuals who would not have earned carry permits.

In addition, one of the things that happened was
Mr. Lichtenstein and Mr. Villanueva would have somebody apply
first for a premises license, which is easier to get and easier
to justify.  There would be a minimal amount of diligence done.

Then it was easier for Mr. Villanueva, once they had a
premises license, without asking for any documentation or
support, to simply to go in the computer and upgrade it.  So
that happened on a number of instances.

People with criminal histories were approved.  In at
least one instance, an individual with a felony conviction was
approved, which is an automatic bar and should never have
happened.

In other instances, people with misdemeanors,
including weapons-based misdemeanors, were approved.  These are
individuals who technically could have been approved.  It is
not a legal bar, but based on our investigation and discussions
in the licensing division, typically would have faced a
significant hurdle in getting gun licenses, or people with
domestic violence or other similar issues.

So, no.  We don't have an indication of a crime that
any of these weapons were used in, but there is ample evidence
of people that shouldn't have gotten gun licenses under normal
standards of getting them.  I think if we were here with

1    evidence of criminal activity that occurred as a result of this

2    crime, we'd be talking about a different guidelines range

3    altogether.

4            Just briefly on deterrence, your Honor, there is a

5    good opportunity for the Court to generally deter this conduct

6    in this case in New York City.  The licensing division, which

7    is just a block away here, is relatively small.  It's finite.

8    There are a limited number of officers in that division.

9            THE COURT:  I think general deterrence, the primary

10   factor in my mind, using specific deterrence -- I don't think

11   Mr. Lichtenstein is bound to do this again, especially if he

12   continues on his path of sobriety.

13           By that comment, I don't mean to suggest his

14   alcoholism made him do this.  It certainly did not.  He was

15   certainly able to function in a somewhat sophisticated criminal

16   scheme, even while being what he says is a functioning

17   alcoholic in his papers.

18           But the general deterrence is both for the police and

19   for other members of the public, not limited to the orthodox

20   Jewish community in Brooklyn who might think about betraying

21   the public trust by bribing police officers.  That's true.

22   There is a punishment aspect here, but the main driver, I

23   think, is general deterrence.

24           MR. CAPONE:  I agree, your Honor.  Just to respond to

25   one additional point that you and Mr. Finkel spoke about, and

1    that is any potential difference between Mr. Lichtenstein and

2    the NYPD officials or the notion that it takes two.

3              It is the case that in some respects it is the public

4    official who has a sworn duty, that has taken an oath, and to

5    some degree, there is more reprehensibility there.

6              Of course, from a guidelines perspective, that's why

7    public officials start higher.  So we'd be talking about a

8    higher --

9              THE COURT:  Not much higher.

10             MR. CAPONE:  Not much higher, but we'd be talking

11   about a higher range.

12             THE COURT:  Is it 2 points to start?

13             MR. CAPONE:  Two points higher.  Yes, your Honor.

14             Here, of course, although Mr. Lichtenstein isn't the

15   public official, he is the person making the most money out of

16   this scheme, and he is, as to the second more recent bribe at

17   least, the initiator of it.  That may be something of a wash,

18   your Honor.

19             THE COURT:  That's the bribe in Count Four; right?

20             MR. CAPONE:  Yes, your Honor.

21             Your Honor, unless you have any additional questions,

22   I will rest on my submission.

23             THE COURT:  All right.  Thank you.

24             Mr. Finkel, is there anything you wanted to say?

25             MR. FINKEL:  Nothing further.  Thank you.

1          THE COURT:  Mr. Finkel, somebody is raising their

2     hand.  Do you want to see what it is.

3          Talk to your father's lawyer.  Talk to the lawyer,

4     sir, first.

5          Mr. Finkel?

6          MR. FINKEL:  Nothing further, your Honor.

7          THE COURT:  This is not an easy sentence.  As I've

8     said before, Mr. Lichtenstein has led a life of a great deal of

9     charitable works, but he has also committed a serious crime.

10    He's betrayed the public trust by bribing and corrupting

11    New York City police officers.

12         He's quite lucky, in terms of sentencing, that none of

13    the licenses for guns in which he was able to subvert the

14    process were used in criminal wrongdoing, to which the

15    government is able to find out, because the sentence certainly

16    would have been higher had that been the case.  I'm still

17    perplexed by what led Mr. Lichtenstein to do this.  I'm not

18    sure I'll ever understand it.

19         I came in fully expecting to impose a guideline

20    sentence.  I'm going to go under the guidelines here.  The

21    agreed-upon guidelines are 57 to 71 months.  In the agreed-upon

22    plea agreement, Mr. Finkel did reserve the right to argue for a

23    variance below the guidelines, and I think in this instance,

24    due to Mr. Lichtenstein's good works, a below-guideline

25    sentence is appropriate.  But the need for general deterrence

1   is extremely important here, both from the standpoint of the

2   police and from the standpoint of other people in the

3   community.

4           My intention is to sentence this defendant to 32

5   months' incarceration on each count to be served concurrently,

6   two years' supervised release on each count, a fine of $20,000

7   to be paid in four quarterly installments beginning March 31, a

8   forfeiture of $230,000, and a special assessment of $200, and

9   the standard mandatory and special conditions of supervised

10  release that are recommended by the probation department.

11          Before I formally impose sentence, Mr. Finkel, did you

12  wish to make any formal objections?

13          MR. FINKEL:  I have several requests.  No objections,

14  your Honor.

15          THE COURT:  If it's sentencing requests, we'll handle

16  it after I've imposed sentence.

17          Government, any objections?

18          MR. CAPONE:  No, your Honor.

19          THE COURT:  Mr. Lichtenstein, please stand, and I will

20  impose sentence.

21          I hereby find that the total offense level is 25, the

22  criminal history category is I, the guideline range is 57 to 71

23  months.

24          Pursuant to the Sentencing Reform Act of 1984, it is

25  the judgment of this Court that the defendant, Alex Shaya

1   Lichtenstein, is hereby committed to the custody of the

2   Bureau of Prisons to be imprisoned for a term of 32 months on

3   each count to be served concurrently.

4           Upon release from imprisonment, Mr. Lichtenstein shall

5   be placed on supervised release for a term of two years on each

6   count to be served concurrently with the conditions recommended

7   by the probation department, namely, the following mandatory

8   conditions:

9           One, he shall not commit another federal, state, or

10  local crime.  Two, he shall not illegally possess a controlled

11  substance.  Three, he shall not possess a firearm, dangerous

12  weapon, or destructive device.  Four, he shall refrain from any

13  unlawful use of a controlled substance.

14          He shall submit to one drug test within 15 days of

15  placement on supervised release and at least two unscheduled

16  drug tests thereafter as directed by his probation officer.  He

17  shall cooperate in the collection of DNA as directed by his

18  probation officer.

19          He also shall comply with standard conditions 1

20  through 13 plus the following special conditions:

21          Mr. Lichtenstein shall participate in an outpatient

22  treatment program approved by the United States probation

23  officer, which program may include testing to determine whether

24  he has reverted to using drugs or alcohol.

25          He must contribute to the cost of services rendered in

1   the form of third-party payments based on his ability to pay

2   and the availability of third-party payments.

3          I authorize the release of available alcohol treatment

4   evaluations and reports, including the presentence

5   investigation report, to his alcohol abuse treatment provider.

6          Two, he must provide his probation officer with access

7   to all requested financial information.

8          Three, he must file his income tax returns in a timely

9   fashion.

10          Four, he must not incur new credit charges or open

11  additional lines of credit without the approval of his

12  probation officer unless he is in compliance with the

13  installment payment schedule that I'm going to impose.

14          I hereby order Mr. Lichtenstein to pay to the

15  United States a special assessment of $200 which is due

16  immediately.  I am imposing a fine of $20,000.

17          If the defendant is engaged in a BOP non-UNICOR

18  program, he must pay $25 per quarter toward the criminal

19  financial penalties, and if he participates in the BOP's UNICOR

20  program as a grade 1 through 4, the defendant must pay

21  50 percent of his monthly UNICOR earnings toward the criminal

22  financial penalties consistent with BOP regulations at 28

23  C.F.R. 545-11.

24          I'm going to change my statement that the $20,000 fine

25  is due in four quarterly installments beginning March 31.

1    Instead I'm going to impose a sentence of the fine being paid

2    in monthly installments of 15 percent of his gross monthly

3    income over the period of supervision to commence 30 days after

4    his release from custody.

5            MR. FINKEL:  Thank you, your Honor.

6            THE COURT:  Within 72 hours of release from the

7    custody of the Bureau of Prisons, Mr. Lichtenstein shall report

8    in person to the probation office in the district in which he

9    is released.  I'm not imposing restitution, because there's no

10   victim, pursuant to 18 U.S. Code, Section 3663.

11           I am imposing a forfeiture of $230,000 as agreed upon

12   in the plea agreement.  That forfeiture shall be included in

13   the judgment.

14           In the special condition of supervised release in

15   which I require that the probation officer be given access to

16   all requested financial information, I am directing that

17   Mr. Lichtenstein fill out and affirm a personal financial

18   statement on a periodic basis and give it to his probation

19   officer.  The frequency will be determined by his probation

20   officer.

21           I understand my authority under Booker, Fan Fan, Gall,

22   and the other cases that Mr. Finkel referred to at the

23   beginning of his remarks.  I understand that the guidelines are

24   advisory only.

25           I have sentenced this defendant below the guideline

1    range, significantly below the guideline range, and less than

2    what I was intending to sentence him when I entered the

3    courtroom today.

4           I have considered all of the factors in Title 18, U.S.

5    Code, Section 3553(a).  I believe the sentence is appropriate,

6    reasonable, and sufficient but not greater than necessary to

7    meet the ends of the criminal justice system.  I don't have to

8    restate it again.

9           Mr. Lichtenstein, you've participated in corrupting

10   the New York City Police Department.  You had to have willing

11   participants.  That I understand, but it's not as if you just

12   sat back and let things happen.  You actively tried to find

13   police officers who would accept bribes, and you were concerned

14   about being found out.  You wanted to make sure at least one

15   wasn't wearing a wire.

16          You undermined the trust of the public and the

17   New York City Police, and you did it over a number of years.

18   You betrayed your friends in the New York Police Department.

19   You betrayed your friends in Shomrim.  You betrayed the members

20   of your community who you helped over the years, and it's a

21   shame.

22          You haven't ruined your life though.  You said you

23   ruined your life.  You'll be able to continue good deeds, sir.

24   Not with money that you've illegally obtained, but both in

25   prison and when you leave, you'll be able to continue a life of

 1   good deeds, and I urge you to do so.

 2            Mr. Finkel, are you aware of any reason whatsoever why

 3   the sentence should not be imposed as I have stated it?

 4            MR. FINKEL:  No, your Honor.

 5            THE COURT:  Mr. Capone?

 6            MR. CAPONE:  No, your Honor.

 7            THE COURT:  I hereby order the sentence to be imposed

 8   as I have stated it.

 9            Mr. Capone, is there a voluntarily waiver of appeal

10   rights of 71 and below?

11            MR. CAPONE:  Yes, your Honor.

12            THE COURT:  Before I notify the defendant of his

13   appeal rights, Mr. Finkel, you wanted to make some requests of

14   the Court.

15            MR. FINKEL:  Please, your Honor.  First, your Honor,

16   we'd respectfully request that you permit the defendant to do a

17   self-surrender.  With regard to this, I note that the probation

18   department says that he is, I think their language, a very good

19   candidate for self-surrender.

20            THE COURT:  What's the position of the government?

21            MR. CAPONE:  No objection, your Honor.

22            THE COURT:  All right.  I'll allow self-surrender.

23   There's some risk though.  I actually don't think it's a risk

24   of flight, but he notified me of a relapse in terms of alcohol.

25            Mr. Lichtenstein, it's important that you continue on

1    your path to sobriety.  There are going to be some pressures as

2    you get toward the date that you have to surrender yourself,

3    but I am going to give you the ability to surrender

4    voluntarily.  Just make sure you continue to follow all of the

5    conditions of your release up to then, including the additional

6    condition of not taking alcoholic beverages.

7         MR. FINKEL:  May I make two additional requests,

8    your Honor?

9         THE COURT:  Yes, sir.

10        MR. FINKEL:  We'd request that your Honor would

11   recommend to the Bureau of Prisons that Mr. Lichtenstein be

12   assigned to an RDAP alcohol program run by the

13   Bureau of Prisons.  We'd also request that your Honor recommend

14   that he be incarcerated in a prison camp, one that has the RDAP

15   program, as close to New York City as possible.

16        THE COURT:  I'll leave it up to the Bureau of Prisons

17   for whether or not he's going to get into the Residential Drug

18   Abuse Program.  I don't tell them what designation of facility

19   to use.

20        For this defendant, I will make the recommendation

21   that he be housed in the tristate area in order to facilitate

22   family visits with his family.

23        They live in Pomona; is that correct?

24        MR. FINKEL:  Yes, your Honor.

25        THE COURT:  With his family that lives in Pomona.  So

1    I will make that recommendation.

2            Mr. Lichtenstein shall surrender for service of

3    sentence at the institution designated by the Bureau of Prisons

4    on or before 2:00 p.m. of May 5, 2017.

5            Mr. Lichtenstein, you have the right to appeal the

6    sentence.  If you cannot pay the costs of an appeal, you have

7    the right to apply for leave to appeal in forma pauperis, which

8    means a lawyer will be appointed to represent you at no cost to

9    you, and you won't have to pay any fees of the appeal as well.

10           I do wish to inform you, sir, that in your plea

11   agreement, you agreed to waive your right to appeal the

12   sentence, and you agreed to waive your right to collaterally

13   attack the sentence to the extent that I sentenced you to 71

14   months and below.  Indeed, I've sentenced you to less than half

15   of that sentence.

16           Is there anything else, Mr. Finkel?

17           MR. FINKEL:  No, your Honor.  Thank you.

18           THE COURT:  Anything else, Mr. Capone?

19           MR. CAPONE:  Your Honor, the government moves to

20   dismiss the open counts as to this defendant.

21           THE COURT:  The motion is granted.

22           Mr. Lichtenstein, the public just cannot not penalize

23   somebody who betrays the public trust, who corrupts the New

24   York Police Department.  You'll serve your sentence.  You'll

25   get out.  You'll be able to rejoin your community.  Thank you.